UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------- X

FENDI ADELE S.R.L., FENDI S.R.L., and     :
FENDI NORTH AMERICA, INC.,

                                          :

            Plaintiffs,

                                       :     Case No.:  06-CV-0243 (RMB)

      -against-

                                       :

ASHLEY REED TRADING, INC.,
SCOTT RESSLER and                          :
JAMES RESSLER,

                                       :

           Defendants.

--------------------------------------- X

## PLAINTIFFS' CORRECTED STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

      Pursuant to Local Civil Rule 56.1, plaintiffs Fendi Adele S.r.l., Fendi S.r.l., and Fendi North America, Inc., respectfully submit this statement of undisputed material facts in support of their motion for summary judgment.

### THE PARTIES

#### The Plaintiffs

      1.     Plaintiff Fendi Adele S.r.l. is the owner of the world famous, federally registered Fendi trademarks and of all other intellectual property rights associated with merchandise bearing any of the Fendi trademarks.  (Declaration of Alberto Fabbri ("Fabbri Decl.") ¶ 2).

      2.     In addition, plaintiff Fendi Adele S.r.l. is the exclusive designer of all handbags, shoulder bags, purses, wallets, and key holders that bear any Fendi trademark (the "Products").

(Deposition of Alberto Fabbri ("Fabbri Dep.") at 13, 402, 403; (Genecin Decl. Ex. 14);[1] Fabbri Decl. ¶ 3).

3.      Plaintiff Fendi S.r.l. is the exclusive worldwide licensee of Fendi Adele S.r.l. for the manufacture and distribution of the Products.  (Fabbri Dep. at 13, 17, 142, 402, 403 (Genecin Decl. Ex. 14); Fabbri Decl. ¶ 4).

4.      The Products are manufactured exclusively by Fendi S.r.l. and its authorized assembly subcontractors in Italy.  (Fabbri Decl. ¶ 5; Fabbri Dep. at 148, 393, 402, 516 (Genecin Decl. Ex. 14); Deposition of Leonardo Minerva, October 24, 2007[2] ("2007 Minerva Dep.") at 72-73) (Genecin Decl. Ex. 12)).

5.      Plaintiff Fendi North America, Inc. is a corporation organized and existing under the laws of the State of New York.  Fendi North America, Inc. is Fendi S.r.l.'s exclusive distributor of the Products to independent retailers in the United States and is the exclusive owner and operator of all Fendi boutiques in the United States.  (Fabbri Decl. ¶ 6; Fabbri Dep. at 13-14, 153, 402, 403, 411-12 (Genecin Decl. Ex. 14)).

6.      Fendi Industria S.r.l., a manufacturing company within the Fendi Group, was merged into Fendi S.r.l in December 2003.  (Deposition of Marta Fontanesi ("Fontanesi Dep.") at 91 (Genecin Decl. Ex. 15); Fabbri Dep. at 392, 395 (Genecin Decl. Ex. 14)).

---

[1]      Exhibits referenced herein are attached to the Declaration of Victor Genecin dated 2/27/09 and are cited as (Genecin Decl. Ex. "__".)

[2]      Leonardo Minerva, Industrial Director of Leather Goods and Logistics Director for plaintiff Fendi S.r.l. from September, 2002 to March, 2008, was deposed by defendants on October 24 and 25, 2007. The transcripts of that testimony will be referred to as "2007 Minerva Dep."  In addition, with the Court's authorization, (Docket # 166), Minerva was examined by plaintiffs *de bene esse* on February 13, 14 and 15, 2008 to preserve his testimony for trial.  The transcripts of Minerva's preservation deposition will be referred to as "2008 Minerva Dep."

7.      The Products have been sold throughout the United States since 1970 in a limited number of carefully selected, highly qualified retail stores and department stores.  (Fabbri Decl. ¶ 7; Fabbri Dep. at 402, 403, 412 (Genecin Decl. Ex. 14); 2007 Minerva Dep. at 355) (Genecin Decl. Ex. 12)).

## The Defendants

8.      Defendant Ashley Reed Trading, Inc. is a corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business in New York, NY.  (Compl. ¶ 10; Am. Answer ¶ 10).  Its business is the purchase and sale of off-price branded merchandise.  (Deposition of Scott Ressler ("S. Ressler Dep.") at 13 (Genecin Decl. Ex. 18)). [3]

9.      Defendant Scott Ressler is the president of ARTI.  (Compl. ¶ 11; Am. Answer ¶ 11) (Genecin Decl. Exs. 6, 7) (S. Ressler Dep. at 14) (Genecin Decl. Ex. 18).

10.     Defendant Jim Ressler is the vice president of ARTI.  (Compl. ¶ 12; Am. Answer ¶ 12 (Genecin Decl. Exs. 6, 7); S. Ressler Dep. at 46 (Genecin Decl. Ex. 18)).

11.     James Ressler and Scott Ressler are brothers; each owns 50% of ARTI.  (S. Ressler Dep. at 41, 46, 648 (Genecin Decl. Ex. 18)).

12.     Aimee Fink, sales manager for ARTI, testified that James and Scott Ressler were her bosses and that everything she did at ARTI went through Scott and James Ressler. (Deposition of Aimee Fink ("Fink Dep.") at 11, 12, 62 (Genecin Decl. Ex. 20)).

13.     Both Scott and Jim Ressler dealt with ARTI's Fendi branded goods.  (S. Ressler Dep. at 50 Genecin Decl. Ex. 18)).

---

[3]      Scott Ressler was deposed on October 16 and 20, 2006 and July 1, 2008.  The pages of the three days of testimony are serially-numbered and will be referenced herein as "S. Ressler Dep. at ___."

14.     In his deposition in this case, James Ressler invoked his Fifth Amendment right against self-incrimination in response to all substantive questions.  (Deposition of James Ressler ("J. Ressler Dep.") Genecin Decl. Ex. 18)).

15.     ARTI has previously been involved in litigation relating to counterfeit merchandise.  (S. Ressler Dep. at 53 (Genecin Decl. Ex. 18)).

16.     ARTI was sued for trademark infringement in 2000.  *See Gucci Am., Inc. v. Ashley Reed Trading*, *et al*., 1:00-cv-06041-RCC-JCF; *see also* S. Ressler Dep. at 7, 11.  In that matter, on April 19, 2004, a Consent Final Judgment was entered as to ARTI, Scott Ressler, and James Ressler.  (1:00-cv-06041, Docket No. 142).

17.     ARTI was again sued in 2001 under federal trademark laws.  *Tommy Hilfiger v. Ashley Reed Trading, et al.*, 1:01-cv-09037-MGC.   On April 18, 2002, the Court in that matter issued a permanent injunction and final judgment on consent against ARTI.  (1:01-cv-09037, Docket No. 12).

18.     Ralph Lauren threatened to sue ARTI for trademark violations.  (S. Ressler Dep. at 120-21 (Genecin Decl. Ex. 18)).

19.     James Ressler is the subject of a criminal proceeding in Georgia involving allegedly counterfeit Prada merchandise.  (S. Ressler Dep. at 34, 127-28, 444 (Genecin Decl. Ex. 18)).

## FENDI'S WORLD-FAMOUS TRADEMARKS

20.     The original Fendi company was founded by Edoardo and Adele Fendi in 1925 in Rome, Italy to manufacture handbags and fur coats.  (Fabbri Decl. ¶ 8).

21.     After the Second World War, Edoardo and Adele Fendi's daughters, Paola, Anna, Franca, Carla and Alda, who were to become famous as the five Fendi sisters, joined the business.   (Fabbri Decl. ¶ 9).

22.     In the late 1960s, a predecessor company of plaintiff Fendi Adele S.r.l. developed the world-famous "Double F" trademark and became known for high-fashion furs and innovative handbags.  (Fabbri Decl. ¶ 10).

23.     In the 1970s and '80s, the "Double F," FENDI and "FF FENDI" trademarks made the Products instantly recognizable.  (Fabbri Decl. ¶ 11); *Fendi S.A.S. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1145 (S.D.N.Y. 1986 (Fendi trademarks "have been extensively advertised and now represent prestigious symbols in fashion.")).

24.     In the 1990s, the "Baguette" Fendi branded handbag became popular with large numbers of consumers.  (Fabbri Decl. ¶ 12).

25.     Today, Fendi Adele S.r.l. and Fendi S.r.l. actively design and develop new merchandise, fabrics, styles and designs, while continuing to offer many items that have become fashion classics.  (Fabbri Decl. ¶ 13).

26.     The Fendi trademarks have acquired great value and are well known to the consuming public and to the fashion trade as identifying and distinguishing Fendi S.r.l. exclusively and uniquely as the authorized source of the Products.  (Fabbri Decl. ¶ 14).

27.     Commencing at least as early as 1972, the predecessors of Fendi Adele S.r.l. and Fendi S.r.l. adopted one or more of the Fendi trademarks for use on a wide variety of fashion merchandise and accessories including, but not limited to, the Products, luggage, apparel and

other related goods, and caused the Fendi trademarks to be registered with the United States

Patent and Trademark office.  (Fabbri Decl. ¶ 15).

28.     True and complete copies of the federal trademarks registrations concerning the

Products are annexed to the Declaration of Victor Genecin dated February 27, 2009 ("Genecin

Decl.") submitted herewith.  These registrations are:

| Registration No. | Registration Date | Mark | Image |
|---|---|---|---|
| 1,244,466 | 7/5/83 | Fendi | FENDI |
| 1,439,955 | 5/19/87 | FF Monogram Trademark and the Fendi trademark together | F FENDI |
| 1,214,472 | 10/26/82 | FF Monogram Trademark | FF |
| 2,648,256 | 11/12/2002 | FF Monogram Trademark | |
| 2,648,257 | 11/12/2002 | FF Monogram Trademark | |

(Compl. ¶ 23 (Genecin Decl. Ex. 6); Genecin Decl. ¶ 2 Exs. 1-5).

29.     The trademarks and the goodwill of the business of plaintiffs in connection with

which the Fendi trademarks are used have never been abandoned.  (Fabbri Decl. ¶ 16).

30.     Plaintiffs intend to continue to preserve and maintain their rights with respect to

the Fendi trademark registrations and to make use of the Fendi trademarks in connection with all

aspects of their respective businesses and, in particular, in all aspects of designing,

manufacturing, marketing, advertising, promoting, distributing, displaying and selling the

Products.  (Fabbri Decl. ¶ 17).

31.    The Fendi trademarks and the goodwill associated therewith have substantial monetary value to plaintiffs.  (Fabbri Decl. ¶ 18).

32.    Fendi S.r.l. has widely distributed the Products with millions of dollars in sales annually.  (Fabbri Decl. ¶ 19).

## FENDI'S CONTROL OVER MATERIALS, MANUFACTURING AND DISTRIBUTION

33.    Each of the Products is individually designed.  (2008 Minerva Dep. at 17-22 (Genecin Decl. Ex. 11)).

34.    Each of the components used in the Products is individually designed.  (2008 Minerva Dep. at 17-22 (Genecin Decl. Ex. 11)).

35.    The design process, from start to finish, is complex, takes considerable time, and involves many people.  (Deposition of Cristiana Torre ("Torre Dep.") at 14, 15, 16, 64 (Genecin Decl. Ex. 13)).

36.    The materials used to make the Products, such as fabric bearing a design containing one of the Fendi trademarks, or the rivets, buckles, zippers, and clasps used in the Products, are manufactured exclusively for Fendi S.r.l. to exacting specifications.  (2007 Minerva Dep. at 100-01, 283, 378 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 42 (Genecin Decl. Ex. 11)).

37.    Once the design team has determined the form and dimensions of a Product style, it then selects the leather, fabric and metal hardware to be used in manufacturing that style.  (2007 Minerva Dep. at 381-82 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 18-19 (Genecin Decl. Ex. 11)).

38.     Fendi S.r.l. manufactures and sells the Products in two annual seasons, the Spring-Summer season, for which manufacturing begins when orders are received from the September Fashion Week in Milan, and the Fall-Winter season, for which manufacturing begins when orders are received from the February Fashion Week.  (2008 Minerva Dep. at 45-48 (Genecin Decl. Ex. 11)).

39.     For each season, the design team decides which styles to include in the line of Products for the season, and which combination of materials to use to manufacture each style. (Torre Dep. at 19-20, 69 (Genecin Decl. Ex. 13); 2008 Minerva Dep. at 17-18 (Genecin Decl. Ex. 11)).

40.     Fendi S.r.l. maintains a database of technical drawings for its Products and records the combinations of materials in which it manufactures each of its Products.  (2008 Minerva Dep. at 431-32 (Genecin Decl. Ex. 11); Torre Dep. at 35, 55 (Genecin Decl. Ex. 13)).

41.     Fendi S.r.l.'s meticulous recordkeeping assists the Fendi Group's anti-counterfeiting efforts:  an item that appears to be a Product, but that is made in a combination of materials in which Fendi S.r.l. never manufactured that style is readily identifiable as counterfeit. (2008 Minerva Dep. at 97-100 (Genecin Decl. Ex. 11)).

42.     Throughout the manufacturing process, the Products are subject to strict quality control and anti-counterfeiting measures.  (2008 Minerva Dep. at 41-42, 49-58 (Genecin Decl. Ex. 11)).

43.     Fendi S.r.l. manufactures Products on a strictly "to-order" basis.  (2008 Minerva Dep. at 48-49, 354, 355 (Genecin Decl. Ex. 11); Torre Dep. at 33 (Genecin Decl. Ex. 13)).

44.     Fendi's S.r.l. authorized customers visit Fendi S.r.l.'s showrooms during the Fall and Spring Fashion Weeks in Milan, view the collection for the season, and place their orders for specific Products in specific quantities.  (2008 Minerva Dep. at 45-49, 355 (Genecin Decl. Ex. 11)).

45.     Fendi S.r.l. manufactures the quantities ordered by its customers.  (2008 Minerva Dep. at 45-49, 355 (Genecin Decl. Ex. 11)).

46.     Through the end of 2001, Fendi S.r.l. sold only to retailers, except that it used a licensed distributor to sell to operators of duty free shops.  Thereafter, and through the end of 2005, Fendi S.r.l. sold only to retailers worldwide.  Since the beginning of 2006, Fendi S.r.l. has sold only to retailers worldwide except in the United States, where it sells to Fendi North America, Inc. and to operators of duty free shops.  (Fabbri Decl. ¶ 22).

47.     Fendi S.r.l. does not manufacture production runs of its Products "on spec," or in the expectation of receiving orders for them.  (2008 Minerva Dep. at 48-49 (Genecin Decl. Ex. 11)).

48.     Fendi S.r.l. does not sell "leftover" merchandise at discounted prices.  (Fabbri Dep. at 110-11 (Genecin Decl. Ex. 14)).

49.     Based upon the orders received from customers, Fendi S.r.l. orders the specific quantities of the materials it will need from its suppliers.  (2008 Minerva Dep. at 42, 47-48 (Genecin Decl. Ex. 11)).

50.     Fendi S.r.l.'s materials suppliers are contractually bound to supply materials that bear the Fendi trademarks only to Fendi S.r.l.  (2008 Minerva Dep. at 42-43, 461, 464-65 (Genecin Decl. Ex. 11)).

51.     Fendi S.r.l. has instituted measures to prevent its suppliers of metallic hardware from selling metallic hardware manufactured to Fendi S.r.l.'s specifications to third parties. (2008 Minerva Dep. at 99-101 (Genecin Decl. Ex. 11)).

52.     Fendi S.r.l's materials suppliers are subject to both periodic and unannounced visits by inspectors employed by Fendi S.r.l. who monitor their activity.  (2008 Minerva Dep. at 41-42, 287-88, 383 (Genecin Decl. Ex. 11); 2007 Minerva Dep. at 62, 101-03 (Genecin Decl. Ex. 12)).

53.     Fendi S.r.l's materials suppliers are required to deliver materials only to the Fendi S.r.l. manufacturing facility located in Grassina, near Florence, Italy.  (2008 Minerva Dep. at 43 (Genecin Decl. Ex. 11)).

54.     Upon receipt, Fendi S.r.l's quality inspectors examine the materials, and, if they do not conform to specifications, Fendi S.r.l. destroys them.  (2008 Minerva Dep. at 42, 288 (Genecin Decl. Ex. 11); 2007 Minerva Dep. at 63 (Genecin Decl. Ex. 12)).

55.     Strict specifications and tolerances govern fabric bearing a design containing one of the Fendi trademarks, making it difficult for third parties to replicate the fabric and design. (2008 Minerva Dep. at 20-22 (Genecin Decl. Ex. 11)).

56.     Fendi S.r.l. contracts with small companies in and around Florence, Italy to assemble the Products.  (2008 Minerva Dep. at 50-51 (Genecin Decl. Ex. 11); 2007 Minerva Dep. at 72-73 (Genecin Decl. Ex. 12)).

57.     These assemblers, called "subcontractors" by Fendi S.r.l., may, with the approval of Fendi S.r.l., subcontract certain limited tasks to other companies, called "sub-subcontractors." (2007 Minerva Dep. at 72, 194 (Genecin Decl. Ex. 12)).

58.     The authorized assembly subcontractors, and their Fendi S.r.l.-approved sub-subcontractors, if any, use the material that Fendi S.r.l. supplies, and they follow Fendi' S.r.l.'s detailed instructions for the assembly of Products.  (2007 Minerva Dep. at 72-76, 78, 194 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 53-54, 287-88, 465-66 (Genecin Decl. Ex. 11); Deposition of Lorenzo Bandinelli ("Bandinelli Dep.") at 86-88 (Genecin Decl. Ex. 36); Fabbri Dep. at 146-47, 149 (Genecin Decl. Ex. 14)).

59.     The subcontractors' relationship with Fendi S.r.l. is governed by a contract that requires them, among other things, to deliver finished Products only to Fendi S.r.l.  (2008 Minerva Dep. at 58 (Genecin Decl. Ex. 11)).

60.     The only authorized customer of a Fendi S.r.l. subcontractor (with respect to goods that bear the Fendi trademark) is Fendi, S.r.l.  (Fabbri Dep. at 148, 155 (Genecin Decl. Ex. 14)).

61.     Each order given by Fendi S.r.l. to an assembly subcontractor is for a stated quantity of a specific Product in a specific combination of materials.  (2008 Minerva Dep. at 287, 363, 383 (Genecin Decl. Ex. 11)).

62.     For each order, Fendi S.r.l.'s manufacturing facility prepares a "kit."  (2008 Minerva Dep. at 51 (Genecin Decl. Ex. 11); Fabbri Dep. at 149 (Genecin Decl. Ex. 14)).

63.     Each kit contains precisely the materials required to manufacture the quantity of the Product called for by the order.  (2008 Minerva Dep. at 51-53, 288 (Genecin Decl. Ex. 11); Fabbri Dep. at 149 (Genecin Decl. Ex. 14)).

64.     The cloth for the outside and linings of each item is pre-cut in Fendi S.r.l.'s manufacturing facility, as are the leather components; the necessary hardware items are prepared and counted.  (Fabbri Dep. at 144, 146-47, 149-50 (Genecin Decl. Ex. 14)).

65.     Fendi S.r.l.'s manufacturing facility meticulously counts all materials supplied in each kit.  (Bandinelli Dep. at 36 (Genecin Decl. Ex. 16)).

66.     Only glue and minor components (such as paint for the border of a shoulder strap) are not included in the kit.  (2008 Minerva Dep. at 54 (Genecin Decl. Ex. 11)).

67.     At most, the subcontractor might have to make minor adjustments to the pieces of leather that Fendi S.r.l. supplies.  (Bandinelli Dep. at 36 (Genecin Decl. Ex. 16)).  Such adjustments involve cutting away small amounts of material such as a strip of leather less than one centimeter in width.  (Bandinelli Dep. at 36-37, 55 (Genecin Decl. Ex. 16)).

68.     Fendi S.r.l. does not deliver kits to its assembly subcontractors; rather, the assembly subcontractors must come to Fendi S.r.l.'s manufacturing facility to pick up the kits (2008 Minerva Dep. at 55, 378 (Genecin Decl. Ex. 11)).

69.     With each kit, Fendi S.r.l. advises the assembly subcontractor of a 16-digit code. (2007 Minerva Dep. at 165-66, 174 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 437 (Genecin Decl. Ex. 11)).

70.     The code identifies the subcontractor (2008 Minerva Dep. at 56 (Genecin Decl. Ex. 11); 2007 Minerva Dep. at 359 (Genecin Decl. Ex. 12)), the style number, the combination of materials used, and the season for which the order is manufactured.  (2008 Minerva Dep. at 34-35 (Genecin Decl. Ex. 11)).

71.     The code is stamped by the subcontractor on a piece of leather trim that is sewn into the inside lining of each Product in the order.  (2008 Minerva Dep. at 34-35, 437 (Genecin Decl. Ex. 11)).

72.     Fendi S.r.l. closely monitors the coding of its Products by its assembly subcontractors.  (2007 Minerva Dep. at 196-97 (Genecin Decl. Ex. 12)).

73.     Fendi S.r.l.'s coding system serves an important quality control function, informing Fendi of the age and assembly subcontractor of an item if there should be a customer complaint.  (2008 Minerva Dep. at 35 (Genecin Decl. Ex. 11); 2007 Minerva Dep. at 359 (Genecin Decl. Ex. 12); Fabbri Dep. at 509, 512-13 (Genecin Decl. Ex. 14)).

74.     The coding system also supports Fendi S.r.l.'s anti-counterfeiting efforts.  (2007 Minerva Dep. at 176-78, 359-60 (Genecin Decl. Ex. 12)).

75.     Minerva testified that he never saw an instance in which a Fendi branded item had correct codes, but imperfect material.  (2008 Minerva Dep. at 60, 494 (Genecin Decl. Ex. 11)).

76.     Since the Fall-Winter season of 2003, every Product bears a hologram label. (2008 Minerva Dep. at 30, 31 (Genecin Decl. Ex. 11); 2007 Minerva Dep. at 136, 145 (Genecin Decl. Ex. 12)).

77.     The hologram label is stitched into the lining of Products.  (2008 Minerva Dep. at 27-28 (Genecin Decl. Ex. 11)).

78.     Fendi S.r.l.'s hologram label is a serially-numbered piece of cloth bearing a hologram.  (2008 Minerva Dep. at 30-32 (Genecin Decl. Ex. 11)).

79.     Each hologram label has a distinct serial number.  (2007 Minerva Dep. at 273-74 (Genecin Decl. Ex. 12)).

80.     Under a microscope, symbols can be seen within a genuine hologram, permitting it to be identified as authentic.  (2007 Minerva Dep. at 269 (Genecin Decl. Ex. 12)).

81.     A specialized vendor manufactures the hologram labels for Fendi S.r.l.  (2007 Minerva Dep. at 332-33 (Genecin Decl. Ex. 12)).

82.     After they are delivered to Fendi S.r.l.'s manufacturing facility, the hologram labels are locked in a safe.  (2008 Minerva Dep. at 54-55, 378, 482 (Genecin Decl. Ex. 11)).

83.     The owner of the assembly subcontractor must come to Fendi S.r.l.'s manufacturing facility in person to receive and sign for the hologram labels assigned to each kit. (2008 Minerva Dep. at 55 (Genecin Decl. Ex. 11)).

84.     For each order, Fendi S.r.l. provides one hologram label for each item to be assembled.  (2008 Minerva Dep. at 55, 288 (Genecin Decl. Ex. 11)).

85.     Fendi tracks the hologram number on each item.  (2007 Minerva Dep. at 274 (Genecin Decl. Ex. 12)).

86.     The hologram label serves important anti-counterfeiting and quality control functions.  (2008 Minerva Dep. at 54, 289 (Genecin Decl. Ex. 11)).

87.     The hologram serial number provides another way to determine whether a Fendi branded item is authentic.  (2007 Minerva Dep. at 338 (Genecin Decl. Ex. 12)).

88.     Fendi S.r.l. monitors the work of its assembly subcontractors.  (2007 Minerva Dep. at 81-83, 196-99, 203-04, 240 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 57-58, 441, 481 (Genecin Decl. Ex. 11); Bandinelli Dep. at 25-29 (Genecin Decl. Ex. 16); Fabbri Dep. at 160 (Genecin Decl. Ex. 14)).

89.     Fendi S.r.l. conducts scheduled and unscheduled inspections of authorized assembly subcontractors.  (2007 Minerva Dep. at 191-94, 198, 200 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 287 (Genecin Decl. Ex. 11); Bandinelli Dep. at 23-26 (Genecin Decl. Ex. 16)).

90.     Fendi S.r.l. inspectors visit subcontractors twice a week.  (2007 Minerva Dep. at 193 (Genecin Decl. Ex. 12)).

91.     Fendi S.r.l. conducts inspections of sub-subcontractors.  (2007 Minerva Dep. at 192 (Genecin Decl. Ex. 12)).

92.     The assembly subcontractors and sub-subcontractors are not permitted to market or sell Fendi trademarked goods to third parties.  (2008 Minerva Dep. at 57-58 (Genecin Decl. Ex. 11); Fabbri Dep. at 148-49 (Genecin Decl. Ex. 14)).

93.     When an assembly subcontractor completes an order, the order must be delivered to Fendi S.r.l.'s distribution center in Italy.  (2008 Minerva Dep. at 288 (Genecin Decl. Ex. 11); Fabbri Dep. at 149, 151 (Genecin Decl. Ex. 14)).

94.     Assembly subcontractors are forbidden to deliver Products anywhere other than to Fendi S.r.l.'s distribution center.  (2008 Minerva Dep. at 57-58, 288 (Genecin Decl. Ex. 11); Fabbri Dep. at 151-52 (Genecin Decl. Ex. 14)).

95.     The subcontractor is required to return each component contained in the kit when the order has been assembled, either by delivering to Fendi S.r.l. the precise number of finished Products called for by the order, or by delivering all of the Products that the subcontractor has been able to finish, plus all damaged or incomplete items and material.  (2007 Minerva Dep. at 189 (Genecin Decl. Ex. 12); Bandinelli Dep. at 37 (Genecin Decl. Ex. 16); Fabbri Dep. at 149 (Genecin Decl. Ex. 14)).

96.     Fendi S.r.l. inspects each finished Product.  (2007 Minerva Dep. at 81-83, 196-99, 203-04, 240 (Genecin Decl. Ex. 12); 2008 Minerva Dep. at 57-58, 441, 481 (Genecin Decl. Ex. 11); Bandinelli Dep. at 25-29 (Genecin Decl. Ex. 16); Fabbri Dep. at 160) (Genecin Decl. Ex. 14)).

97.     If a Product has not been assembled correctly and cannot be repaired, the Product is destroyed.  (2008 Minerva Dep. at 53 (Genecin Decl. Ex. 11)).

98.     Fendi S.r.l.'s distribution center in Italy ships the Products directly to Fendi's authorized customers.  (Fabbri Dep. at 151-52 (Genecin Decl. Ex. 14)).

99.     Genuine Products are shipped only by Fendi S.r.l's distribution center.  (2008 Minerva Dep. at 288 (Genecin Decl. Ex. 11); Fabbri Dep. at 151-52 (Genecin Decl. Ex. 14)).

100.    As of July, 2001, it has been Fendi S.r.l.'s practice to ship the Products to its customers worldwide from a single location, the Fendi distribution center in Calenzano, Sesto Fiorentino, Italy, near Florence.  (Fabbri Decl. ¶ 20).

101.    Prior to July, 2001, the Products were shipped from one of two distribution centers in Italy, one located in Bagno a Ripoli, also near Florence, and the other in Rome. (Fabbri Decl. ¶ 21).

102.    The only source of Products at wholesale in North America is Fendi North America, except for operators of duty free shops in North America, which deal directly with Fendi S.r.l.  The only source of Products for customers outside of North America is Fendi S.r.l. (Fabbri Dep. at 155-56; 404-05 (Genecin Decl. Ex. 14)).

103.   Fendi S.r.l. has always complied with the requirement of Italian law that every seller of goods issue an invoice to each purchaser on a form regularly used by the seller for this purpose.  (Fabbri Decl. ¶ 23).

104.   Fendi S.r.l.'s invoice form is printed with the Fendi S.r.l. name and the locations of the company's corporate offices in Italy.  (Fabbri Decl. ¶ 24).

105.   Fendi S.r.l.'s invoice is issued and dated on the date on which the goods shown on the invoice are ready for shipment.  (Fabbri Decl. ¶ 25).

106.   Fendi S.r.l.'s invoice also shows the name and address of Fendi S.r.l.'s customer and the order number assigned to the order.  (Fabbri Decl. ¶ 26).

107.   Fendi S.r.l.'s invoice sets forth the dimensions and weight of each box of goods shipped, and Fendi S.r.l.'s distribution center assigns each box a unique number.  The box number is stated on the invoice.  (Fabbri Decl. ¶ 27).

108.   The contents of each box, including the exact quantity of each style, described by Fendi S.r.l.'s style number and materials code, and a description of the article in words, are also stated on the invoice.  (Fabbri Decl. ¶ 28).

109.   Using Fendi S.r.l.'s computerized records, Alberto Fabbri, the chief financial officer of the Fendi Group, is able to access all invoices going back to 2001 that have been issued by Fendi S.r.l. for Products.  (Fabbri Decl. ¶ 29).

110.   Fabbri is able to compare any document that appears to be a Fendi S.r.l. invoice to Fendi S.r.l.'s extensive database of invoices to determine whether the document is authentic. (Fabbri Decl. ¶ 30).

## **FENDI S.R.L.'S EXAMINATION OF QUESTIONED GOODS**

111.    Leonardo Minerva, Industrial Director of Leather Goods and Logistics Director for plaintiff Fendi, S.r.l., was in charge of all manufacture by Fendi S.r.l. of Products from September, 2002 until March, 2008.  (2008 Minerva Dep. at 10-11 (Genecin Decl. Ex. 11)).

112.    In addition, when Fendi S.r.l. was presented with questions concerning the authenticity of handbags, shoulder bags, purses, wallets and key holders bearing its trademarks, Minerva was responsible for examining them and determining whether they were genuine. (2008 Minerva Dep. at 12-13 (Genecin Decl. Ex. 11)).

113.    Minerva examined hundreds of questioned items each year from all over the world.  (2008 Minerva Dep. at 13 (Genecin Decl. Ex. 11)).

114.    Minerva followed a multi-step protocol to determine the authenticity of a questioned item bearing Fendi trademarks.  (2008 Minerva. Dep. at 59-61).

115.    First, he examined the physical characteristics of the item, *i.e* the quality of the materials, finishing, metallic hardware, and the way the item was manufactured.  (2008 Minerva Dep. at 59-60 (Genecin Decl. Ex. 11)).

116.    Minerva then checked the item against Fendi S.r.l.'s records to determine whether Fendi S.r.l. had actually manufactured the particular style in the combination of materials presented.  (2008 Minerva Dep. at 60 (Genecin Decl. Ex. 11)).

117.    Minerva then inspected each of the components for conformity with Fendi's specifications.  (2008 Minerva Dep. at 60-61 (Genecin Decl. Ex. 11)).

118.    Inside each of the Products, Fendi S.r.l. places a card on which details such as the style number, description code, season of production and order number are recorded.  A

counterfeit item often contains a card that reproduces the appearance of the card inserted by Fendi S.r.l.  When a card was present, Minerva checked the numbers printed on it to verify whether they correspond to Fendi S.r.l.'s production data.  (2008 Minerva Dep. at 28, 29-30, 35-36, 65, 73-74, 77-78- 97, 110, 122, 134, 148, 162, 282 (Genecin Decl. Ex. 11)).

119.    Minerva then verified each part of the product code stamped on the leather trim inside the lining.  (2008 Minerva Dep. at 60 (Genecin Decl. Ex. 11)).

120.    Further, he examined the hologram and checked the serial number on the hologram label.  (2008 Minerva Dep. at 60 (Genecin Decl. Ex. 11)).

121.    When a questioned item has more than one coded element -- card, leather trim and/or hologram -- the information provided by these elements could be cross-checked for consistency.  (2008 Minerva Dep. at 31, 35 (Genecin Decl. Ex. 11)).

122.    A written report was prepared concerning each item examined for authenticity. (2008 Minerva Dep. at 62 (Genecin Decl. Ex. 11)).

### THE UNCONTROVERTED EVIDENCE OF COUNTERFEITING

123.    In *Fendi Adele, s.r.l. et al. v. Filene's Basement, Inc. et al.*, Case No. 06 Civ. 0244 (RMB) (MHD), currently pending before Judge Berman in this District, plaintiffs examined 15 Fendi branded handbags and small leather items that had either been sold by Filene's Basement or that were obtained from that defendant during discovery.  Each of these items was determined by Minerva to be counterfeit.

124.     In addition, plaintiffs purchased a total of five Fendi branded items from three

other retailers, Big M, Inc., Nordstrom's Rack and Saks Off Fifth that Minerva also examined

and determined to be counterfeit.[4]

125.     Filene's Basement's buyers testified that the source for that company's Fendi

branded goods was ARTI.  (Deposition of Cynthia A. Quinn ("Quinn Dep.") at 134-35;

Deposition of Melissa R. Miller ("Miller Dep.") at 35-36; Deposition of Lisa Honig ("Honig

Dep.") at 120; *see also* Deposition of J. Rudd ("Rudd Dep.") at 145).

126.     Michael Wolkoff, senior vice president and general merchandise manager of the

Off Fifth Division of Saks Fifth Avenue testified that his company's source for Fendi branded

goods was ARTI.  (Wolkoff Dep. at 6, 11 (Genecin Decl. Ex. 21)).

127.     Scott Ressler testified that ARTI sold Fendi branded goods to Filene's Basement,

Saks Off Fifth Avenue, Big M, Inc. and Nordstrom's Rack, as well as to Burlington Coat Factory

and Neiman Marcus Last Call.  (S. Ressler Dep. at 136-40 (Genecin Decl. Ex. 18)).

128.     The following table sets forth the uncontroverted evidence of counterfeit Fendi

branded goods supplied by ARTI:

---

[4]       Plaintiffs' lawsuit for counterfeiting against Filene's Basement and its parent company, Retail
Ventures, Inc., *Fendi Adele, s.r.l. et al. v. Filene's Basement, Inc. et al.*, Case No. 06 Civ. 0244 (RMB)
(MHD), is currently pending  before this Court.  Their lawsuit against defendants' customer Burlington
Coat Factory Warehouse Corporation and its subsidiary, Cohoes Fashions, Inc., *Fendi Adele, s.r.l. et al.
v.Burlington Coat Factory Warehouse et al.,* Case No. 06 Civ. 0085 (LBS) (MJD), is pending before
Judge Sand.  Also pending, before Judge Koeltl, is plaintiffs' lawsuit against two other wholesalers of
counterfeits, Colton International and its owner, Howard Colton, *Fendi Adele, s.r.l. et al. v. 546332 BC,
Ltd. et al.*, Case No. 06 Civ. 7084 (JGK) (MHD).

        On motion of the defendants, those cases, and Fendi's lawsuit against Big M, Inc., which has
since been settled, were consolidated with the instant case for purposes of discovery.  All documents
concerning ARTI produced by the defendants in any of these cases or otherwise obtained by plaintiffs
were produced to defendants herein, and defendants had the opportunity to attend and examine at each
deposition in which any matter concerning ARTI was raised.

| RETAILER | EX. | MIMICS FENDI MODEL NO. | SUMMARY OF INDICIA OF COUNTERFEITING | 2008 MINERVA DEP. AT |
|---|---|---|---|---|
| BIG M | PL 21 | 8BR001 | The fabric and lining are not the ones used by Fendi; the color of this item is not consistent with genuine Fendi zucca fabric; the hologram is not attached; serial number on hologram label is set in the wrong font; code inside bag identifies an assembler that has never produced in this item in this particular color. | 265-66 |
| BIG M | PL 20 | 8BR001 | Leather is low grade and not consistent with Fendi quality; the fabric measurements do not correspond to Fendi's specifications; side buckles consist of the wrong material; the Fendi trademark is not where it should be; incorrect lining; lining fabric is not the one used by Fendi; code inside bag identifies an assembler that has never produced this item during the referenced season; card inside bag with the manufacturing order number does not correspond to any manufacturing order of Fendi, nor does the code correspond to the color of this item. | 256-57 |
| FILENE'S | PL 78 | 8M0024 | Leather is low grade and not consistent with Fendi quality; different lining; the season code is spring-summer, but this particular model in this color was not produced in that season; code inside bag identifies an assembler that has never produced this item in this color during spring-summer; card inside bag with the manufacturing order number corresponds to a different item. | 201-03 |

| RETAILER | EX. | MIMICS FENDI MODEL NO. | SUMMARY OF INDICIA OF COUNTERFEITING | 2008 MINERVA DEP. AT |
|---|---|---|---|---|
| FILENE'S | PL 79 | 8M0024 | Leather is low grade and not consistent with Fendi quality; lining fabric is not the one used by Fendi; zipper pull is different from the one used by Fendi during the season when this item was allegedly manufactured; the code refers to a wallet that should be beige, but this item is black. | 205 |
| FILENE'S | PL 80 | 8M0000 | Zipper pull is different from the one used by Fendi in the season (spring-summer '03) when this item was allegedly manufactured; lining is too dark and does not meet Fendi's specifications; code inside bag identifies an assembler that has never produced this model during the spring-summer '03 season; the manufacturing code corresponds to a beige item, but this one is black. | 206-07 |
| FILENE'S | PL 81 | 8M0000 | Leather is low grade and has a "plastic" feeling; different lining; code inside bag identifies an assembler that has never produced this model during the spring-summer '03 season; manufacturing order number corresponds to an item in "zucchini" fabric, but this item is made with "zucca" fabric. | 208-09 |
| FILENE'S | PL 82 | 8BR155 | This model has never been made in this color/fabric combination; fabric does not meet Fendi's specifications in terms of color and dimension; lining fabric is not the one used by Fendi; inside metallic plate is not the correct size; code inside bag that identifies assembler is missing; card inside bag has the recurrent manufacturing order number 10955 used by counterfeiters and that was used by Fendi to produce a different model. | 211-12 |

| RETAILER | EX. | MIMICS FENDI MODEL NO. | SUMMARY OF INDICIA OF COUNTERFEITING | 2008 MINERVA DEP. AT |
|---|---|---|---|---|
| FILENE'S | PL 83 | 8BR158 | Lining fabric is not the one used by Fendi; fabric does not meet Fendi's specifications; accessories do not conform to those used by Fendi for this model; inside metallic plate is not the correct size; manufacturing order number corresponds to another model; assembler code is missing. | 214-15 |
| FILENE'S | PL 84 | 8BR155 | Fabric does not meet Fendi's specifications; zipper pull consists of material not used by Fendi at the time this item was supposedly manufactured; inside metallic plate is not the correct size; lining fabric is not the one used by Fendi; assembler code is missing; card inside bag has the recurrent manufacturing order number 10955 used by counterfeiters and that was used by Fendi to produce a different model. | 216 |
| FILENE'S | PL 85 | 8BR444 | Model has never been produced in this fabric color, and fabric does not meet Fendi's specifications; zipper pull present on this item was out of production when this item was supposedly manufactured; inside metallic plate is not the correct size; lining fabric is not the one used by Fendi; code inside bag includes an assembler code that corresponds to a materials supplier, not an assembler; card inside bag with the manufacturing order number corresponds to a different item in a different color; hologram is not authentic. | 218-19 |

| RETAILER | EX. | MIMICS FENDI MODEL NO. | SUMMARY OF INDICIA OF COUNTERFEITING | 2008 MINERVA DEP. AT |
|---|---|---|---|---|
| FILENE'S | PL 86 | 8BR156 | Fabric does not meet Fendi specifications; trim is incorrect for this model; inside metallic plate is the wrong size; different zipper pull was used when this item was allegedly manufactured; assembler code is missing; card inside bag has the recurrent manufacturing order number 10955 used by counterfeiters and that was used by Fendi to produce a different model with a different fabric. | 236-37 |
| FILENE'S | PL 87 | 8BH133 | Different geometrical dimensions than an authentic Fendi; different lining; buckles are incorrect; hologram is not authentic; code inside bag that identifies assembler is a number not assigned by Fendi to any assembler. | 239 |
| FILENE'S | PL 88 | 8BR000 | This model has never been made in this fabric/color combination; interior lining does not meet Fendi's specifications; different zipper pull was used in the season when this item was allegedly manufactured; hologram is not authentic; code inside bag identifies year of production as 2002, *i.e.*, before Fendi began placing holograms in Products; code identifies a supplier that never produced this model during the corresponding season. | 241-42 |
| FILENE'S | PL 89 | 8BR001 | Leather is low grade and not consistent with Fendi quality; hologram is not authentic; interior lining is not one used by Fendi on this model; buckles consist of the wrong material for this model and are not within tolerance for thickness; fabric is different from that used by Fendi in terms of geometric dimension and color; hologram is not authentic. | 244-45 |

| RETAILER | EX. | MIMICS FENDI MODEL NO. | SUMMARY OF INDICIA OF COUNTERFEITING | 2008 MINERVA DEP. AT |
|---|---|---|---|---|
| FILENE'S | PL 90 | 8BR155 029 | Inside metallic plate is the wrong size; zipper pull side buckles are made of zinc alloy instead of the brass used by Fendi; the season code on the bag is fall-winter '02, but Fendi introduced this zinc alloy after that season; fabric is not one used by Fendi; assembler code is missing; interior lining does not meet Fendi specifications; card inside bag has a manufacturing order number that was used by Fendi to produce a different model. | 247-48 |
| FILENE'S | PL 91 | 8BR444 | Metallic inside plate is the wrong size; lining and fabric do not meet Fendi standards; hologram is not authentic; code inside bag that identifies assembler is a number not assigned by Fendi to any assembler; the season code on the bag is fall-winter '05, but Fendi never produced this model in fall-winter '05; card inside bag has an incorrect manufacturing order number -- it does not correspond to any order for handbags. | 249-50 |
| FILENE'S | PL 92 | 8BR444 | Lining and fabric are not used by Fendi; inside metallic plate is the wrong size; hologram is not authentic; code inside bag that identifies assembler is a number not assigned by Fendi to any assembler; card inside bag has a manufacturing order number that was used by Fendi to produce a different model; the size of the "FF" trademark does not meet Fendi's specifications. | 252-54 |
| Rack | PL 53 | 8BR269 | "[T]he leather is completely a lower grade of leather, compared to [Fendi] leather"; interior lining is not one used by Fendi; incorrect shade of fabric; hologram is not authentic. | 269 |

| RETAILER | EX. | MIMICS FENDI MODEL NO. | SUMMARY OF INDICIA OF COUNTERFEITING | 2008 MINERVA DEP. AT |
|---|---|---|---|---|
| Saks | PL 54 | 8BR000 | Leather is low grade and not consistent with Fendi quality; fabric is not used by Fendi, *i.e.*, different weave, dimensions, feel, and geometrical measurements; lining is not used by Fendi; buckles consist of incorrect material; hologram is not authentic, is peeled off, and is not properly situated on the label; serial number on hologram label is set in the wrong font; code inside bag that identifies assembler does not correspond to any assembler of this model. | 271-73 |
| Saks | PL 55 | 8BR000 | Leather is low grade and not consistent with Fendi quality; fabric is not one used by Fendi; the color is "completely different"; code inside bag identifies an assembler that never produced this model, in this combination and color, in fall-winter '02. | 275-76 |

129.    Each of the counterfeit Fendi branded items listed above bears a counterfeit of at least one of the Fendi-registered trademarks listed in paragraph 28, above.[5]  The following table illustrates at least one counterfeit Fendi trademark for each exhibit, but does not represent an exhaustive catalogue of the counterfeit trademarks present on these items:

---

[5]    The exhibits that are handbags and small leather goods will be delivered to the Court for review upon the Court's request.

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| PL 78 |  | 1,214,472 | Wallet |
| |  | 1,244,466 | |
| |  | 1,439,955 | |
| PL 79 |  | 1,214,472 | Wallet |
| |  | 1,244,466 | |
| |  | 1,439,955 | |
| PL 80 |  | 1,214,472 | Wallet |
| |  | 1,439,955 | |
| PL 81 |  | 1,214,472 | Wallet |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|-----|-------|---------------------------|---------------|
|     |       | 1,244,466 |          |
|     |       | 1,439,955 |          |
| PL 82 |     | 1,214,472 | Handbag  |
|     |       | 1,244,466 |          |
|     |       | 1,439,955 |          |
| PL 83 |     | 1,214,472 | Handbag  |
|     |       | 1,244,466 |          |
|     |       | 1,439,955 |          |
| PL 84 |     | 1,214,472 | Handbag  |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| |  | 1,244,466 | |
| |  | 1,439,955 | |
| PL 85 |  | 1,214,472 | Handbag |
| |  | 1,244,466 | |
| |  | 2,648,257 | |
| |  | 1,439,955 | |
| PL 86 |  | 1,214,472 | Handbag |
| |  | 1,244,466 | |
| |  | 1,439,955 | |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| PL 87 | | 1,214,472 | Handbag |
| | | 1,244,466 | |
| | | 2,648,257 | |
| | | 1,439,955 | |
| PL 88 | | 1,214,472 | Handbag |
| | | 1,244,466 | |
| | | 2,648,256 | |
| | | 1,439,955 | |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| PL 89 | | 1,214,472 | Handbag |
| | | 1,244,466 | |
| | | 1,439,955 | |
| | | 2,648,256 | |
| PL 90 | | 1,214,472 | Handbag |
| | | 1,244,466 | |
| | | 1,439,955 | |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| PL 91 |  | 1,214,472 | Handbag |
| |  | 1,244,466 | |
| |  | 2,648,257 | |
| |  | 1,439,955 | |
| PL 92 |  | 1,214,472 | Handbag |
| |  | 1,244,466 | |
| |  | 2,648,257 | |
| |  | 1,439,955 | |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| PL 53 Nordstro m Rack | | 1,214,472 | Handbag |
| | | 1,244,466 | |
| | | 2,648,256 | |
| | | 1,439,955 | |
| PL 54 Saks Off 5th | | 1,214,472 | Handbag |
| | | 1,244,466 | |
| | | 1,439,955 | |

| EXH | IMAGE | TRADEMARK REGISTRATION NO. | TYPE OF GOODS |
|---|---|---|---|
| |  | 2,648,256 | Handbag |
| PL 55 Saks Off 5th |  | 1,214,472 | Handbag |
| |  | 1,244,466 | |
| |  | 2,648,256 | |
| |  | 1,439,955 | |

## THE UNCONTROVERTED EVIDENCE OF DEFENDANTS' PROFITS

## FROM THEIR SALES OF FENDI BRANDED GOODS

130.    Defendants produced incomplete records of their purchases and sales of Fendi branded merchandise.  (Declaration of James J. James J. Donohue, C.P.A., C.V.A., dated February 18, 2009 ("Donohue Decl.") ¶¶ 3, 13).

131.    Notably, defendants did not retain the invoices that they received from their suppliers of Fendi branded goods (S. Ressler Dep. at 182, 259-60), nor did they record what they paid for goods in its computer system.  (S. Ressler Dep. at 615 (Genecin Decl. Ex. 18)).

132.   In addition, defendants did not keep complete records of their sales. (Donohue

Decl. ¶¶ 14, 18-24).

133.   The ARTI document production reflects total sales of Fendi branded goods of

$        . (Donohue Decl. Ex. 3).
**REDACTED**

134.   Documents obtained in discovery from customers of ARTI reveal an additional

$        in sales not disclosed by defendants. (Donohue Decl. Ex. 3).

**REDACTED**                                                    **REDACTED**

135.   Defendants do not controvert that they made $          in sales of Fendi branded

handbags and small leather goods. (Donohue Decl. ¶ 12, Ex. 3).

136.   Defendants did not put forward any evidence of their costs, and their damages

expert, Neil Bressler, made no calculations whatsoever concerning deductions to be taken from

sales. The entirety of his expert report states as follows:

> My resume is attached as Exhibit A, and for the past 29 years I
> have been a Certified Public Accountant. From approximately
> 2003, 1 have been the accountant for Ashley Reed Trading.
>
> The calculation of the profit earned by Ashley Reed Trading, Inc.
> for the sale of Fendi products in any particular year would
> commence by determining the sales of Fendi product less any
> returns and allowances. From this amount one would deduct the
> cost of acquiring the goods. This would include the cost of
> merchandise, duty, and freight. The net balance would represent
> the gross profit margin earned on sales. Generally accepted
> accounting principals [sic] would necessitate determining the
> amount of the company's overhead to apply in order to determine
> the final or net profit or loss for each year. Examples of overhead
> would include salaries, rent, and warehousing costs as contained in
> the company's tax return and financial statements.
>
> The ratio of Fendi sales to total sales for the same year should then
> be multiplied by the total overhead for that year to determine this
> amount. Subtracting this overhead from the gross margin would
> then yield the net profit or loss for each year.
>
> There are no articles written by myself nor have I been asked to

- 35 -

testify in court during the past four years.

My rate of compensation for the work performed in this matter is $350 per hour.

(Expert Report of Neil Bressler (Genecin Decl. Ex. 8)).

## THE UNCONTROVERTED EVIDENCE THAT DEFENDANTS' SALES OF COUNTERFEIT FENDI BRANDED PRODUCTS WERE WILLFUL

137.    After the commencement of the present litigation, defendants returned their

inventory of Fendi branded goods to their suppliers:

> Q.      With respect to the merchandise, he Fendi branded merchandise that's the subject matter of this litigation, did you have any inventory?
>
> A       No.
>
> Q.      You presently do not have any inventory?
>
> A.      No.
>
> Q.      Upon the initiation of the lawsuit did you have any inventory?
>
> A.      We might have had a little.  I think we returned it.
>
> Q.      Returned it to whom?
>
> A.      I'm not sure.
>
> Q.      So when the litigation was initiated, you took the merchandise, the Fendi brands of merchandise that you had in inventory, and you returned it?
>
> A.      Yes.
>
> Q.      The Fendi branded merchandise that you had in your possession that was in your inventory at the time the litigation was initiated, were those handbags and accessories?
>
> A.      Yes.

Q.      Were they the subject matter of the litigation that was
        involved in this case?

A.      Yes.

Q.      So you took product that was the subject matter of this
        litigation and you got rid of it?

A.      Returned it.

Q.      You got rid of it, you sent it back somewhere?

A.      Sent it back, yes.

Q.      Do you know how much merchandise that was?

A.      No, I don't.

Q.      Do you have records of that?

A.      I'm not sure.

(S. Ressler Dep. at 123-24 (Genecin Decl. Ex. 18)).

138.    Defendants did not have documents relating to the returns.  (S. Ressler Dep. at
133-34 (Genecin Decl. Ex. 18)).

139.    When Fendi sued Annie Sez, moreover, Scott Ressler took back Fendi branded
goods from that company, and returned them to his supplier:

Q.      Do you recall that Annie Sez, at the time when Fendi sued
        them, had Fendi branded products in inventory?

A.      I do.

Q.      And do you recall that those products were ultimately sent
        back to Ashley Reed?

A.      Yes.  They returned them to me, and I returned them to my
        source.

Q.      Right.  Do you recall about when they returned them to
        you?

A.      No.  After the onset of the lawsuit.

Q.     They were returned to you?

A.     They returned them to me and I returned them to my
       source.

Q.     And who was your source?

A.     It was -- if you read me off the list again, I'll tell you which
       one it was.

Q.     Why don't you try to remember who you returned those
       goods to?

A.     We're back to the memory game?

(S. Ressler Dep. at 592-93 (Genecin Decl. Ex. 18)).

140.    Scott Ressler testified that he returned the Fendi branded goods from Annie Sez to

Moda Oggi.  (S. Ressler Dep. at 608 (Genecin Decl. Ex. 18)).[6]

141.    Defendants did not retain the invoices that they received from their suppliers of

Fendi branded goods.  (S. Ressler Dep. at 182, 259-60 (Genecin Decl. Ex. 18)).

142.    James Ressler testified as follows:

Q.     From what company or companies has Ashley Reed
       Trading Incorporated purchased Fendi branded products?

MR. SCHOEN: Same objection.

MR. BAINTON: Objection to form.

MR. SCHOEN: And same objection.

A.     By advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 20 (Genecin Decl. Ex. 19)).

Q.     Did Ashley Reed Trading Corporation sell genuine Fendi
       products to Filene's Basement?

_____

[6]     Moda Oggi was identified in plaintiffs' Burlington Coat Factory litigation as the supplier of Fendi
branded items determined by Minerva to be counterfeit.

        MR. SCHOEN: Same objection.

A.     By advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 30 (Genecin Decl. Ex. 19)).

Q.     Did Ashley Reed Trading Incorporation sell counterfeit Fendi products to Filene's Basement?

        MR. SCHOEN: Same objection.

A.     By advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 31 (Genecin Decl. Ex. 19))

Q.     And isn't it true that you knew that all of the Fendi trademarked merchandise purchased by Burlington Coat Factory from Ashley Reed Trading was counterfeit?

        MR. SCHOEN: Same objection.

A.     Under the advice of counsel, I invoke the Fifth.

Q.     Isn't it true that Ashley Reed Trading sold counterfeit Fendi trademarked goods to Burlington Coat Factory?

        MR. SCHOEN: Same objection.

A.     Under the advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 147 (Genecin Decl. Ex. 19)).

Q.     Isn't it true that when Ashley Reed purchased Fendi trademarked goods from Moda Oggi, it did so knowing that those goods were counterfeit?

        MR. BAINTON: Objection.

        MR. SCHOEN: Object as to form, and same objection.

A.     By advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 85 (Genecin Decl. Ex. 19)).

Q.     Isn't it true that when Ashley Reed purchased Fendi trademarked goods from Moda Oggi, it did so knowing that those goods were counterfeit?

        MR. BAINTON: Objection.

MR. SCHOEN: Object as to form, and same objection.

A.      By advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 85 (Genecin Decl. Ex. 19)).

Q.      And all cases when Lawrence Samuel was a party to transactions involving Fendi trademarked goods, isn't it true that you knew that the goods that you were obtaining were counterfeit?

MR. SCHOEN: Objection.

MR. BAINTON: Objection.

MR. SCHOEN: And same objection.

A.      Under the advice of counsel, I invoke the Fifth.

(J. Ressler Dep. at 213 (Genecin Decl. Ex. 19)).

143.    At a meeting held in or about June, 2003, Filene's Basement's then-CEO, Heywood Wilansky, asked James Ressler to sign a form letter agreement.  (Deposition of Cynthia Quinn ("Quinn Dep.") at 59, 68 (Genecin Decl. Ex. 22)).

144.    Wilansky told James Ressler: "Before you can sell us this Fendi merchandise, you are going to need to sign our letter."  (Quinn Dep. at 59 (Genecin Decl. Ex. 22)).

145.    The letter agreement contains an undertaking by ARTI to defend Filene's Basement in the event of a lawsuit concerning goods supplied by ARTI.  (Filene's Basement Pls. Ex. 12 ¶ 4 (Genecin Decl. Ex. 9)).

146.    The Agreement James Ressler executed on June 12, 2003 contains a redacted paragraph.  (Pls. Exs. 12, 97 (Genecin Decl. Exs. 9, 10); *see also* Deposition of James Rudd ("Rudd Dep.") at 134-35 (Genecin Decl. Ex. 23)).

147.    Under his signature on the letter agreement, Jim Ressler wrote that "Point 2 was taken out."  (Pls. Ex. 12 (Genecin Decl. Ex. 9)).

- 40 -

148.    Point 2, the redacted paragraph, reads:

> Seller has the legal right to sell the Merchandise, including sale
> thereof for resale in the U.S.A., and the purchase and resale of the
> Merchandise by Filene's in the U.S.A. will not violate or infringe
> upon any existing contractual and/or Proprietary Rights owned by
> others.

(Pls. Ex. 97 (Genecin Decl. Ex. 10); *see also* Rudd Dep. at 134-35 (Genecin Decl. Ex. 23)).

149.    Defendants never purchased goods directly from Fendi.  (S. Ressler Dep. at 97 (Genecin Decl. Ex. 18)).

150.    Defendants claim that they purchased Fendi branded goods from an Italian company called Cinque Più, and paid a company in Switzerland called Hidea for these goods.  (S. Ressler Dep. at 54, 62-63, 108 (Genecin Decl. Ex. 18)).

151.    Scott Ressler testified that Fendi branded goods were purchased through a company called Hidea, and packed by Cinque Più for ARTI.  (S. Ressler Dep. at 581, 583 (Genecin Decl. Ex. 18)).

152.    Cinque Più S.r.l. was, in fact, the member of the Fendi Group that was responsible for the manufacturing of the Products until 2000, when its name was changed to Fendi Industria S.r.l.  Fendi Industria S.r.l., in turn, was merged into Fendi S.r.l. in December, 2003.  The corporate records of Cinque Più S.r.l. are maintained by Alberto Fabbri, chief financial officer of the Fendi Group.  (Fabbri Decl. ¶ 34).

153.    The records of Cinque Più S.r.l. show that Ashley Reed Trading, Inc. was never a customer of that company.  (Fabbri Decl. ¶ 35).

154.    The records of Cinque Più S.r.l. show that HIDEA was never a customer of that company, (Fabbri Decl. ¶37), nor has HIDEA ever been a customer of Fendi S.r.l. or of Fendi North America, Inc.  (Fabbri Decl. ¶ 38).

155.    Plaintiffs' Exhibits 62 and 63 each are composed of documents produced by defendants that appear to be packing lists for Fendi branded goods shipped by Cinque Più to ARTI.  Scott Ressler testified that these packing lists reflect Fendi branded goods packed by Cinque Più for ARTI.  (S. Ressler Dep. at 581, 583 (Genecin Decl. Ex. 18)).

156.    The documents contained in Plaintiffs' Exhibits 62 and 63 are not authentic documents of Cinque Più.  (Fabbri Decl. ¶¶ 44-47).

New York, New York
February 27, 2009

Respectfully submitted,

SQUIRE, SANDERS & DEMPSEY L.L.P.

By _____
    Richard L. Mattiaccio (RM 4764)
    Victor Genecin (VG 9733)
    Steven Skulnik (SS 7821)

    1095 Avenue of the Americas, 31st Floor
    New York, NY  10036
    (212) 872-9800

    *Attorneys for Plaintiffs*
    FENDI ADELE S.r.l., FENDI S.r.l., and
    FENDI NORTH AMERICA, INC.