Gerard F. Dunne
Law Offices of Gerard F. Dunne, P.c.
156 Fifth Avenue, Suite 1223
New York, New York  10010
Tel.: 212-645-2410
Attorney for Defendants

UNITED STATES DISTRICT COURT　　　　　　　ECF CASE
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
FENDI ADELE S.R.L., FENDI S.R.L.       :
and FENDI NORTH AMERICA                            Civil Action No.
                                                                   :
        Plaintiffs,                                          06 CIV 0243 (RMB)
                                                                   :
        vs.
                                                                   :
ASHLEY REED TRADING, INC.
SCOTT RESSLER                                            :
and JAMES RESSLER
                                                                   :
        Defendants.
                                                                   :
---------------------------------------------------------x

## DECLARATION OF SCOTT RESSLER

I, Scott Ressler, hereby declare the following to be true and correct to the best of my knowledge and belief; and make the following statements with the knowledge that any false statements willfully made may subject me to criminal charges of perjury under the laws of the United States.

1.  I am the President of Ashley Reed Trading, Inc. ("Ashley Reed") and along with Ashley Reed am a defendant in the above captioned case. I have personal knowledge of the facts set forth in this declaration, and I make this declaration in support of defendants' opposition to plaintiff's motion for summary judgment. I will refer to the various corporate plaintiffs as "Fendi."

2.  Ashley Reed has for years been involved in the lawful activity of importing into the United States and trading in "gray market" products bearing prominent trademarks. Such

1

goods are also often referred to as "parallel imports" or "diverted" goods. Gray market or diverted products are genuine products bearing a trademark legitimately, but often intended by the trademark owner to be sold in a market different from the United States.

3. As is well known in the trade, owners of prominent trademarks for luxury goods, such as Fendi, object strongly to the gray market and the diversion of their goods due to the fact that such diversion often results in their goods being sold in discount retail stores. This naturally, upsets the premium stores where companies like Fendi would prefer their products to be sold.

4. Products such as Fendi-branded leather goods are typically sold by a Fendi company to retailers in Europe and others around the world at prices below the prices the same goods are sold by Fendi to retailers in the United States. As a result, price disparities result between the same goods sold in Europe, or elsewhere, and in the United States; and a legitimate international trade in these goods results.

5. There are many ways that genuine goods enter the "gray market." Companies termed "diverters" will often buy such products in Europe, or elsewhere, from one or more stores with an over supply of the products, and resell such goods to importers such as Ashley Reed for importation into the United States. Also, companies such as Fendi will sell their genuine products to companies to resell in markets, such as eastern Europe, where the prices must be far lower than those charged to those reselling the goods in the United States.

6. And, I have personal knowledge that factories authorized to make leather goods in Italy will often sell excess goods and sometimes "seconds," products not quite up to standards, to companies at a discount for sale outside of Italy.

7. For my company's business, I have traveled many times to Italy to purchase leather goods, and have, in fact, served as an agent for a prominent American company

seeking to have high-end leather goods manufactured in Italy. I am well aware that factories in Italy manufacturing luxury leather goods for the owners of the trademarks often are permitted to sell off excess goods, or seconds; and I have actually permitted excess goods to be sold by Italian factories when I have been serving as an agent for the manufacture of leather goods in Italy by an American trademark owner.

8. During a visit to Italy in 2004, I met Lorenzo Bandinelli, a person who represented to me that he was an inspector employed by Fendi. I had inquired about purchasing overstocks of Fendi leather goods, and I wanted a person from Fendi to inspect the goods I was to be shown, and to assure me they were of first grade and authentic. With Mr. Bandinelli, I visited a factory in Italy to inspect the quality of Fendi-branded leather goods manufactured for Fendi. Mr. Bandinelli took me to factory in Italy where together we toured the factory and met with the owner. Both Mr. Bandinelli and the owner assured me the factory I visited was authorized by Fendi to manufacture Fendi-branded products, and I was shown work orders and specifications from Fendi for the manufacture of their goods.

9. Based on the assurances of Mr. Bandinelli and the documents provided by Mr. Bandinelli and the fcatories to Ashley Reed establishing the factory was authorized by Fendi to manufacture Fendi-branded products, Ashley Reed purchased Fendi-branded goods.

10. When touring the factory with Mr. Bandinelli, I witnessed many bolts of fabric with the Fendi double FF trademark, and many packages of the hardware such as buckles, zippers and the like used to assemble Fendi hand bags; and the use of these items to manufacture Fendi branded hand bags was ongoing during my tour of the factory with Mr. Bandinelli. Mr. Bandinelli. inspected the Fendi-branded products produced by the factory that had offered goods to Ashley Reed, and confirmed that the Fendi products Ashley Reed was purchasing were genuine, and of first quality.

3

11.    Ashley Reed had also purchased Fendi leather goods in 2004 that were from form a store in Italy clearly marked and represented as a "Fendi" store. We also purchased Fendi goods that were from a duty free shop in Guam in 2002. Ashley Reed often deals with agents for its overseas purchases, but we were shown and did examine documents form these sources establishing the Fendi merchandise had been purchased from Fendi.

12.    I am aware that Fendi has asserted that some Fendi-branded products sold by Ashley Reed are counterfeit. This is not, of course, the first time an owner of a luxury brand has asserted to Ashley Reed diverted or gray market goods are counterfeit. This has happened many times to Ashley Reed, including recently when my brother and business partner in Ashley Reed, Jim Ressler, was charged with criminal counterfeiting regarding Prada bags acquired from Italy in the same manner as many of the Fendi bags involved in this matter. However, the criminal charges of counterfeiting against Jim Ressler were recently dismissed.

13.    Fendi has claimed a sample of Fendi-branded bags purchased and resold by Ashley Reed were counterfeit by examining the bags and noting the bags differ from the quality standards of Fendi, or include leather tags attached to the bags which have incorrect markings. I have no explanation as to why this may be correct, except to note that a counterfeiter that is copying a Fendi bag would also have every reason to copy the codes on the leather straps, so the bags were not made by a copier making counterfeit bags. I understand Fendi has brought to the Court's attention about 20 bags that had been sold by Ashley Reed in 2004, and I suppose these bags were made by the factory I visited with Mr. Bandinelli. The codes may have been changed by the factory for a reason I can only guess. Perhaps the bags were actually "seconds," or imperfect and the factory did not want the workmanship of the bags traced to them. Or perhaps the bags were made to be sold to a

Fendi store as overstock, and the differing codes were put into to avoid warranty obligations. Whatever the reason, Ashley Reed purchased Fendi bags from sources who had acquired directly or indirectly from Fendi, or were made by a factory under the watchful eye of a Fendi inspector, or authenticated by him.

14. The Fendi trademark was applied to these goods legitimately, and the diversion of such goods to the United States is perfectly legal, although unsettling to Fendi and its preferred high-end retailers in the United States.

15. Ashley Reed dealt in such diverted goods, not counterfeit goods.

16. Ashley Reed has been involved in litigation that involved allegations of counterfeiting, in all cases Ashley Reed denied all allegations of counterfeiting, and no judgement has been made against Ashley Reed that found Ashley Reed dealt in counterfeit merchandise.

17. Ashley Reed was sued for alleged trademark infringement in 2000 in *Gucci Am., Inc. v. Ashley Reed Trading, et al*, 1:00-cv-06041. At all times Ashley Reed denied any claims that the alleged Gucci products were counterfeit. A Final Judgment on Consent was made after the parties settled, and Ashley Reed made no admission to counterfeiting activity. Settlement was entered into as a business decision due to, amongst other things, the a payment from the insurance company of Ashley Reed to settle the suit in view of the costs of a potential litigation, as well as an offer by Gucci to make Ashley Reed an authorized distributor of Gucci-branded products.

18. Ashley Reed was sued in 2001 under federal trademark laws in *Tommy Hilfiger v. Ashley Reed Trading, et al*, 1:01-cv-09037. At all times Ashley Reed denied any claims that the alleged Tommy Hilfiger products were counterfeit. A Final Judgment on Consent was made after the parties settled for a small monetary amount that was between $5,000 and

$10,000, and Ashley Reed made no admission to counterfeiting activity. Settlement was entered into as a business decision due to, amongst other things, the costs of a potential litigation.

19.   In 2001, my brother, James Ressler, and I, along with our attorney at the time, Brett Meyer, met more than once with Fendi's attorneys and provided documentation illustrating how we were then acquiring Fendi-branded merchandise.

20.   The merchandise we had been selling in 2001 had been acquired from Hidea, a billing company in Lucern Switzerland, that was offering genuine Fendi products, from manufacturers of Fendi bags. We provided the appropriate documentation to Fendi's attorneys concerning these bags, and the documents we provided identified a Fendi company, Cinque Piu as the manufacturer of the Fendi bags. I was told by Fendi's attorney that if the bags were manufactured by a Fendi- authorized factory, Fendi could not prevent Ashley Reed from importing and selling such bags. I was further told by Fendi's attorney that if Fendi found any problems with the documentation, he would contact me.

21.   Subsequent to these meetings in 2001, Fendi did not in anyway contact Ashley Reed for more than four years, until the allegations that initiated the current dispute were made at the end of 2005 and early 2006.

22.   Based on these actions by Fendi, we felt assured that dealing with a Fendi factory in Italy was certainly legal, and we made sure the goods we purchased from the factory were legitimate by insisting on the assurances of a Fendi inspector to authenticate the goods.

23.   In 2002 Ashley Reed purchased genuine Fendi-Branded goods from Zucker's Gifts in New York. Zucker's showed Ashley Reed invoices indicating that such

goods were purchased from the Duty Free Shop in Guam, and it was explained these genuine goods became available from the Duty Free Shop in Guam due to the large decrease in tourism to the United States from Japan following the "9/11" attacks.

24. In 2004 we also bought extensive amount of goods from a company known as Moda Oggi which acquired Fendi goods from legitimate sources; and in this suit the attorneys for Fendi have acknowledged some of these goods were genuine.

25. As I testified in my deposition, Ashley Reed suffered a computer crash in late 2003 or 2004, and thus its records prior to that time are incomplete. But Ashley Reed has turned over to the attorneys for Fendi all documents in its possession showing the quantities of Fendi products acquired abroad, from whom, and to whom the goods were resold.

26. Many of our invoices for the re-sale of the Fendi goods we acquired are not in the possession of Ashley Reed. Rosenthal and Rosenthal, LLC is a factor that had loaned Ashley Reed money for its purchases, and in return, received an assignment of all Ashley Reed's receivables. When invoicing products, the invoices and supporting documentation were sent to Rosenthal and Rosenthal by Ashley Reed inasmuch as Rosenthal and Rosenthal was the owner by assignment of these receivables, and made the collections. Rosenthal and Rosenthal would periodically report its collections made on Ashley Reed's account, but these reports were not broken down by brand. Ashley Reed thus did not have all its invoicing and receivable records inasmuch as these were essentially the property of Rosenthal and Rosenthal, LLC and in their possession.

27. The full information regarding Ashley Reed's sale of Fendi-branded goods as well as payments received was available at Rosenthal and Rosenthal's office in New York City. The attorneys for Fendi were made aware of Rosenthal and Rosenthal, LLC,

and its possession of the records regarding in Ashley Reed's receivables, and invited to examine such records. The attorneys for Fendi declined to do so.

28. Ashley Reed has expenses for the conduct of its business, and I typically determine the price we have for the sale of our merchandise by considering our overhead and costs. In the years in question when we were selling Fendi branded goods, our margins were always very low due to our sales being primarily to discount stores. Our gross profit considering as costs just our cost of goods was typically 25%; but considering our other fixed costs as insurance, interest, warehouse, employees and the like our profits were very low, for example, in 2003 we actually lost money and operated at a loss, in 2004 our net profits were only 0.75% and in 2005 our net profits were 1.16% of sales.

29. I understand that Fendi has asserted that Ashley Reed since 2001 has sold over $10,000,000 (Ten Million Dollars) of Fendi goods. That number is assuredly based on erroneous information; and extremely too high. Exact and correct figures could have been obtained from Rosenthal and Rosenthal by Fendi, but they chose not to review the actual Ashley Reed invoices available.

New York, New York
April 24, 2009

_____
Scott Ressler