UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FENDI ADELE S.R.L., FENDI S.R.L., and          :
FENDI NORTH AMERICA, INC.,                      :
                                                :
                              Plaintiffs,        :
                                                :          06 Civ. 243 (RMB) (MHD)
              -against-                          :
                                                :          **DECISION & ORDER**
ASHLEY REED TRADING, INC.,                      :
SCOTT RESSLER, and JAMES RESSLER,               :
                                                :
                              Defendants.        :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/16/10

## I.    Introduction

On January 12, 2006, Fendi Adele s.r.l. ("Fendi Adele"), Fendi S.r.l., and Fendi North

America, Inc. (collectively, "Fendi" or "Plaintiffs") filed a complaint against Ashley Reed

Trading, Inc. ("Ashley Reed") and Ashley Reed's sole owners and officers, Scott Ressler, its

President, and James Ressler, its Vice President (collectively, "Defendants") pursuant to the

United States Trademark Act, 15 U.S.C. §§ 1051 et seq. ("Lanham Act"), Section 360-*l* of the

New York General Business Law, and New York common law. (Compl., dated Jan. 12, 2006

("Compl."), ¶¶ 1–3.) Plaintiffs allege, among other things, that Defendants' "offering for sale

and selling [of] handbags, shoulder bags, purses, wallets and key chains . . . that imitate the

designs of [Fendi products] and that bear reproductions, counterfeits, copies or colorable

imitations of the 'FENDI' trademarks" constituted trademark counterfeiting, false designation of

origin, and trademark dilution under Federal law, and unfair competition and trademark dilution

under New York law. (Compl. ¶¶ 1–3, 37.) Defendants assert affirmative defenses including,

among other things, laches and acquiescence. (Am. Answer, dated Dec. 7, 2006 ("Answer"), at

8–10.)

On March 4, 2009, Plaintiffs moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") arguing, among other things, that: (1) "there is no legal or factual basis" for Defendants' affirmative defenses of laches and acquiescence because "Defendants have presented absolutely no evidence that [P]laintiffs consented to their sales of counterfeits"; (2) "summary judgment is warranted on [Plaintiffs'] Lanham Act claims of trademark counterfeiting and false designation of origin" because Defendants' "use in commerce of the Fendi trademarks is shown by uncontroverted evidence"; (3) "[p]roof of trademark counterfeiting and unfair competition under the Lanham Act also proves . . . common law unfair competition"; (4) Plaintiffs are entitled to summary judgment for trademark dilution under 15 U.S.C. § 1125(c) because "Defendants admit that they used the Fendi name and trademarks in commerce after the marks had become famous," and under New York law because "Defendants' use of identical marks is not only confusing, but constitutes a whittling away of the distinctive nature of [P]laintiffs' valuable trademarks"; and (5) Plaintiffs are entitled to a permanent injunction pursuant to 15 U.S.C. § 1116(a) because "[i]rreparable harm is established by likelihood of confusion . . . and counterfeit goods are inherently confusing." (Pls.' Corrected Mem. of Law in Supp. of Their Mot. for Summ. J., dated Mar. 4, 2009 ("Pl. Mem."), at 8–10 (internal quotations omitted), 23.) Plaintiffs also argue that: (6) they are entitled to an accounting of Defendants' "profits from their counterfeiting activity" because "Defendants' admissions establish that they were willfully blind, or worse, to the counterfeit nature of the Fendi[-]branded goods they sold"; and that "Plaintiffs are entitled to costs and attorneys' fees" and "pre-judgment interest." (Pl. Mem. at 15, 19.)

On April 30, 2009, Defendants filed an (13-page) opposition arguing, among other things, that: "Ashley Reed reasonably relied on [Fendi's] silence in continuing [its] dealings in

2

Fendi-branded goods"; "the testimony and affidavits offered by Fendi in support of [its] motion are largely contested and subject to questions of reliability and credibility"; "Ashley Reed purchased genuine Fendi Products" and has "for years been involved in the lawful activity of importing into the United States and trading in 'gray market' products bearing prominent trademarks"; an injunction "preventing the sale of genuine goods without advance permission of Fendi would unduly restrain legitimate trade"; and Defendants "certainly [have] raised substantial questions as to the [willfulness] of their conduct." (Corrected Defs.' Mem. of Law in Support of Their Response in Opp'n to Pls.' Mot. for Summ. J., dated Apr. 30, 2009 ("Def. Opp'n"), at 3, 6, 9–10.) Defendants do not appear to respond directly to Plaintiffs' arguments concerning costs, attorneys' fees, and pre-judgment interest. (See Def. Opp'n at 1–12.) Defendants also state in their papers that "a ruling on summary judgment in favor of [Defendants] with regard to all sales prior to 2005 is appropriate" because Plaintiffs have offered no evidence with regard to any goods purchased before 2005. (Def. Opp'n at 4–6.)[1]

On May 13, 2009, Plaintiffs filed a reply arguing, among other things, that while the twenty (20) counterfeit items in this case ("Examined Items") all date from (or after) 2005, "[D]efendants produced numerous forged invoices and packing lists from Fendi companies, addressed to [D]efendants or their purported suppliers . . . bearing dates going as far back as 1999." (Pls.' Reply Mem. in Supp. of Their Mot. for Summ. J., dated May 13, 2009 ("Reply"), at 6.) Plaintiffs also argue that "[i]t is hardly surprising" that Defendants have abandoned their "'unclean hands' defense and their defense relating to [P]laintiffs' supervision and inspection of

---

[1]    Defendants' counsel contradicted this statement about partial summary judgment at oral argument on February 4, 2010. (See Tr. of Proceedings, dated Feb. 4, 2010 ("Hr'g Tr."), at 20:22–21:7 ("THE COURT: You're a moving party too, right? . . . MR. DUNNE: . . . [N]ot on liability. THE COURT: [W]hat does your motion say? . . . You want summary judgment partially too, right?  MR. DUNNE: **No.**" (emphasis added)).)

goods" and, thus, "summary judgment in favor of [P]laintiffs is warranted on these defenses." (Reply at 9 n.11.)

On January 29, 2010, Defendants filed a Supplemental Submission which attaches a Declaration of Howard Colton, a defendant in another litigation brought by Fendi in this District. (See Supp'l Submission of Defs., dated Jan. 29, 2010.)[2]

On February 4, 2010, as noted, the Court heard oral argument.[3]  (See Hr'g Tr.)

On February 11, 2010, Plaintiffs wrote to the Court enclosing a February 8, 2010 decision by United States District Judge Leonard B. Sand granting summary judgment to Fendi on its trademark counterfeiting, trademark dilution, and common law unfair competition claims against Burlington Coat Factory Warehouse Corporation ("Burlington Coat Factory") and Cohoes Fashion, Inc., a wholly-owned subsidiary of Burlington Coat Factory (collectively, "Burlington").[4]

---

[2]   Defendants specifically acknowledge that their untimely Supplemental Submission is not properly before the Court and need not be considered. (See Hr'g Tr. at 15:7-10, 16:14-15, 14:17-19 ("THE COURT: [P]ursuant to what Federal Rule of Civil Procedure did you send it [i.e., the Supplemental Submission] and am I supposed to look at it?  MR. DUNNE: There isn't any Federal Rule of Civil Procedure. . . . It doesn't come in. . . . You don't have to consider it.").)

[3]   At oral argument, Defendants' counsel conceded that Defendants are "**not sure exactly where these bags came from**." (Hr'g Tr. at 10:13-18 (emphasis added); see pp. 25–26, infra.)

[4]   See Letter from Richard L. Mattiaccio to Hon. Richard M. Berman, dated Feb. 11, 2010 (citing Fendi Adele S.r.l. v. Burlington Coat Factory Warehouse Corp., No. 06 Civ. 85, 2010 WL 431509, at *3, 5–6 (S.D.N.Y. Feb. 8, 2010) ("Minerva, the Industrial Director of Leather Goods and Logistics Director for Fendi from 2002 to 2008, testified that thirty nine of the Fendi-branded products taken from Burlington were counterfeit. **He also identified twenty Fendi-branded products Ashley Reed supplied to other retailers as counterfeit**. . . . Minerva's testimony establishes a prima facie case that the goods at issue are counterfeit. . . . Burlington . . . notes that it, along with Ashley Reed [i.e., one of Burlington's principal suppliers of Fendi-branded goods], has previously purchased authentic Fendi goods through the secondary market.  Burlington's prior purchase of authentic goods has no bearing on Minerva's determination that the goods he inspected were counterfeit. . . . Even if authentic goods could be obtained through non-authorized customers, Burlington has put forward no evidence to counter

For the reasons set forth below, Plaintiffs' motion for summary judgment is granted in part and denied in part.

## II.    Background

Fendi Adele S.r.l., an Italian limited liability company (Compl. ¶ 5), is the "owner of the . . . federally registered Fendi trademarks and of all other intellectual property rights associated with merchandise bearing any of the Fendi trademarks" and "the exclusive designer of all handbags, shoulder bags, purses, wallets, and key holders that bear any Fendi trademark (the 'Products')." (Pls.' Corrected Statement Pursuant to Local Civil Rule 56.1, dated Feb. 27, 2009 ("Pl. 56.1"), ¶¶ 1–2; Reply of Defs. to Pls.' Statement Pursuant to Rule 56.1, dated Apr. 28, 2009 ("Def. 56.1"), ¶¶ 1–2.) Fendi Adele S.r.l. has held the following United States Patent and Trademark Office ("USPTO") registration numbers for at least five years: Nos. 1,214,472; 1,244,466; 1,439,955; 2,648,256; and 2,648,257 (collectively, "Fendi Marks"). (Pl. 56.1 ¶ 28; Def. 56.1 ¶ 28; see Decl. of Victor Genecin, dated Feb. 27, 2009 ("Genecin Decl."), Exs. 1–5 (USPTO Certificates of Registration).) The Fendi Marks "have acquired great value and have become well known to the consuming public and trade as identifying and distinguishing FENDI exclusively and uniquely as the source of the merchandise to which the trademarks are applied." (Compl. ¶ 21; Answer ¶ 21.)

Ashley Reed, a New York corporation, engages in the "business [of] the purchase and sale of off-price branded merchandise." (Pl. 56.1 ¶ 8; Def. 56.1 ¶ 8.) Scott Ressler and James Ressler are, respectively, the President and Vice President of Ashley Reed and each owns fifty

---

the multiple deviations identified in each of the products. Burlington has failed to offer any hard evidence showing that its version of the events is not wholly fanciful.") (emphasis added and internal citations and quotations omitted); see also p. 17 n.6, infra.

percent of the company.  (See Pl. 56.1 ¶¶ 9–11; Def. 56.1 ¶¶ 9–11.)  Both Scott and James

Ressler dealt with Ashley Reed's Fendi-branded goods.[5]  (Pl. 56.1 ¶ 13; Def. 56.1 ¶ 13.)

"In Late 2000 and Early 2001 Fendi was aware of Ashley Reed's dealing in Fendi-

branded merchandise and made allegations to Ashley Reed's customers . . . that Ashley Reed

was dealing in counterfeit goods."  (Defs.' Statement of Material Facts as to Which There Are

Genuine Disputes, dated Apr. 28, 2009 ("Def. Supp'l 56.1"), ¶ 6; Pls.' Resp. to Defs.' Statement

of Material Facts as to Which They Claim There Are Genuine Disputes, dated May 13, 2009

("Pl. Supp'l 56.1"), ¶ 6.)  "In 2001 Ashley Reed, with [its] attorney Brett Meyer, met more than

once with Pavia and Harcourt, the attorneys for Fendi handling Fendi's anti-counterfeiting

efforts in the United States."  (Def. Supp'l 56.1 ¶ 7; Pl. Supp'l 56.1 ¶ 7.)

Scott Ressler testified at his deposition that, in or about 2001, Fendi sent a cease and

desist letter to Ashley Reed and that counsel for Fendi subsequently advised him at a meeting

that Ashley Reed was selling counterfeit Fendi-branded merchandise.  (See Genecin Supp'l Decl.

Ex. 30 (Dep. of Scott Ressler, dated Oct. 16, 2006 ("S. Ressler Dep. Add'l Excerpts")), at 104:7–

105:1 ("Q.  Four to five years ago were you served with a cease and desist letter from Fendi?

---

[5]      Scott Ressler acknowledged that "his brother and business partner in Ashley Reed, Jim
Ressler, was charged with criminal counterfeiting regarding Prada bags acquired from Italy in
the same manner as many of the Fendi bags involved in this matter."  (Decl. of Scott Ressler,
dated Apr. 24, 2009 ("S. Ressler Decl."), ¶ 12.)  On December 1, 2008, James Ressler pleaded
guilty to two counts of assisting with "the entry and attempt to enter into the commerce of the
United States imported merchandise by means of false and fraudulent invoices," in violation of
18 U.S.C. § 3.  (Supp'l Decl. of Victor Genecin in Further Supp. of Pls.' Mot. for Summ. J.,
dated May 13, 2009 ("Genecin Supp'l Decl."), Ex. 24 (Criminal Information, dated Dec. 1,
2008), at 1–2; Ex. 26 (Guilty Plea and Plea Agreement, dated Dec. 1, 2008), at 1.)

James Ressler's criminal defense counsel appeared at the February 4, 2010 oral argument
and explained the plea as follows:  "[I]t has nothing to do with counterfeiting"; it has to do
with "the importer . . . [having] brought in the goods [i.e., Prada handbags] and understated their
value for duty purposes . . . [a]nd Mr. Ressler was an accessory after the fact to . . . facilitating
that."  (Hr'g Tr. at 25:15-20, 23-24 (emphasis added).)

A. Yes.  Q.  What did you do in response to that cease and desist letter?  A.  I came to see

you. . . .  Q.  At that meeting were you advised that the Fendi[-]branded merchandise that you

were selling was counterfeit?  A. **Yes.**" (emphasis added)).)  "After these meetings in 2001,

Fendi did not contact Ashley Reed regarding allegations of counterfeit Fendi goods until the

initiation of this current dispute in late 2005."  (Def. Supp'l 56.1 ¶ 7; Pl. Supp'l 56.1 ¶ 7.)

    Leonardo Minerva ("Minerva"), Industrial Director of Leather Goods and Logistics

Director for Fendi S.r.l, "was in charge of all manufacture by Fendi S.r.l. of Products from

September, 2002 until March, 2008."  (Pl. 56.1 ¶ 111; Def. 56.1 ¶ 111.)  Minerva "examined 15

Fendi[-]branded handbags and small leather items that had either been sold by Filene's Basement

or that were obtained from that defendant during discovery" and also examined "a total of five

Fendi[-]branded items [purchased] from three other retailers[:]  Big M., Inc., Nordstrom's Rack

and Saks Off Fifth." (collectively, as noted at p. 3, <u>supra</u>, "Examined Items").  (Pl. 56.1 ¶¶ 123–

24; Def. 56.1 ¶¶ 123–24.)  Minerva testified at his deposition that he had conducted authenticity

examinations for each of the twenty Examined Items, which included Fendi-branded handbags

and wallets, and had determined them to be counterfeit.  (<u>See</u> Genecin Decl. Ex. 11 (Dep. of

Leonardo Minerva, dated Feb. 13, 2008 ("2008 Minerva Dep.")), at 269:22–273:18 ("Q.  What

was [your] conclusion?  A. **Fendi never made this bag, therefore the bag is a counterfeit**.  Q.

And what are your reasons for concluding that Plaintiff[s'] Exhibit 53 . . . is counterfeit?  A.

Well, . . . the leather . . . [is] a lower grade. . . . The fabric . . . is really different from the original

one in terms of the weave, in terms of dimensions and also the touch, it's very soft . . . .  Q.  [I]s

that original Fendi fabric?  A.  No.  Q.  How about the lining . . . ?  A.  No, it doesn't respect the

standards of Fendi.  And the buckles here are not of the same material that they should be in this

bag. . . . Q.  On the label where the hologram is supposed to be, there is no hologram?  A.  No."

(emphasis added)), 203:19–205:11 ("Q. What was [your] conclusion . . . ?   A. That this item is a counterfeit . . . .   Q. And what are your reasons for concluding that Plaintiff[s'] Exhibit 79 . . . is counterfeit?   A. Well, the fabric has a darker color than the original one, the leather, that's the most evident thing[,] is different from the grade that we use, it's a lower grade.  The lining is not the lining that we use.  The zipper pull is different from the one that we use[d] in that season, and . . . the code that's on the tag, 8M0024PURFORU9, refers to a wallet that should be beige, not black."), 200:5–203:18, 205:23–206:4, 207:9–219:9, 235:8–254:8, 255:11–257:6, 265:2–267:2, 268:8–269:21, 273:19–276:19; see also Pl. 56.1 ¶¶ 128–29.)

Minerva also testified that, under his supervision, his assistant, Massimo Lepri, prepared a written report for each of the twenty Examined Items ("Authenticity Reports").  (See 2008 Minerva Dep. at 492:7-15 ("These reports are part of a consolidated process whereby [they] are prepared by Mr. Massimo Lepri under my supervision."), 495:4-8 ("All of the reports were checked by me."); see also Pl. 56.1 ¶ 122 ("A written report was prepared concerning each item examined for authenticity."); Def. 56.1 ¶ 122.)

Defendants concede that they sold the twenty items that Minerva examined.  (See Def. Opp'n at 8 ("[T]he bags Mr. Minerva examined were sold by Ashley Reed[.]"); Def. 56.1 ¶ 127 ("Scott Ressler testified that [Ashley Reed] sold Fendi[-]branded goods to Filene's Basement, Saks Off . . . , Big M., Inc. and Nordstrom's Rack . . . ."); Def. 56.1 ¶ 125 ("Filene's Basement's buyers testified that the source for that company's Fendi[-]branded goods was [Ashley Reed]."); Def. 56.1 ¶ 126 ("Michael Wolkoff, senior vice president and general merchandise manager of the Off Fifth Division of Saks Fifth Avenue[,] testified that his company's source for

8

Fendi[-]branded goods was [Ashley Reed]."); see also Purgess v. Sharrock, 33 F.3d 134, 144 (2d

Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of

fact.").)

Defendants (previously) were accused of counterfeiting by three other fashion

companies. (See S. Ressler Decl. ¶ 12 ("This is not, of course, the first time an owner of a

luxury brand has asserted to Ashley Reed [that its] . . . goods are counterfeit.  This has happened

many times to Ashley Reed[.]").)  Gucci America and Tommy Hilfiger sued Defendants for

trademark infringement in 2000 and 2001, respectively, resulting in consent judgments against

Defendants. (See Def. 56.1 ¶ 18; see also Def. 56.1 ¶¶ 15, 16, 17.)  And, in or about 2004, Ralph

Lauren "threatened to sue [Ashley Reed] for trademark violations" but reached a settlement with

Defendants prior to commencing litigation.  (S. Ressler Dep. Excerpts at 120:16–121:25.)

Ashley Reed alleges that, after the instant litigation commenced, it returned all Fendi-

branded handbags and accessories in its inventory to their sources. (See Genecin Decl. Ex. 18

(Dep. of Scott Ressler, dated Oct. 16, 2006 ("S. Ressler Dep. Excerpts")), at 124:6-13

("Q. [W]hen the litigation was initiated, you took the merchandise, the Fendi brands of

merchandise that you had in inventory, and you returned it?  A. Yes.  Q. Returned it to the

people that you purchased it from?  A. Yes.").)  Defendants "did not have [or produce]

documents relating to the returns."  (Pl. 56.1 ¶ 138; Def. 56.1 ¶ 138.)

Scott Ressler testified that Defendants did not always keep invoices issued to Ashley

Reed by its direct suppliers. (See S. Ressler Dep. Excerpts at 258:20–260:4.)  He also testified

that Ashley Reed sometimes retained copies of invoices issued to its suppliers by their sources of

Fendi-branded products. (See S. Ressler Dep. Excerpts at 258:20–260:4 ("A.  We would . . . see

copies of the invoices [from our suppliers' sources].  And sometimes [our sources] would

9

actually give us copies of the invoices. . . . Q. Did you retain copies of those invoices?

A. Yes. Q. Who were those invoices from? A. Different retailers. Some from Fendi directly.

Q. So you [would] keep that documentation, but you wouldn't keep the invoices from Graham

[Limited, i.e., one of Ashley Reed's alleged suppliers] for the payment of goods? A. We felt

that was more important in case we ever had a problem with somebody like you. Q. Keeping

that backup information as opposed to actual invoices -- A. Exactly. Q. -- from your source?

A. Exactly, yes. And we didn't always keep the invoices from Fendi.").)

Scott Ressler also testified that in some instances Ashley Reed discarded financial

records after one year. (See Hr'g Tr. at 22:16-18 ("THE COURT: [Y]our client says he doesn't

keep documents past a year or two. MR. DUNNE. Correct."); see also S. Ressler Dep. Excerpts

at 271:11-24 ("Q. How did you pay Zucker's Gifts for the goods? A. I would imagine with a

check. Q. Do you maintain a copy of the cancelled check? A. From five years ago, no. We

don't have our records that long. Q. You don't maintain records for at least five years?

A. Not that I know of."); see also S. Ressler Dep. Excerpts at 566:3-19 ("Q. . . . [W]hen you say

you clean out the files, what do you do with the contents of a file that you've cleaned out? A. A

lot of them we throw out, because we just don't physically have the room for it. Q. So would it

be fair to say that if you received invoices from Ma.Gia [i.e., one of Ashley Reed's alleged

suppliers] during 2004, that those invoices were thrown out sometime around February of 2005?

A. Possible, but not definitely. Q. Why not? A. We're a small company and everything

doesn't get done efficiently. Q. So some things might be kept, some things might get thrown

away? A. Yes.").)

Scott Ressler also testified that Ashley Reed conducted a "rigorous" inspection of all

goods purchased from secondary sources, including a "side-by-side comparison" with

merchandise it obtained directly from Fendi stores, but he conceded that Ashley Reed did not keep receipts for these purchases. (S. Ressler Dep. at 269:15–270:10 ("Q. So you would do a side-by-side comparison?  A. Absolutely, yes.  Q. You said that you would make purchases from the Fendi stores.  Do you have receipts for those purchases?  A. No.  Q. Why not?  A. We would return the goods. . . .  Q. But even upon returning the goods, you would have an invoice?  A. Why would you keep it if you returned it?  We paid – when we bought the goods in the store, we paid retail.  Q. You did not think that . . . maintaining invoices showing that you did this type of process . . . was not important in a situation such as this?  A. No.").)

"At a meeting held in or about June 2003, Filene's Basement['s] then-CEO, Heywood Wilansky, asked James Ressler to sign a form letter agreement"; the agreement was executed by James Ressler on June 12, 2003.  (Pl. 56.1 ¶¶ 143, 146, 148; Def. 56.1 ¶¶ 143, 146, 148.)  The agreement omits a redacted paragraph (¶ 2) that, prior to its redaction, read: "Seller has the legal right to sell the Merchandise, including sale thereof for resale in the U.S.A., and the purchase and resale of the Merchandise by Filene's in the U.S.A. will not violate or infringe upon any existing contractual and/or Proprietary Rights owned by others." (Pl. 56.1 ¶¶ 146, 148; Def. 56.1 ¶¶ 146, 148.)  **Under his signature on the letter agreement, J[ames] Ressler wrote that 'Point 2 [legal right to sell] was taken out.'"** (Pl. 56.1 ¶ 147 (emphasis added); Def. 56.1 ¶ 147.)

### III.   Legal Standard

"Summary judgment is appropriate when 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Chloé v. DesignersImports.com USA, Inc., No. 07 Civ. 1791, 2009 WL 1227927, at *4 (S.D.N.Y. Apr. 30, 2009) (quoting Fed.

R. Civ. P. 56(c)). "The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." Burberry Ltd. v. Euro Moda, Inc., No. 08 Civ. 5781, 2009 WL 1675080, at *3 (S.D.N.Y. June 10, 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "A party opposing a properly made motion for summary judgment 'may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in [Fed. R. Civ. P. 56] – set out specific facts showing a genuine issue for trial.'" DesignersImports.com USA, 2009 WL 1227927, at *5 (quoting Fed. R. Civ. P. 56(e)). "When deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party . . . and draw all inferences and resolve all ambiguities in that party's favor." Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615, 617 (2d Cir. 2008).

"The distinguishing feature of the acquiescence defense is the element of active or explicit consent to use of an allegedly infringing mark." Deere & Co. v. MTD Holdings, Inc., No. 00 Civ. 5936, 2004 U.S. Dist. LEXIS 2550, at *68 (S.D.N.Y. Feb. 19, 2004) (quoting Sun America Corp. v. Sun Life Assurance Co. of Can., 77 F.3d 1325, 1338 (11th Cir. 1996) (emphasis omitted)). "In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996).

In order to obtain a permanent injunction on a Lanham Act claim, "a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.'" L. & J.G. Stickley, Inc. v. Cosser, 255 F. App'x 541, 543 (2d Cir. 2007) (quoting Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006)). "In trademark disputes, 'a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.'" Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426

F.3d 532, 537 (2d Cir. 2005) (quoting Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988)); see also In re Vuitton et Fils S.A., 606 F.2d 1, 4 (2d Cir. 1979).

"[A] plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting." Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995) (quoting George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1540 (2d Cir. 1992)); see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 500 F. Supp. 2d 276, 278, 280 (S.D.N.Y. 2007).

## IV.   Analysis

### (1)   Affirmative Defenses

### Acquiescence

Plaintiffs argue (persuasively) that Defendants "point to no evidence that Fendi actively consented to [D]efendants' ongoing sales of counterfeits." (Reply at 9.)  Defendants counter that in meetings with Fendi's attorneys in 2001, Defendants "made a genuine good-faith effort to resolve any apparent dispute" and "[u]nder these circumstances, it was reasonable for Ashley Reed to rely on Fendi's silence as consent to its good faith offer of accommodation." (Def. Opp'n at 11 (internal citations and quotations omitted).)

A defendant has the burden of proof on his affirmative defense of acquiescence. See Gidatex, S.r.l. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 135 (S.D.N.Y. 1999). "Acquiescence is implied by active consent, which is 'conduct on the plaintiff's part that amount[s] to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.'" Info. Superhighway, Inc. v. Talk Am., Inc., 274 F. Supp. 2d 466, 472 (S.D.N.Y. 2003) (quoting ProFitness Physical Therapy Ctr. v. Pro-Fit

Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 68 (2d Cir. 2002)).  "[S]ilence is far

from 'active acquiescence.'"  Deere & Co., 2004 U.S. Dist. LEXIS 2550, at *68.

Plaintiffs are entitled to summary judgment as to Defendants' affirmative defense of

acquiescence because, among other reasons, Defendants fail to adduce any evidence that

Plaintiffs made assurances that they would not assert their rights in the Fendi Marks against

Defendants.  See Gidatex, 82 F. Supp. 2d at 135; see also Carl Zeiss Stiftung v. VEB Carl Zeiss

Jena, 433 F.2d 686, 704 (2d Cir. 1970).  Indeed, Defendants specifically acknowledge that

Plaintiffs sent Ashley Reed a cease and desist letter in 2001 because Ashley Reed was selling

counterfeit Fendi-branded merchandise.  (See pp. 5-6, supra; S. Ressler Dep. Add'l Excerpts at

104:7–105:1 ("Q.  Four to five years ago were you served with a cease and desist letter from

Fendi?  A.  Yes. ...  Q.  Were you advised that the Fendi[-]branded merchandise that you were

selling was counterfeit?  A. Yes.").)  And, Defendants have not shown that they suffered any

harm or prejudice because of any delay by Plaintiffs in asserting their rights.  See Road Dawgs

Motorcycle Club of U.S., Inc. v. "Cuse" Road Dawgs, Inc., No. 05 Civ. 966, 2009 WL 5185809,

at *13 (N.D.N.Y. Dec. 22, 2009); see also Conopco, 95 F.3d at 192 ("A defendant has been

prejudiced by a delay when the assertion of a claim available some time ago would be

'inequitable' in light of the delay in bringing that claim.").

### Laches

Plaintiffs argue, among other things, that "it is undisputed that Fendi filed suit within the

six-year limitations period for fraud"; "[t]here is simply no evidence that Fendi ever consented to

[D]efendants' continuous course of counterfeiting since 2001"; Defendants "received a cease and

desist letter from Fendi in 2001"; and "during [a] meeting [between Fendi's counsel and Scott

Ressler] in 2001, Fendi expressly demanded that [D]efendants stop selling counterfeit

Fendi[-]branded items." (Reply at 9–10.) Defendants counter that "Fendi may have placed Ashley Reed on notice with [its] allegations, but their subsequent failure to follow up does not allow the cease and desist letters of 2001 to destroy a claim of laches . . . since the claims were not promptly followed by a lawsuit"; and Defendants "reasonably relied on [Fendi's] silence in continuing [their] dealings in Fendi-branded goods." (Def. Opp'n at 10–11 (citations and quotations omitted).)

"[P]rior to the running of the most closely analogous state statute of limitations[,] there is no presumption of laches and the burden remains on the defendant to prove the defense." Conopco, 95 F.3d at 191. "In evaluating whether [a] plaintiff's delay in taking action was sufficiently long to invoke laches in a Lanham Act suit, the Second Circuit has held that the six-year statute of limitations applicable to state-law fraud claims in New York is the appropriate measure." Fitzpatrick v. Sony-BMG Music Entm't, Inc., No. 07 Civ. 2933, 2008 WL 84541, at *2 (S.D.N.Y. Jan. 8, 2008) (citing Conopco, 95 F.3d at 191–92).

Plaintiffs are entitled to summary judgment as to Defendants' affirmative defense of laches because, among other reasons, Defendants adduce no evidence that Plaintiffs unreasonably delayed in bringing suit or that Defendants were prejudiced. See Road Dawgs, 2009 WL 5185809, at *14; Gidatex, 82 F. Supp. 2d at 134; see also Carl Zeiss, 433 F.2d at 703 ("There is no evidence that appellants were ever lulled into a false sense of security or acted in reliance thereon."). Plaintiffs initiated this suit within the applicable six-year period of limitations. See Fitzpatrick, 2008 WL 84541, at *2 ("Prior to the running of the [six-year statute of limitations period] there is no presumption of laches . . . ." (citation omitted and alteration in original)). In light of the cease and desist letter sent to Ashley Reed in 2001 and the subsequent meetings between attorneys for Fendi and Scott Ressler, Defendants were clearly on notice of

Plaintiffs' objections to any sales by Ashley Reed of counterfeit Fendi-branded goods.  (See pp.

5-6, supra; S. Ressler Dep. Add'l Excerpts at 104:7–105:1); Saratoga Vichy Spring Co. v.

Lehman, 625 F.2d 1037, 1041 (2d Cir. 1980) ("[a] simple warning letter would have sufficed");

see also Elvis Presley Enters. v. Capece, 141 F.3d 188, 205 (5th Cir. 1998) ("Any acts after

receiving a cease and desist letter are at the defendant's own risk because it is on notice of the

plaintiff's objection to such acts."); Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props.,

Inc., 616 F. Supp. 2d 622, 634 (N.D. Tex. 2009) ("[A]ny time lapse after a trademark plaintiff

issues a cease and desist letter to the defendant does not count for the purposes of laches[.]").

### Other Affirmative Defenses

Plaintiffs are also entitled to summary judgment on two other affirmative defenses raised

by Defendants in their Answer, namely that "Plaintiffs have filed and prosecuted their claims in

this matter with unclean hands rendering [their] rights unenforceable"; and that "Fendi has failed

to adequately monitor the manufacture and distribution of Fendi-branded products so as to render

the Fendi marks asserted herein invalid and unenforceable."  (Answer at 9–10.)  Defendants

appear to have abandoned "their 'unclean hands' defense and their defense relating to

[P]laintiffs' supervision and inspection of goods" by failing to oppose summary judgment

concerning these defenses in their opposition to Plaintiffs' motion.  (Reply at 9 n.11; see Def.

Opp'n at 9–10 (arguing only that "Defendants have valid affirmative defenses of laches and

acquiescence" (capitalization omitted))); see also Dunkin' Donuts Franchised Rests. LLC v. Tim

& Tab Donuts, Inc., No. 07 Civ. 3662, 2009 WL 2997382, at *9 (E.D.N.Y. Sept. 15, 2009)

("Although the plaintiffs clearly enumerate each of defendants' affirmative defenses . . . on

which they base their motion, defendants have not made any arguments in opposition to

plaintiffs' motion.  As a result of defendants' failure to oppose plaintiffs' motion as to their

defenses . . . , the court finds that the defendants abandoned their affirmative defenses . . . ."); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

### (2)    Trademark Counterfeiting and False Designation of Origin Under the Lanham Act

Preliminarily, Defendants attempt to contest the admissibility of Minerva's testimony that the Examined Items are "counterfeit" arguing, among other things, that Minerva:  (1) did "not have personal knowledge of the facts he testified about" and (2) "directly read portions of his testimony from reports prepared by others at Fendi for this litigation." (Def. Opp'n at 7–8.) Plaintiffs counter, among other things, that:  (1) "Minerva unquestionably had the requisite knowledge" because he "supervised the preparation of Fendi's reports concerning the authenticity examinations" of the Examined Items; "reviewed, checked, and signed each report"; and "checked measurements and other characteristics of the [Examined Items]"; and (2) Minerva also testified about "characteristics of many of the counterfeits at issue . . . without reference to his reports."[6]  (Reply at 2–4.)

Rule 701 of the Federal Rules of Evidence ("Fed. R. Evid.") allows a lay witness to testify to "opinions or inferences which are[:]  (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a

---

[6]    Minerva, who was Industrial Director of Leather Goods and Logistics Director for Fendi S.r.l and "in charge of [its] manufacture . . . of Products from September, 2002 until March, 2008," testified at his depositions as a lay witness.  (Pl. 56.1 ¶ 111; Def. 56.1 ¶ 111; see also p. 7, supra; 2008 Minerva Dep. at 12:9–13:11.)  Minerva's responsibilities included "all development of leather goods, all the research of the material, the development of the models, the sample collection that goes to the fashion show, the purchasing of all the material, the production of all the leather goods, [and] the distribution of these leather goods to [Fendi's] distribution center." (2008 Minerva Dep. at 11:16–12:4; see also Minerva Dep. at 12:9–13:11 ("Q.  Do you have responsibility for examining products that look like Fendi products, but their authenticity is questioned?  A.  Yes.  Q.  And for how long have you been doing that work?  A.  After . . . the one-year training, . . . four years and a half."  Q. . . . [H]ow many questioned products have you examined in your career at Fendi?  A.  Hundreds, hundreds a year.").)

fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Minerva's testimony concerning the Examined Items is admissible under Fed. R. Evid. 701. See M.O.C.H.A. Soc'y, Inc. v. City of Buffalo, No. 98 Civ. 99, 2008 WL 4412093, at *2–3 (W.D.N.Y. Sept. 23, 1998). First, Minerva's opinions are rationally based on his perceptions because, among other reasons, in his role as Industrial Director of Leather Goods and Logistics Director for Fendi, he independently inspected each Examined Item for indicia of counterfeiting, and supervised the preparation of the Authenticity Reports. (See 2008 Minerva Dep. at 406:12–407:15, 492:7-15, 495:4-8, 495:13-17); see also Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 181 (2d Cir. 2004) ("to the extent Huang's testimony was grounded in the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to [Fed. R. Evid.] 701 . . . because it was based on his perceptions" (emphasis in original)); United States v. Glenn, 312 F.3d 58, 67 (2d Cir. 2002); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993). Second, Minerva's testimony is helpful to the determination of, among other issues, the genuineness of the Examined Items. See M.O.C.H.A. Soc'y, 2008 WL 4412093, at *2. Third, Minerva's testimony falls within the scope of Fed. R. Evid. 701 because it "is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his . . . position in the business." Bank of China, 359 F.3d at 181 (citing Fed. R. Evid. 701 advisory committee's note); see also United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007).

Minerva's testimony is admissible notwithstanding that he may have relied at times on the Examination Reports to refresh his recollection. (See 2008 Minerva Dep. at 12:9–13:11); Fendi Adele S.r.l., 2010 WL 431509, at *5 ("Minerva was entitled to consult the reports

throughout his testimony.  Courts have permitted witnesses to rely on notes or documents

throughout the course of testimony if the witness demonstrates an independent recollection, and

the testimony is of a detailed nature."); see also Goings v. United States, 377 F.2d 753, 761 n.11

(8th Cir. 1967) ("Generally, . . . lay witnesses testifying should be allowed continuously to refer

to data on their reports, etc.").  While Minerva appears at times to have lacked effective present

recollection, it was entirely appropriate to refresh his memory with the Authenticity Reports.

(See, e.g., 2008 Minerva Dep. at 254:9–255:17, 273:19–275:8; see also Bankers Trust Co. v.

Publicker Indus., Inc., 641 F.2d 1361, 1363 (2d Cir. 1981) ("There is no required, ritualistic

formula for finding exhaustion of memory." (citing Goings, 377 F.2d at 760–61)).  It cannot be

concluded, as Defendants suggest, that Minerva was merely reading from the Authenticity

Reports, "instead of [testifying from] his own knowledge," (Decl. of Gerard F. Dunne, dated

Apr. 28, 2009 ("G. Dunne Decl."), ¶ 2), because, among other reasons, at times while testifying

Minerva compared Examined Items to genuine Fendi merchandise and then specified

deficiencies he observed in the Examined Items during those comparisons.  (See 2008 Minerva

Dep. at 208:7–209:20); see also Fendi Adele S.r.l., 2010 WL 431509, at *5 ("Given the fact that

Minerva did not rely exclusively on the reports and that the nature of the testimony was detailed,

we find his use of the reports was proper.").

### **Trademark Counterfeiting and False Designation of Origin**

Plaintiffs argue that "when asked during his deposition whether [Ashley Reed] purchased

and sold counterfeit Fendi products, James Ressler invoked the Fifth Amendment" and that

"[c]ourts are permitted to draw an adverse inference in civil cases where a litigant asserts the

Fifth Amendment." (Reply at 6 n.7.)  Defendants counter that "for summary judgment purposes

[the court] should consider all reasonable inferences in favor of the non-moving party."  (Hr'g

Tr. at 35:22-25.)

While it is settled law that a trier of fact may draw an adverse inference in a civil action against a party who invokes the Fifth Amendment privilege, the court in deciding this summary judgment motion has not drawn any inference from James Ressler's invocation of his right against self-incrimination. See Fidelity Funding of Cal., Inc. v. Reinhold, 79 F. Supp. 2d 110, 117 (E.D.N.Y. 1997); (Order, dated Feb. 9, 2010, at 4 ("Judge Dolinger properly determined that in the interest of bringing this litigation to a reasonably prompt close . . . a further stay [of the deposition of James Ressler] is not warranted[.]" (internal quotation omitted))); see also Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 57 (2d Cir. 2005); Varone v. City of New York, No. 02 Civ. 1089, 2003 WL 21787475, at *12 (S.D.N.Y. Aug. 4, 2003).

Plaintiffs also argue, among other things, that "[t]he Fendi trademarks are . . . valid and entitled to protection" and that "[D]efendants' use in commerce of counterfeits of the Fendi trademarks is shown by uncontroverted evidence." (Pl. Mem. at 6–8.) Defendants counter, among other things, that "Ashley Reed has for years been involved in the lawful activity of importing into the United States and trading in 'gray market' products bearing prominent trademarks"; "Ashley Reed purchased genuine Fendi Products directly from the Fendi store in Italy"; and "[a] large amount of Fendi products had been acquired from sources Fendi itself identified as genuine." (Def. Opp'n at 2–4.)

"A claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use), is analyzed . . . [by looking] first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers

confusion as to the origin or sponsorship of the defendant's goods." Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003) (citing Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993)).  To determine whether there is a likelihood of confusion, courts in the Second Circuit generally rely on the eight-factor test set forth in Polaroid Corp. v. Polarad Electrics Corp., 287 F.2d 492, 495–96 (2d Cir. 1961). See Burberry, 2009 WL 1675080, at *5. "However . . . where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each Polaroid factor because counterfeit marks are inherently confusing." Id. (quoting Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 454–55 (S.D.N.Y. 2005)); see also Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).  The court "need only determine the more fundamental question of whether there are items to be confused in the first place -- that is, whether the items at issue . . . are, in fact, counterfeit and whether [d]efendants sold those items." Duty Free Apparel, 286 F. Supp. 2d at 287–88. "Sellers bear strict liability for violations of the Lanham Act." Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1152 n.6 (7th Cir. 1992).

The Fendi Marks are clearly entitled to protection because, as Defendants acknowledge, Fendi Adele S.r.l. owns the marks, (see Def. 56.1 ¶ 1); and Defendants have offered no evidence to rebut the presumption that the Fendi Marks are valid and enforceable arising from their registration with the USPTO. (See Genecin Decl. Exs. 1–5 (USPTO Certificates of Registration); pp. 13–17, supra); see also 15 U.S.C. §§ 1057(f), 1115(a); Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999) ("A certificate of registration with the [USPTO] is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."); Burberry, 2009 WL 1675080, at *5. Three of the Fendi Marks are incontestable

21

because Plaintiffs continuously used them for at least five years after registering the Marks with the USPTO and prior to commencing this action.[7]  (See Genecin Decl. Exs. 1–3 (USPTO Certificates of Registration)); 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 277 F. Supp. 2d 356, 361 (S.D.N.Y. 2003) ("[p]laintiff's registration of the relevant mark has been in place for more than five years; its entitlement to protection is therefore incontest[a]ble").

And, Defendants have not rebutted Plaintiffs' claim that the Examined Items were counterfeit Fendi-branded goods.[8]  Plaintiffs met their burden to show the absence of a genuine issue of material fact as to Defendants' liability through unrebutted testimony (e.g., Minerva that the twenty Examined Items are counterfeit and were not manufactured by Fendi.  (See pp. 7– 8, supra; 2008 Minerva Dep. at 201:17-18 ("This item is counterfeit because it was not produced by Fendi."), 203:19–205:11 ("[T]his item is a counterfeit because it was not made by Fendi."), 210:23-24 ("This item is a counterfeit, because it's not been produced by Fendi."), 255:25–256:2 ("Fendi didn't make this bag, therefore the bag is a counterfeit."), 265:9-10 ("[T]he bag is a counterfeit, because it was not made by Fendi."), 269:22–273:18 ("Fendi never made this bag, therefore the bag is a counterfeit."); see also Duty Free Apparel, 286 F. Supp. 2d at 288. Minerva supported his conclusion that each of the twenty Examined Items are counterfeit by identifying specific deviations from genuine Fendi Products.  (See pp. 7–8, supra; 2008 Minerva Dep. at 204:24–205:9 ("[W]hat are your reasons for concluding that Plaintiff[s'] Exhibit 79 . . . is counterfeit?  A.  [T]he fabric has a darker color than the original one, the leather . . . is different

---

[7]    The other two Fendi Marks had not been registered and in continuous use for at least five years at the time this action was filed but are presumed valid because they were registered with the USPTO. (See Genecin Decl. Exs. 4–5 (USPTO Certificates of Registration)); Sizzler Family Steak Houses v. Western Sizzlin' Steak House, Inc., 793 F.2d 1529, 1540–41 (11th Cir. 1986).

[8]    Defendants acknowledge that "the bags Mr. Minerva examined were sold by Ashley Reed." (Def. Opp'n at 8.)

from the grade that we use, it's a lower grade. The lining is not the lining we use. The zipper pull is different from the one that we use in that season[.]"), 269:9-17 ("Q. [W]hat are your reasons for concluding that Plaintiff[s'] Exhibit 53 . . . is counterfeit?  A. Well, the inner lining is . . . different from the one we use, the nuance of the color of fabric is different, the leather is completely a lower grade . . . compared to our leather. The hologram is . . . counterfeited . . . ."), 271:15–272:17 ("Q. What was [your] conclusion [regarding Plaintiffs' Exhibit 54?] A. . . . [B]esides the leather, [which is a] lower grade, this fabric is really, really different. . . . [T]he buckles here are not of the same material they should be in this bag. The hologram that is detached from here . . . has a number whose font is not the original one."); Pl. 56.1 ¶¶ 128–29); see also Burberry, 2009 WL 1675080, at *6 ("Jackson determined that these purported 'Burberry' items contained several significant deviations from authentic[] Burberry products."); Duty Free Apparel, 286 F. Supp. 2d at 288.

In response, Defendants employ "mere speculation or conjecture" that the Examined Items are not counterfeit.  See Fendi Adele S.r.l., 2010 WL 431509, at *7 ("Burlington has failed to provide any evidence to defeat Fendi's prima facie case and establish the existence of a genuine issue of fact as to the authenticity of the goods in question"); Martal Cosmetics, Ltd. v. Int'l Beauty Exch. Inc., No. 01 Civ. 7595, 2007 WL 895697, at *21 (E.D.N.Y. Mar. 22, 2007) ("I conclude that the evidence on which . . . [d]efendants seek to rely supports nothing more than mere speculation and conjecture. . . . I therefore conclude that there is no genuine dispute of material fact as to whether the seized goods were counterfeit." (internal quotation and citation omitted)).

None of Defendants' speculations or conjecture includes evidence that the "gray market" was the source of the twenty Examined Items.  See Fendi Adele S.r.l., 2010 WL 431509, at *7

("Burlington has not offered a countervailing expert, evidence that any of the goods in question were purchased from an authorized Fendi customer, or any other affirmative evidence that the bags are genuine. . . . Burlington's prior purchase of authentic goods has no bearing on Minerva's determination that the goods he inspected were counterfeit.").  And, Defendants fail to create a triable issue of fact by suggesting (guessing) that:  (i) "[t]he bags that were examined – [they] were **likely obtained** from the Fendi factory that were authorized to be sold as genuine authentic goods," (Hr'g Tr. at 10:20-22 (emphasis added)); (ii) "**[p]erhaps** the bags were actually 'seconds,' or imperfect and the factory did not want the workmanship of the bags traced to them," (S. Ressler Decl. ¶ 13 (emphasis added)); (iii) "**perhaps** the bags were made to be sold to a Fendi store as overstock," (S. Ressler Decl. ¶ 13 (emphasis added)); (iv) "[t]he codes **may have** been changed by the factory **for a reason I can only guess**," (S. Ressler Decl. ¶ 13 (emphasis added)); (v) "Ashley Reed . . . purchased Fendi leather goods in 2004 that were from . . . a store in Italy clearly marked and **represented** as a 'Fendi' store," (S. Ressler Decl. ¶ 11 (emphasis added)); (vi) Ashley Reed purchased an "extensive amount of goods from a company known as Moda Oggi" and "the attorneys for Fendi have acknowledged that **at least some** of these goods were genuine," (Def. Opp'n at 4–5 (emphasis added)); and (vii) a Fendi inspector, Lorenzo Bandinelli ("Bandinelli"), "said the goods that we [i.e., Ashley Reed] were buying were authentic," (J. Dunne Decl. Ex. 85 (Dep. of Scott Ressler, dated Oct. 16, 2006 ("Defs. S. Ressler Dep. Excerpts")), at 83:4–86:9), and "**I suppose** these bags [i.e., the Examined Items] were made by the factory I visited with Mr. Bandinelli," (S. Ressler Decl. ¶ 13 (emphasis added)).[9]  See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

---

[9]     See discussion at pp. 32–34, infra.

summary judgment." (internal quotation and citation omitted)); Duty Free Apparel, 286 F. Supp. 2d at 289 ("Harvest Wrap fails to offer specific evidence supporting its hypothesis that these particular bags escaped . . . Gucci's rigorous quality control measures. . . . Harvest Wrap cannot defeat a prima facie case of summary judgment based on the mere speculation that this unlikely possibility came about in this particular case."), 290 ("Harvest Wrap asserts that whether or not it is in the business of selling counterfeit goods – as opposed to merely having sold two counterfeit items – is an issue of material fact which should preclude summary judgment.  The Court disagrees.  The plain language of the relevant statutes does not require that the plaintiff prove that a defendant committed the infringement in any particular amount, or with any amount of regularity. . . . [T]he amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages . . . ." (citations omitted and alteration in original)); Designerimports.com USA, 2009 WL 1227927, at *7–8.

And, perhaps most significant, Defendants' counsel conceded at oral argument that Defendants are "**not sure exactly where these bags** [i.e., the twenty counterfeit Examined Items] **came from**."  (Hr'g Tr. at 10:13-18 (emphasis added); see also note 3, supra); Duty Free Apparel, 286 F. Supp. 2d at 289; J.C. Penney Corp. v. Carousel Ctr. Co., 306 F. Supp. 2d 274, 279 (N.D.N.Y. 2004) ("Supposition does not create a genuine issue of material fact, instead it creates a false issue, the demolition of which is the primary goal of summary judgment." (citation omitted)).

Accordingly, Plaintiffs are entitled to summary judgment on their claims of trademark infringement under 15 U.S.C. § 1114(1) and false designation of origin under 15 U.S.C. § 1125(a) against Defendants.  See Burberry, 2009 WL 1675080, at *7–8; Fendi S.a.s. Di Paola Fendi e Sorelle v. Cosmetic World, Ltd., 642 F. Supp. 1143, 1145 (S.D.N.Y. 1986) ("Plaintiff

has established that defendants, in violation of 15 U.S.C. § 1051 et seq., actively engaged in the sale of goods bearing counterfeit FENDI and FF trademarks.").[10]

### (3)    Common Law Unfair Competition

Plaintiffs argue, among other things, that "[p]roof of trademark counterfeiting . . . under the Lanham Act also proves . . . common law unfair competition under New York law." (Pl. Mem. at 9.)  Defendants do not appear to respond to this argument.  (See Def. Opp'n at 1–12.)

To prevail on a common law claim of unfair competition, a plaintiff "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [a defendant's] bad faith," and "[u]nder New York law, a presumption of bad faith attaches to the use of a counterfeit mark."  See Philip Morris USA Inc. v. Felizardo, No. 03 Civ. 5891, 2004 U.S. Dist. LEXIS 11154, at *22–24 (S.D.N.Y. June 18, 2004) (citing Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1227–28 (2d Cir. 1987)); see also Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another.  Central to this notion is some element of bad faith.") (citations omitted).

Plaintiffs are entitled to summary judgment on their unfair competition claim against Defendants under New York common law because Plaintiffs have established Defendants' liability for trademark counterfeiting under the Lanham Act, (see pp. 19–26, supra), and Defendants have offered no evidence that rebuts the presumption of bad faith.  See Fendi Adele S.r.l., 2010 WL 431509, at *8 ("Burlington's sale of counterfeit Fendi-branded merchandise

---

[10]    If the Court were to conduct an examination using the Polaroid factors, it would find that Defendants' sale of goods bearing Fendi Marks, (see pp. 21–22, supra), created a strong likelihood of confusion.  See Romag Fasteners, Inc. v. J.C. Penney, Inc., No. 07 Civ. 1667, 2007 WL 4225792, at *6 (D. Conn. Nov. 28, 2007) ("[T]he Polaroid factors uniformly suggest that consumer confusion will be caused by the [counterfeit] snaps on the J.C. Penney handbags.").

allows this Court to infer bad faith; therefore, summary judgment is appropriate as to Fendi's common law claims of unfair competition."); Cartier Int'l B.V. v. Ben-Menachem, No. 06 Civ. 3917, 2008 WL 64005, at *13 (S.D.N.Y. Jan. 3, 2008) ("Defendants' sale of the [c]ounterfeit [p]roducts serves to establish bad faith under New York law, and therefore summary judgment is appropriate as to th[is] claim[].");  Burberry, 2009 WL 1675080, at *15 ("Because Burberry's claims under New York state law are reviewed based on the federal law standard (i.e.[,] that of sections 32(1)(a) and 43(a) of the Lanham Act), [defendants] are also liable for unfair competition under New York and common law.").[11]

### (4)   Trademark Dilution

Plaintiffs argue, among other things, that they are entitled to summary judgment on their claims for trademark dilution under 15 U.S.C. § 1125(c) and Section 360-*l* of the New York

---

[11]   The record in this case also reflects Defendants' bad faith because Alberto Fabbri, Plaintiffs' chief financial officer, testified that he examined several invoices produced by Defendants purporting to be issued to Fendi or its suppliers, some dated as early as 1999, and that he determined that these invoices are not genuine.  (See Fabbri Decl ¶¶ 47 ("Each page of Plaintiffs' Exhibit 63 [packing list dated Jan. 28, 2001 bearing the name Ashley Reed Trading Inc.] gives the appearance of being a page from a packing list issued by Cinque Più S.r.l [i.e., a Fendi Group company that was responsible for manufacturing until 2000] to Ashley Reed Trading, Inc.; however, none of the pages in Plaintiffs' Exhibit 63 is a genuine document of Cinque Più S.r.l."), 42–43 ("Plaintiffs' Exhibit 61 [is] composed of pages . . . which give[] the appearance of . . . a packing list issued by Cinque Più S.r.l. to Mit & Mat Fashion, Inc [dated June 23, 1999.] . . . None of the pages in Plaintiffs' Exhibit 61 is a genuine document of Cinque Più S.r.l."), 30 ("I am able to compare any document that appears to be a Fendi S.r.l. invoice to Fendi S.r.l.'s extensive database of invoices to determine whether the document is authentic."); Reply at 6.)  Further evidence of bad faith includes:  Defendants' acknowledgment that in 2003 James Ressler removed from an agreement between Ashley Reed and Filene's Basement a warranty that "Seller [i.e., Ashley Reed] has the legal right to sell the Merchandise," (Pl. 56.1 ¶¶ 146–148; Def. 56.1 ¶¶ 146–148; (see also p. 9, supra; pp. 32–34, infra), Chanel, Inc. v. Xiao Feng Ye, No. 06 Civ. 3372, 2007 WL 2693850, at *3 (E.D.N.Y. Sept. 12, 2007); and Defendants' acknowledgment that, without investigating the genuineness of the Fendi-branded merchandise in their inventory after this lawsuit was initiated, they returned that merchandise to its sources, (S. Ressler Dep. Excerpts at 124:6-13); see Cartier, 294 F. App'x at 621 ("Sardell's actions in returning the watches [after a trademark counterfeiting complaint was filed], rather than holding them in inventory . . . , also evidences bad faith.").

General Business Law. (Pl. Mem. at 8–10.) Defendants claim that they "did not deal in counterfeit Fendi Products." (See Def. Opp'n at 3 (capitalization omitted).)

The Federal Trademark Dilution Act of 1995 ("FTDA"), as amended effective October 6, 2006 by the Trademark Dilution Revision Act ("TDRA"), "entitles the owner of a famous, distinctive mark to an injunction against the user of a mark that is 'likely to cause dilution' of the famous mark." Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (citing 15 U.S.C. § 1125(c)(1)). Congress enacted the TDRA "in response to [a 2003] Supreme Court[] decision . . . constru[ing] the FTDA to require a showing of actual dilution, as opposed to a likelihood of dilution." Id. However, the TDRA's "more lenient standard . . . only appl[ies] to pre-October 6, 2006 conduct to the extent that a plaintiff seeks injunctive relief, and not money damages." Burberry, 2009 WL 1675080, at *9 (citing Starbucks Corp., 477 F.3d at 766). Because Plaintiffs seek only damages for their Federal and state law claims of trademark dilution, (see Pl. Mem. at 10), and because it is undisputed that Defendants began using the Fendi Marks prior to October 6, 2006, (Compl. ¶ 68; Answer ¶ 68), the Court will apply the FTDA's requirement of actual dilution to Plaintiffs' Federal law dilution claims rather than the TDRA's "likely to cause dilution" standard. See Dan-Foam A/S v. Brand Named Beds, LLC, 500 F. Supp. 2d 296, 305–06 n.87 (S.D.N.Y. 2007) ("To the extent that [a claim based on pre-October 6, 2006 conduct] seeks monetary relief for its dilution claim, the FTDA standard for obtaining remedies other than injunctive relief still governs."). As shown below, Plaintiffs have established that: "[i] its mark is famous; [ii] the defendant is making commercial use of the mark in commerce; [iii] the defendant's use began after the mark became famous; and [iv] the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." Louis Vuitton Malletier v. Dooney &

Bourke, Inc., 454 F.3d 108, 118 (2d Cir. 2006).

### (i)    Fame

It is undisputed that each of "FENDI's registered trademarks [i.e., the Fendi Marks] are famous marks." (Compl. ¶ 68; Answer ¶ 68); see Dooney & Bourke, 454 F.3d at 118 ("since Vuitton's mark is conceded to be a famous mark we need not discuss th[e] factors" that courts may consider in deciding whether a mark is "famous").

### (ii)    Commercial Use in Commerce

Plaintiffs have established Defendants' commercial use in commerce of the Fendi Marks because Defendants' "sale of merchandise bearing [plaintiffs' marks to] third party retail entities satisfies this element." Burberry, 2009 WL 1675080, at *13; (see pp. 19–26, supra); see also Louis Vuitton Malletier v. Veit, 211 F. Supp. 2d 567, 578–79 (E.D. Pa. 2002) ("Defendants' use of [p]laintiffs' Registered Trademarks. . . . in order to sell their counterfeit goods . . . constitutes [d]efendants' commercial use in commerce of [p]laintiffs' Registered Trademarks.").

### (iii)    Defendants Used the Marks After They Became Famous

It is undisputed that "Defendants used FENDI's famous marks and trade name in commerce after the marks had become famous." (Compl. ¶ 69; Answer ¶ 69); see also Savin Corp. v. Savin Group, 391 F.3d 439, 449 n.4 (2d Cir. 2004).

### (iv)    Dilution

Plaintiffs argue that there is actual dilution under Federal law because, among other reasons, "[i]t is undisputed that Defendants used marks that mimic the registered marks that Fendi owns." (Pl. Mem. at 8–9.) Defendants do not appear to respond to this argument. (See Def. Opp'n at 1–12.)

"[D]ilution is presumed if the senior and junior marks are identical," and "[i]n cases

analyzing dilution under the [FTDA], courts have held counterfeit marks to be identical to the senior mark." Burberry, 2009 WL 1675080, at *14 (citing Savin, 391 F.3d at 452–53); see also 15 U.S.C. § 1127 (defining a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark").

Plaintiffs have shown that Defendants' use of the Fendi Marks dilutes the quality of the Marks by diminishing their capacity to identify and distinguish the Fendi Products. See Am. Honda Motor Co. v. Pro-Line Protoform, 325 F. Supp. 2d 1081, 1085 (C.D. Cal. 2004). Defendants sold counterfeit merchandise bearing one or more of the Fendi Marks, (see pp. 19–26, supra), and there is a presumption of actual dilution since the record reflects that the marks on the counterfeit Examined Items are virtually identical in their appearance to – and, on most of the Examined Items, exact replicas of – one or more of the Fendi Marks. (See S. Ressler Decl. ¶ 14 ("The Fendi trademark was applied to these goods."); Genecin Decl. Exs. 1–5; Genecin 2d Supp'l Decl. Exs. 20–21, 53–55, 78–92; Pl. 56.1 ¶¶ 128–29; Def. 56.1 ¶¶ 128–29); Savin, 391 F.3d at 453; Burberry, 2009 WL 1675080, at *15 ("[T]he junior marks at issue in this case are exact replicas of Burberry's marks. There is no distinction between the junior and senior marks."); Gen. Motors Corp. v. Autovation Tech., Inc., 317 F. Supp. 2d 756, 757 (E.D. Mich. 2004). Defendants offer no evidence that rebuts the presumption of actual dilution. See Savin, 391 F.3d at 452–53.

Having established a prima facie case of trademark dilution, which has gone unrebutted by Defendants, Plaintiffs are entitled to summary judgment on their claim under 15 U.S.C. § 1125(c). See Burberry, 2009 WL 1675080, at *15. And, because the FTDA's dilution standard is at least as stringent as the standard required to prove a dilution claim under New York state law, Plaintiffs are also entitled to summary judgment on their claim of trademark

dilution under Section 360-*l* of the New York General Business Law.  See id. at *10 n.3 ("Under the [FTDA], courts treated state and federal dilution claims as effectively the same."), *15 ("Burberry has made a sufficient showing of dilution per se, and its motion for summary judgment on its federal and state claims of dilution is granted."); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 n.1 (2d Cir. 1999), abrogated on other grounds by Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003).

### (5)   Permanent Injunction

Plaintiffs argue that Defendants should be permanently enjoined from, among other things, "purchasing, offering for sale or selling any item bearing the word 'Fendi' or any Fendi trademark unless they have first obtained written permission from plaintiff Fendi S.r.l." (Pl. Mem. at 10–12.)  Defendants counter, among other things, that an injunction "preventing the sale of genuine goods without advance permission of Fendi would unduly restrain legitimate trade." (Def. Opp'n at 12.)

Plaintiffs are entitled to a permanent injunction prohibiting Defendants from purchasing, offering, or selling any item bearing the word "Fendi" or any of the Fendi Marks without Plaintiffs' written permission because, among other reasons, Plaintiffs have succeeded on the merits of their trademark counterfeiting and false designation of origin claims, (see pp. 19–26, supra); Defendants concede that Plaintiffs have no adequate remedy at law for trademark counterfeiting and false designation of origin, (see Answer ¶ 51 (acknowledging that "FENDI has no adequate remedy at law" for trademark counterfeiting)); and Plaintiff have shown likelihood of confusion, (see p. 22, supra), and, thereby, established irreparable harm.  See Duty Free Apparel, 286 F. Supp. 2d at 290 ("The preceding discussion establishes Gucci's success on the merits, and in this Circuit, a showing of likelihood of confusion establishes irreparable

harm[.]"); see also Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 246 (2d Cir. 2009); L. & J.G. Stickley, 255 F. App'x at 543; Bellagio Jewelry, Inc. v. Croton Watch Co., No. 06 Civ. 6672, 2008 WL 3905895, at *18 (C.D. Cal. Aug. 20, 2008) ("Defendant is permanently enjoined from the use of [p]laintiffs' registered trademark 'Bellagio' in connection with the marketing, promotion, distribution, advertising, offering for sale or sales of watches, without the express written permission of [p]laintiffs.").

Defendants' argument that the injunctive relief sought by Plaintiffs would "unduly restrain legitimate trade," (Def. Opp'n at 12), is unsupported by citation to any legal authority and is otherwise unpersuasive because "[a] district court must be permitted to fashion an 'injunction which will keep a proven infringer safely away from the perimeter of future infringement.'" Versace v. Versace, 213 F. App'x 34, 36 (2d Cir. 2007) (quoting Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 220 (2d Cir. 2003)); see also Versace, 213 F. App'x at 36 ("[W]e have recognized that 'a party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party.'" (quoting Oral-B Labs., Inc. v. Mi-Lor Corp., 810 F.2d 20, 24 (2d Cir. 1987))).

### (6)   Accounting of Defendants' Profits

In support of an accounting of Defendants' profits, Plaintiffs argue, among other things, that "[D]efendants' admissions establish that they were willfully blind, or worse, to the counterfeit nature of the Fendi[-]branded goods they sold." (Pl. Mem. at 16; Reply at 8.) Defendants counter that they "certainly ha[ve] raised substantial questions as to the willfulness of their conduct." (Def. Opp'n at 11–12.)

"[A] plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting." Bambu Sales, 58 F.3d at 854.

32

"The standard for willfulness is 'whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility.'" Nike, Inc. v. Top Brand Co., No. 00 Civ. 8179, 2005 U.S. Dist. LEXIS 42374, at *19–20 (S.D.N.Y. July 13, 2005) (quoting Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283, 288 (2d Cir. 1999)); Tanning Research Labs., Inc. v. Worldwide Imp. & Exp. Corp., 803 F. Supp. 606, 610 (E.D.N.Y. 1992). "[K]nowledge includes a willful blindness or a failure to investigate because one was afraid of what the inquiry would yield." Lorillard Tobacco Co. v. A & E Oil, Inc., 503 F.3d 588, 591–92 (7th Cir. 2007) (citation and internal quotation omitted).  Willful blindness "does not lie unless the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire further out of fear of the result of the inquiry." Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 513, 515 (S.D.N.Y. 2008).

In addition to establishing that Defendants' sales of counterfeit goods involved (at least) some element of bad faith, (see pp. 26–27, supra), Plaintiffs present additional evidence of "willfulness" in support of their application for an accounting.  (See pp. 5–6, 11–15, 27 n.11, supra; S. Ressler Dep. Add'l Excerpts at 104:7–105:1); see also Tanning Research Labs., 803 F. Supp. at 610.  Defendants also concede that they discarded crucial financial records after (as little as) one year, (see pp. 8–9, supra; S. Ressler Dep. Excerpts at 566:3-19); that they "didn't always keep . . . invoices from Fendi" and other documentation of Ashley Reed's suppliers, (S. Ressler Dep. Excerpts at 259:15–260:4); that they did not think it was important to maintain documentation showing that Ashley Reed allegedly conducted a side-by-side comparison of the goods it purchased from secondary sources with those available in Fendi stores, (id. at 269:15–270:10); and that some of Defendants' suppliers would "sanitize the invoices [being provided to Ashley Reed by] taking their [i.e., the suppliers'] names off the[m]," (Decl. of Joseph A. Dunne,

dated Apr. 28, 2009 ("J. Dunne Decl."), Ex. 3 (Pls.' Excerpts from Dep. of Scott Ressler, dated

Oct. 16, 2006), at 67:12-23; see also Def. 56.1 ¶ 131 ("[Ashley] Reed did not maintain records as

far back as 2001.")); Cartier, 2008 WL 64005, at *14 ("[C]ounterfeiters' records are frequently

non-existent, inadequate or deceptively kept[.]" (citation omitted)).

    At the same time, there may still be issues of fact and/or credibility that bear on

Defendants' willfulness in connection with Plaintiffs' application for an accounting. (Compare

Defs. S. Ressler Dep. Excerpts at 83:4–86:9 ("Q.  The [Fendi] inspector you've been talking

about, his name is Lorenzo Bandinelli?   A.  Yes.   Q.  You said that you met with him two or

three times?   A.  Yes."); Bandinelli Dep. at 45:5-23 ("Q.  Did you ever meet an American called

Jim Ressler?   A.  No.   Q.  Ever meet an American called Scott Ressler? . . .  A.  No. . . .  Q.

Have you ever heard their names before today?   A.  No.")); see also In re Dana Corp. (Jasco

Tools, Inc. v. Dana Corp.), 574 F.3d 129, 152 (2d Cir. 2009); Island Software & Computer Serv.,

Inc. v. Microsoft Corp., 413 F.3d 257, 263–64 (2d Cir. 2005) ("A [finder of fact] could, without

doubt, conclude that [defendant's] statements reveal willful blindness, or establish a pattern of

conduct so unreasonable as to constitute reckless disregard. Still, it is not beyond peradventure

that a reasonable [finder of fact] would conclude otherwise.  And that is enough to make

summary judgment on the issue of willfulness inappropriate."); Sam Wong & Son, Inc. v. N.Y.

Mercantile Exch., 735 F.2d 653, 678 (2d Cir. 1984).

## V.    Conclusion and Order

    For the foregoing reasons, Plaintiffs' motion for summary judgment [#87] is granted as to

their request to strike Defendants' affirmative defenses and as to their claims of trademark

counterfeiting and false designation of origin under the Lanham Act, common law unfair

competition under New York law, and trademark dilution under 15 U.S.C. § 1125(c) and Section

360-*l* of the New York General Business Law, and denied without prejudice for further

proceedings by Magistrate Judge Dolinger as to Plaintiffs' application for an accounting of

profits.  Accordingly, it is hereby

     **ORDERED** that Defendants are permanently enjoined under section 34(a) of the

Lanham Act from purchasing, offering for sale, or selling any item bearing the word "Fendi"

and/or any of Fendi's registered trademarks without the express written permission of Plaintiffs;

and it is further

     **ORDERED** that this matter is referred to Magistrate Judge Dolinger for a determination

as to the appropriateness of an accounting of Defendants' profits and, if warranted, an

assessment of Plaintiffs' damages.

Dated: New York, New York
      February 16, 2010

                                              **RICHARD M. BERMAN, U.S.D.J.**