UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
FENDI ADELE S.R.L., FENDI
S.R.L. and FENDI NORTH AMERICA,  :

               Plaintiffs,     :     <u>REPORT & RECOMMENDATION</u>

        -against-          :     06 Civ. 0243 (RMB)(MHD)

ASHLEY REED TRADING, INC., SCOTT :
RESSLER and JAMES RESSLER,
                          :
               Defendants.
--------------------------------x


TO THE HONORABLE RICHARD M. BERMAN, U.S.D.J.:


     Plaintiffs Fendi Adele S.r.l., Fendi S.r.l. and Fendi North
America are manufacturers and importers of branded Fendi bags. They
have sued three defendants, including James Ressler, Scott Ressler
and their company -- Ashley Reed Trading, Inc. -- on claims of
having distributed counterfeit Fendi products, in violation of the
Lanham Act, 15 U.S.C. §§ 1051 <u>et</u> <u>seq.</u>, section 360-l of the New
York General Business Law and New York common law. Following
discovery, plaintiffs moved for summary judgment, seeking dismissal
of all of defendants' affirmative defenses and relief on all of
their own claims, including their requests for injunctive relief
and an accounting of defendants' profits. That motion was granted
in part and denied in part. Specifically, defendants' affirmative
defenses were dismissed, and plaintiffs were granted summary

judgment on defendants' liability for trademark counterfeiting and false designation of origin under the Lanham Act, trademark dilution under the Lanham Act and New York statutory law, and unfair competition under New York common law. Fendi Adele S.R.L. v. Ashley Reed Trading, Inc., 2010 WL 571804, *8-17 (S.D.N.Y. Feb. 16, 2010). The District Court also awarded plaintiffs injunctive relief in the form of a prohibition on defendants "purchasing, offering, or selling any item bearing the word 'Fendi' or any of the Fendi Marks without [p]laintiffs' written permission." Id. at *18. However, the court deferred a final ruling on plaintiff's motion insofar as it sought an accounting of defendants' profits. Instead, it denied this aspect of the motion "without prejudice," observing that "there may still be issues of fact and/or credibility that bear on [d]efendants' willfulness in connection with [p]laintiff's application for an accounting." Id. at *19-20. The court then referred the case to me to conduct further proceedings to determine plaintiffs' entitlement to an accounting and the extent of any monetary relief for "plaintiffs' damages". Id. at *20.

Based on the submissions of the parties, we now recommend that plaintiffs be awarded $10,486,542.00 in treble damages for defendants' willful trademark counterfeiting in 2005 and 2006. We further recommend that plaintiffs be awarded $970,795.20 in

2

prejudgment interest. However, we recommend that summary judgment be denied on plaintiffs' claims for counterfeiting prior to 2005 and that those claims proceed to a jury trial. Moreover, we recommend that an award of plaintiffs' costs and reasonable attorneys' fees be postponed until the balance of their claims are resolved.

### Prior Proceedings

On January 12, 2006, plaintiffs filed a complaint asserting claims against defendants under the Lanham Act, the New York General Business Law and New York common law. In support of their federal-law claims, plaintiffs contended that defendants had infringed their registered trademarks through the sale of counterfeit merchandise, in violation of 15 U.S.C. § 1114(1)(a), and had falsely designated the origin of those products, in contravention of 15 U.S.C. § 1125(a). (Compl., ¶¶ 41-45, 54-58). They also alleged that defendants had infringed on plaintiffs' famous marks, in violation of 15 U.S.C. § 1125(c). (Id. at ¶¶ 67-74). Pursuant to 15 U.S.C. § 1117(a) plaintiffs sought relief in the form of an accounting and disgorgement of defendants' profits, compensation for their own damages, and reimbursement of their costs and attorneys' fees. (Id. at ¶¶ 46, 59, 75). They also sought

treble damages in the form of three times the greater of defendants' profits or their own damages, prejudgment interest on those damages, and attorneys' fees under 15 U.S.C. § 1117(b). (<u>Id.</u> at ¶¶ 47, 60, 76). Moreover, they requested injunctive relief pursuant to 15 U.S.C. § 1116(a) and § 1125(c) and destruction of the infringing goods under 15 U.S.C. § 1118. (<u>Id.</u> at ¶¶ 52, 53, 65, 66, 81). Defendants filed an answer, which they later amended, in which they asserted affirmative defenses, including plaintiffs' acquiescence, laches, unclean hands and the invalidity of plaintiffs' trademarks, and also sought a jury trial. (Am. Answer, ¶¶ 94-97).

This case was consolidated for discovery with five other pending actions that had been initiated by plaintiffs. In March 2009, following the completion of discovery, plaintiffs moved for summary judgment on all of their claims and for dismissal of defendants' affirmative defenses. (<u>See</u> Order dated Nov. 6, 2006). After briefing and oral argument on plaintiffs' motion, the District Court granted it in part, but denied "without prejudice" plaintiffs' request for an accounting of defendants' profits. <u>Ashley Reed Trading, Inc.</u>, 2010 WL 571804, at *20. Specifically, the court dismissed defendants' affirmative defenses of acquiescence, laches, unclean hands and the invalidity of

plaintiffs' trademarks. Id. at *8-9. It also granted plaintiffs summary judgment on defendants' liability for trademark counterfeiting, false designation of origin and common-law unfair competition. Id. at *15.

In finding that defendants had sold counterfeit Fendi goods and were liable under both sections 1114(1)(a) and 1125(a) of Title 15, the court relied squarely on the deposition testimony of the Industrial Director of Leather Goods and Logistics Director for Fendi S.r.l., Leonardo Minerva. According to Minerva's testimony, which was not rebutted, he had examined twenty Fendi-labeled handbags and small leather items that had been sold by Ashley Reed and had determined that they were counterfeit. Id. at *4, 5, 13.[1] The court characterized defendants' attempts to refute this testimony as "speculations or conjecture" and found it unavailing.

---

[1] Fifteen of the items that Minerva examined had been sold by Filene's Basement or provided by that retailer in the course of discovery in a lawsuit that Fendi had filed against it. (See Pls.' Corrected Rule 56.1 Statement, ¶ 123). The parties on the current motion apparently agree that these items were either sold in 2005 or obtained from Filene's Basement's warehouse in 2007. (See Pls.' Resp. to Defs.' Statement of Material Facts, ¶ 5. See also Decl. of Joseph A. Dunne in Opp'n to Pls.' Mot. for Summ. J., executed Apr. 28, 2009, ¶ 19). Plaintiffs bought the other five items from three other retailers who identified Ashley Reed as their source of Fendi-branded merchandise, and whom Scott Ressler named as customers of Ashley Reed. (See Pls.' Corrected Rule 56.1 Statement at ¶¶ 124-27). See also Ashley Reed Trading, Inc., 2010 WL 571804, at *5.

Ashley Reed Trading, Inc., 2010 WL 571804, at *13-15. The court further noted that the five Fendi marks displayed on that merchandise had all been registered and were either incontestible or presumptively valid. Based on its conclusion that plaintiffs' evidence of defendants' dilution of their famous Fendi trademarks was "unrebutted", the court also held that plaintiffs were entitled to summary judgment on their federal dilution claim. Id. at *17.[2]

In terms of a remedy, the court awarded plaintiffs a permanent injunction against defendants "purchasing, offering, or selling any item bearing the word 'Fendi' or any of the Fendi Marks without [p]laintiffs' written permission." Id. at *18.[3] The court also

---

[2] The court also granted plaintiffs summary judgment on their common-law unfair competition and New York state-law trademark dilution claims. The court concluded that plaintiffs had established defendants' liability for trademark counterfeiting and that defendants had not rebutted the common-law presumption of bad faith that accompanies the use of a counterfeit mark, thus establishing liability for common-law unfair competition. Id. at *15. Likewise, it reasoned that proof of trademark dilution under the Lanham Act sufficed to establish dilution under state law. Id. at *17.

[3] The court did not specify under what authority it was affording injunctive relief, although it cited a section of plaintiffs' memorandum of law in support of their summary-judgment motion discussing their request for injunctive relief under 15 U.S.C. § 1116(a). Id. at *18. Nevertheless, we interpret the injunctive relief that the court awarded to address plaintiffs' requests for injunctions under both sections 1116(a) and 1125(c). (See Compl. at ¶¶ 52, 65, 81).

addressed plaintiffs' request for an accounting of defendants' profits, noting that to obtain such an accounting plaintiffs must prove that defendants willfully infringed on their trademarks. Ashley Reed Trading, Inc., 2010 WL 571804, at *19. The judge acknowledged that "[d]efendants' sales of counterfeit goods involved (at least) some element of bad faith" and that plaintiffs had proffered additional evidence of defendants' willful infringement, including defendants' disposal of financial records after as little as a year, their failure to keep records of their alleged side-by-side comparisons of their products with genuine Fendi goods, and their continued dealings with suppliers who had insisted on removing their names from their invoices. Id.. Nevertheless, he indicated that "there may still be issues of fact and/or credibility that bear on [d]efendants' willfulness," and cited in particular a dispute in the record as to whether Scott Ressler had met with an inspector for Fendi named Lorenzo Bandinelli, who supposedly told him that some of the Fendi-branded goods that defendants intended to buy were genuine. Id. Thus, although the court did not specifically conclude that defendants had established a material factual dispute as to willfulness, it denied plaintiffs' request for an accounting of defendants' profits without prejudice and referred that matter to me to "determin[e] . . . the appropriateness of an accounting of [d]efendants' profits

7

and, if warranted, [conduct] an assessment of [p]laintiff's damages." Id. at *20.[4]

Defendants subsequently sought reconsideration of the dismissal of their affirmative defenses of acquiescence and laches. The court, however, denied their request. (Order dated May 11, 2010).

At a conference with counsel on February 23, 2010, we advised the parties that we interpreted the District Court's directive as requiring us to determine, first, whether plaintiff was entitled to summary judgment on the question of willfulness -- which the District Court deemed a predicate for an award of trebled profits -- and then, if we so concluded, to assess the amount of provable infringing profits. With the agreement of the parties, we invited both sides to supplement their previously-filed motion papers. Both sides have since done so, addressing both plaintiffs' entitlement to damages, including an accounting of defendants' profits, and the

---

[4] We interpret this mandate to cover a determination of plaintiffs' entitlement to treble damages, prejudgment interest and attorneys' fees as well. We understand plaintiffs' request for an order requiring defendants to destroy all infringing material pursuant to 15 U.S.C. § 1118 to be moot in light of defendants' representation that they returned all Fendi merchandise to their suppliers following commencement of this lawsuit. See id. at *5.

extent of a requested award of prejudgment interest and attorneys'
fees.

<u>ANALYSIS</u>

We first detail the standards for awarding Rule 56 relief, and
then discuss the criteria that are pertinent to a determination of
plaintiffs' requests for monetary and related relief. We proceed to
apply those considerations to determine the remedies, if any, to
which plaintiffs are entitled beyond the injunctive relief that
they have already been afforded.

A. <u>Summary Judgment Criteria</u>

The court may enter summary judgment only if it concludes that
there is no genuine dispute as to the material facts and that,
based on the undisputed facts, the moving party is entitled to
judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see</u>, <u>e.g.</u>,
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Feingold v.
New York</u>, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is
'material' for these purposes if it 'might affect the outcome of
the suit under the governing law [while] [a]n issue of fact is
'genuine' if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009); Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co.,

10

315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth
Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails
to meet its initial burden, however, the motion will fail even if
the opponent does not submit any evidentiary materials to establish
a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress
& Co., 398 U.S. 144, 160 (1970); Giannullo v. City of New York, 322
F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing
party must then shoulder the burden of demonstrating a genuine
issue of material fact. See, e.g., Beard v. Banks, 548 U.S. 521,
529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243
F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party
cannot rest "merely on allegations or denials" of the factual
assertions of the movant, Fed. R. Civ. P. 56(e); see, e.g.,
Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,
374 F.3d 56, 59-60 (2d Cir. 2004), nor can it rely on its pleadings
or on merely conclusory factual allegations. See, e.g., Weinstock
v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). It must also "do
more than simply show that there is some metaphysical doubt as to
the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc.,
411 F.3d 69, 75 (2d Cir. 2005). Rather, it must present specific

evidence in support of its contention that there is a genuine dispute as to the material facts. <u>See</u>, <u>e.g.</u>, <u>Celotex</u>, 477 U.S. at 324; <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998); <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 526 (2d Cir. 1994).


B. <u>Damages for Trademark Counterfeiting and Dilution</u>


As noted, plaintiffs have asserted federal claims for defendants' use of counterfeits of their registered trademarks (in violation of section 1114(1)(a)), false designation of origin (in violation of section 1125(a)) and trademark dilution (in violation of section 1125(c)). The Lanham Act contains an intricate and partly overlapping set of provisions governing the remedies available for each of these violations.


The provisions of 15 U.S.C. § 1114(1) specify, in pertinent part, that a person

who shall, without the consent of the registrant –

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale [or] offering for sale . . . of any goods . . . on or in connection with which such use is likely to cause confusion . . . or to deceive . . .

       *             *             *

shall be liable in a civil action by the registrant for

12

the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).[5] As for the tort of false designation of origin and the dilution of trademarks, 15 U.S.C. § 1125 recognizes a civil cause of action for a trademark owner, although it does not explicitly advert to possible monetary remedies. Instead, the specific remedies for a claimant under any of these categories of claim are addressed in 15 U.S.C. § 1117.

Subsection 1117(a) states, as relevant, that:

> [w]hen a violation of any right of the registrant of a mark . . ., a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of  this title, shall have been established . . ., the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

_____

[5] A parallel provision, in section 1114(1)(b), specifies the terms for monetary relief against persons who "reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such . . . imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale [or] offering for sale . . . of goods . . . ." 15 U.S.C. § 1114(1)(b). For this form of misconduct, section 1114(1) specifies that, to recover infringers' profits or damages, the registrant must establish that the infringer acted "with knowledge that such imitation is intended to be used to cause confusion, or . . . mistake, or to deceive." The same knowledge requirement is not imposed in this section on plaintiffs who sue users of counterfeit marks under section 1114(1)(a).

15 U.S.C. § 1117(a).[6] If the infringing conduct of the defendant involved the use of a counterfeit of a registered mark, the plaintiff may be awarded not only the infringer's profits and its own damages, but an amount based on the trebling of one or the other of those figures, plus attorneys' fees. The pertinent provision specifies the following:

> In assessing damages under subsection (a) [of this section] for any violation of section 1114(1)(a) of this title . . . in a case involving use of a counterfeit mark or designation . . . the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of . . . intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark . . . in connection with the sale [or] offering for sale . . . of goods . . .

15 U.S.C. § 1117(b)(1). The same provision also authorizes the court in such circumstances to exercise its discretion to award prejudgment interest at the rate defined in 26 U.S.C. § 6621(a). See 15 U.S.C. § 1117(b).

_____

[6] On the topic of the infringer's profits, this provision goes on to require the plaintiff to prove only the defendant's sales, and imposes the burden on the defendant to "prove all elements of cost or deduction claimed." It also permits the court, if it finds the amount of profits to be "either inadequate or excessive", to fashion an award that is either larger or smaller, and it also permits an award of attorneys' fees to the prevailing party "in exceptional cases". Id.

In defining a plaintiff's burden when it seeks to justify an award of an infringer's profits, we focus initially on the wording of section 1117(a), which, as noted, authorizes such an award if the plaintiff establishes "a violation of any right of the registrant of a mark, a violation under section 1125(a) or (d), or a willful violation under section 1125(c) of this title." Literally read, this wording suggests that if the claimed violation -- as here -- was premised on counterfeiting a registered mark (in violation of section 1114(1)(a)) or false designation of origin (in violation of section 1125(a)), the plaintiff would not have to prove willfulness, although such proof would be required for an award of profits on a claim of trademark dilution (under section 1125(c)). The courts within this circuit have split on this issue -- which turns on whether the Trademark Amendments Act of 1999, Pub. L. No. 106-43, 113 Stat. 218, affected pre-existing Second Circuit precedent that had required such a showing of willfulness, see, e.g., Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996); George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1540 (2d Cir. 1992) -- although the majority of recent decisions have held that, notwithstanding the current statutory wording,[7] willfulness must still be proven to

---

[7] The 1999 amendment added the explicit requirement of willfulness with respect to claims for dilution under section

15

trigger disgorgement for false designation of origin or counterfeiting of a registered mark. See Mr. Water Heater Enters., Inc. v. 1-800-Hot Water Heater, LLC, 648 F. Supp. 2d 576, 589-90 (S.D.N.Y. 2009); Pedinol Pharmacal, Inc. v. Rising Pharms., Inc., 570 F. Supp. 2d 498, 502-03 (E.D.N.Y. 2008); Life Servs. Supplements, Inc. v. Natural Organics, Inc., 2007 WL 4437168, *2-7 (S.D.N.Y. Dec. 17, 2007); Malletier, 500 F. Supp. 2d at 280-82; Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, 2004 WL 326708, *10-11 (S.D.N.Y. Feb. 23, 2004). Contra Cartier v. Aaron Faber, Inc., 512 F. Supp. 2d 165, 172-73 (S.D.N.Y. 2007); cf. Nike, Inc. v. Top Brand Co., 2005 WL 1654859, *11 (S.D.N.Y. July 13, 2005) (willfulness is not a requirement but is a pertinent equitable consideration).[8]

---

1125(c). See Malletier v. Dooney & Bourke, Inc., 500 F. Supp. 2d 276, 278 (S.D.N.Y. 2007) (citing 113 Stat. 218).

[8] The Third, Fourth and Fifth Circuits have concluded that the 1999 amendment to section 1117(a) suggested that proof of a defendant's willfulness is not required for a recovery of the defendant's profits under that section. See Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 175 (4th Cir. 2006); Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 171, 174 (3d Cir. 2005); Quick Techs., Inc. v. Sage Group PLC, 313 F.3d 338, 347-49 (5th Cir. 2003). However, although the Fifth Circuit declined to adopt a bright-line rule requiring plaintiffs to demonstrate willfulness to obtain an accounting, it recognized that willful infringement "is an important factor which must be considered when determining whether an accounting of profits is appropriate." Quick Techs., Inc., 313 F.3d at 349. Similarly, the Fourth Circuit concluded that proof of willfulness is not required but "it remains a highly pertinent factor" in deciding whether to award damages. Synergistic Int'l, LLC, 470 F.3d at 175 & n.13. See generally

We need not enter into this debate for two reasons. First, the decision of the District Court in this case is predicated on the assumption that willfulness is a requirement for an award of infringer's profits, see Ashley Reed Trading, Inc., 2010 WL 571804, at *19 ("'[A] plaintiff must prove that an infringer acted with willful deception before an infringer's profits are recoverable by way of an accounting.'") (quoting Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995)), and that ruling is the law of the case, which we have been given no justification to revisit. See, e.g., DiLaura v. Power Auth. of State of N.Y., 982 F.2d 73, 76 (2d Cir. 1992) ("'[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case'" absent justification for reconsideration) (quoting Liona Corp. v. PCH Assocs. (In Re PCH Assocs.), 949 F.2d 585, 592 (2d Cir. 1991)). Accord Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'") (quoting Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964)).[9] Second, the

_____

Nike, Inc., 2005 WL 1654859, at *10-11.

   [9] To the extent that plaintiffs' contention that no showing of willfulness is necessary to obtain an accounting of defendants' profits for their violations of 15 U.S.C. §

17

evidence easily suffices to justify a finding that defendants' willfulness has been established beyond triable dispute. See, e.g., Fendi Adele, S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 599 n.10 (S.D.N.Y. 2010).

"'The standard for willfulness is whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility.'" Nike, Inc., 2005 WL 1654859, at *6 (quoting Kepner-Tregoe, Inc. v. Vroom, 186 F.3d 283, 288 (2d Cir. 1999) (additional internal quotation marks omitted)). Accord Ashley Reed Trading, Inc., 2010 WL 571804, at *19. In this regard, the Second Circuit has cited with approval the observation of the Seventh Circuit that "'willful blindness is equivalent to actual knowledge for purposes of the Lanham Act.'" Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 110 (2d Cir. 2010) (quoting Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992)). A party exhibits willful blindness when it has reason to suspect that infringement is occurring, but instead of investigating it "shield[s] itself from learning of the

---

1114(1)(a) or § 1125(a) is intended to seek reconsideration of the District Court's ruling regarding the necessity of proving willfulness, they should have made that application before the District Judge. (Pls.' Mem. of Law in Furtherance of the Report and Recommendation for Which This Case was Referred ("Pls.' Damages Mem.), 13-15).

particular infringing transactions by looking the other way." Id.
at 109.

Although we assume that defendants' willfulness is a necessary
prerequisite to plaintiffs' receipt of defendants' profits,
typically the court also should consider other factors bearing on
plaintiffs' entitlement to those profits. These include "(1) the
degree of certainty that the defendant[s] benefitted from the
unlawful conduct; (2) availability and adequacy of other remedies;
(3) the role of a particular defendant in effectuating the
infringement; (4) plaintiff[s'] laches; and (5) plaintiff[s']
unclean hands." George Basch Co., 968 F.2d at 1540. Accord
Malletier, 500 F. Supp. 2d at 279; Gidatex, S.r.L. v. Campaniello
Imports, Ltd., 82 F. Supp. 2d 136, 144 (S.D.N.Y. 2000). The court
has discretion to assess "the relative importance of these factors
and determin[e] whether, on the whole, the equities weigh in favor
of an accounting." George Basch Co., 968 F.2d at 1540.

C. Assessment of the Motion

Although the parties' current submissions focus primarily on
the questions of the willfulness of defendants' infringement and
the proper measure of plaintiffs' damages, we must first clarify

19

the period of infringement that plaintiffs have established as a matter of law. The District Court did not specify the period of defendants' infringement, but rather premised its finding of defendants' liability on the counterfeit nature of twenty Fendi-branded bags and leather goods sold by defendants in 2005 and later determined to have been counterfeit. We therefore must determine whether plaintiffs have established defendants' liability for the period proceeding their sale of these goods. After doing so, we turn to an evaluation of the evidence of defendants' willfulness during the period of proven infringement, and then determine the relief to which plaintiffs are entitled. Finally, we address the method for resolving those issues that cannot be decided as a matter of law.

### 1.   Period of Infringement

Plaintiffs are seeking the disgorgement of "all profits obtained by defendants from their sales of Fendi branded handbags and small leather goods," which they calculate to be $9,995,196.00. (See Pls.' Corrected Mem. of Law in Supp. of their Mot. for Summ. J. ("Pls.' Summ. J. Mem."), 12). These sales were apparently made between 1999 and 2006. (See Decl. of James J. Donohue in Supp. of Pls.' Mot. for Summ. J., executed Feb. 18, 2009, ¶ 12). Defendants

contend that the District Court did not find that all Fendi-branded goods sold by defendants were counterfeit, but instead found defendants liable for trademark counterfeiting and dilution based on an examination of twenty bags that were "purchased in a relatively narrow window in 2005." (Defs.' Mem. of Law in Resp. to Pls.' Mem. of Law in Furtherance of the Report and Recommendation for Which This Case was Referred ("Defs.' Damages Mem."), 2). Therefore, they argue, since plaintiffs have been investigating Ashley Reed since 2001 but have not produced any counterfeit bags sold by defendants prior to 2005, all such items must have been legitimate and plaintiffs are not entitled to any of defendants' profits from the sale of Fendi-branded goods prior to 2005. (Defs.' Damages Mem. at 2. <u>See</u> <u>also</u> Defs.' Mem. in Supp. of Their Response in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Summ. J. Opp'n Mem."), 5-6). We conclude that there are disputed factual issues pertaining to whether defendants engaged in infringing activity prior to 2005, and therefore that plaintiffs' entitlement to their profits from the period from 1999 to 2005 cannot be resolved as a matter of law.

In arguing that they are entitled to all of defendants' profits from their sales of Fendi-branded merchandise, plaintiffs highlight the District Court's finding that defendants sold counterfeit merchandise, a finding that was based on Mr. Minerva's

examination of and testimony regarding the twenty items sold by defendants. (Pls.' Reply Mem. in Further Supp. of Pls.' Positions Concerning the Report and Recommendation for Which This Case was Referred by the District Court on Feb. 16, 2010 ("Pls.' Reply Damages Mem."), 1). They also dispute defendants' claim that plaintiffs have acknowledged that defendants sold genuine Fendi goods prior to 2005, arguing that the record "is devoid of any acknowledgment by Fendi that these defendants bought or sold genuine Fendi goods at any time." (Id. at 5). Additionally, they cite as evidence of defendants' pre-2005 infringement their proffer of invoices and packing lists dated as early as 2000, which they claim to be documents that defendants forged in an attempt to demonstrate their receipt of genuine Fendi-branded goods. (Id.).

Although defendants acknowledge that they were not authorized distributors of Fendi goods, they contend that they sold Fendi-branded merchandise with valid trademarks that had been obtained on the so-called "grey market," which defendants describe as "genuine products bearing a trademark legitimately, but . . . intended by the trademark owner to be sold in a market different from the United States." (Decl. of Scott Ressler in Opp'n to Pls.' Mot. for Summ. J., executed Apr. 24, 2009, ¶¶ 2, 14-15). In support of this assertion, defendants have proffered the testimony of Scott Ressler

22

describing the various sources from which Ashley Reed obtained
Fendi-branded merchandise with purportedly authentic trademarks and
the methods that Ashley Reed used to validate the merchandise that
it purchased and sold. (See generally Dunne Decl., Ex. 3. See also
Decl. of Victor Genecin, Esq. in Supp. of Pls.' Mot. for Summ. J.,
executed Feb. 27, 2009, Ex. 18). A finder of fact could rely on
this testimony, if credited, to establish defendants' assertion
that they dealt in merchandise with valid trademarks, although as
we note the pertinent factual claims in Ressler's testimony have
been disputed by plaintiffs.

Among the sources of Ashley Reed's Fendi-branded merchandise
that Ressler identified is a Fendi manufacturing company named
Cinque Più. Ressler testified that he visited a company near
Florence or Milan, Italy to view Fendi-branded merchandise that he
later purchased through a Swiss company named Hidea. (Genecin
Decl., Ex. 18 at 63-65). Ressler stated that Hidea acted as a
billing agent for Cinque Più, and that he received packing lists
for his purchases from Cinque Più. (Id., Ex. 18 at 63, 108).
Ressler said that he identified Cinque Più as the source of the
Fendi-branded merchandise that Ashley Reed was selling in 2001
during meetings that year with Fendi's attorneys that he attended
with his brother and Ashley Reed's then-attorney. (Ressler Decl. at

23

¶¶ 19-20). He further recounted that he was informed by an attorney for Fendi during these meetings that if the merchandise had been "manufactured by a Fendi-authorized factory, Fendi could not prevent Ashley Reed from importing and selling" such merchandise. (Id. at ¶ 20). He also testified that during the course of those meetings he had provided documentation identifying Cinque Più as the source of Ashley Reed's Fendi-branded merchandise and was told that if Fendi had a problem with the documentation it would contact him, but that he did not hear from Fendi until it made allegations against Ashley Reed in 2005. (Id. at ¶¶ 20-21).

Ressler's version of events is supported by the deposition testimony of plaintiffs' former attorney, Mr. Anthony Cannatella, who attended the 2001 meetings between representatives of Fendi and defendants. (Dunne Decl., Ex. 6 at 158-59). Mr. Cannatella confirmed that at one of the meetings defendants provided packing lists from Cinque Più and that the lists were sent to Fendi's representatives in Italy. (Id., Ex. 6 at 159-62). Cannatella further stated that he did not recall receiving any response to the documents from Fendi's Italian representatives. (Id., Ex. 6 at 162).[10]

_____

[10] In support of their summary-judgment motion plaintiffs proffered evidence disputing the validity of these packing lists.

Plaintiffs admit that Cinque Più was a "manufacturing . . . company of the Fendi Group that [was] later named Fendi Industria and later on merged into Fendi SRL." (Genecin Decl., Ex. 14 at 392. See also Fabbri Decl. at ¶ 34). However, they claim that Cinque Più was not authorized to distribute Fendi-branded leather goods, only to manufacture them. (See Dunne Decl., Ex. 6 at 157-58). They have also proffered evidence that Fendi only provides its manufacturers genuine material to produce a specified number of Fendi-branded products, and that all genuine Fendi goods are delivered to a central distribution center near Florence once they are completed. (Genecin Decl., Ex. 11 at 51-52, Ex. 12 at 73, Ex. 14 at 149-51). Moreover, plaintiffs dispute that Ashley Reed was a customer of Cinque Più or that a company named Hidea was a customer of either Cinque Più or Fendi or performed billing or other functions for Cinque Più or any company within the Fendi group. (See Fabbri Decl. at ¶¶ 35-38).

Ressler also testified about a one-time purchase of approximately $200,000.00 in Fendi-branded bags and accessories from Zucker's Gifts in New York in 2002. (Genecin Decl., Ex. 18 at 65, 272). Ressler stated that he examined the merchandise at

(Decl. of Alberto Fabbri in Supp. of Pls.' Mot. for Summ. J., executed Feb. 26, 2009, ¶¶ 44-47 & Exs. 2-3).

Zucker's Gifts' warehouse prior to purchasing it, and that he was shown invoices from a duty-free store in Guam called DFS, from which Zucker's Gifts had purchased the merchandise. (Id., Ex. 18 at 268, 272; Ressler Decl. at ¶ 23). He was told that "these genuine goods became available from the [d]uty [f]ree [s]hop in Guam due to the large decrease in tourism to the United States from Japan following the '9/11' attacks." (Ressler Decl. at ¶ 23). Defendants have proffered two invoices from Zucker's Gifts to Ashley Reed, dated February 8 and February 13, 2002, itemizing the quantities and Fendi product codes of the Fendi-branded merchandise that Ashley Reed had purchased. (Dunne Decl., Ex. 12). Defendants have also submitted a single page from an invoice from DFS Guam dated December 11, 2001, which apparently accompanied the sale of Fendi-branded merchandise from DFS to Zucker's Gifts. (Id. at ¶ 17 and Ex. 13). Plaintiffs admit that they used a licensed distributor to sell Fendi-branded goods to duty-free shops through the end of 2001. (Fabbri Decl. at ¶ 22).[11]

---

[11] Although plaintiffs have not introduced any evidence directly refuting the genuineness of the merchandise that defendants purchased from Zucker's Gifts, we consider it unnecessary to evaluate defendants' entitlement to summary judgment dismissing plaintiffs' claims with respect to this merchandise, as defendants do not appear to have maintained records that would permit a fact-finder to track the ultimate disposition of the merchandise or segregate defendants' profits from the sale of this merchandise from revenue attributable to the sale of other Fendi-branded products. (See Ressler Decl. at ¶

Ressler also claims to have obtained merchandise from Fendi manufacturers to whom he was introduced by a Fendi inspector named Lorenzo Bandinelli. (Dunne Decl., Ex. 3 at 75, 82-83). Ressler stated that he met with Mr. Bandinelli two or three times, beginning in 2004, and that Mr. Bandinelli took him to Fendi factories. (Id., Ex. 3 at 83-84; Ressler Decl. at ¶ 8). According to Ressler, Mr. Bandinelli said that the goods that Ashley Reed would be purchasing from these factories through various sources -- including a company called Florence Style, individuals named Max and Pasquali who operated a company called Evans Bay, and an individual named Lawrence Samuel -- would be authentic. (Dunne Decl., Ex. 3 at 57, 85-86).[12] Ressler also testified that during his

---

25 (noting incompleteness of Ashley Reed's records prior to 2004)). As such, plaintiffs' entitlement to defendants' profits from the period following their purchase from Zucker's Gifts will turn on their ability to establish other infringing conduct during that time period, an issue on which material factual disputes exist.

[12] Plaintiffs claim that Ressler's testimony about Mr. Bandinelli is "irrelevant" because they have failed to connect him to a single item that Ashley Reed sold. (Pls.' Reply Damages Mem. at 1). However, Ressler's testimony, if credited, would establish at a minimum that Ressler was put into contact with Fendi manufacturers by an employee of the company, which could support defendants' claims that they purchased genuine Fendi goods from the so-called grey market. Plaintiffs point out that defendants lack documentary evidence of purchases from Ashley Reed or other intermediaries from such Fendi factories. However, while a fact-finder could discredit Ressler's testimony on this basis, it does not render Ressler incompetent to offer evidence about his purported face-to-face meetings with Mr. Bandinelli.

visits he saw work orders and specifications that had been provided to the factories from Fendi regarding the proper methods for manufacturing Fendi goods. (Ressler Decl. at ¶ 8). After visiting the factories, Ressler stated, he worked with a co-worker of Mr. Bandinelli named Paola to place orders with Lawrence Samuel. (Dunne Decl., Ex. 3 at 433-34).[13]

Plaintiffs dispute Ressler's description of his contact with Mr. Bandinelli. Mr. Bandinelli testified during his deposition that he had never heard the name of, or met, Scott Ressler. (Supplemental Decl. of Victor Genecin, Esq. in Further Supp. of Pls.' Mot. for Summ. J., executed May 13, 2009, Ex. 31, 45). Moreover, plaintiffs claim that none of the sources that Ashley Reed used to obtain merchandise from the factories to which Mr. Bandinelli allegedly took Ressler were customers of Fendi. (See Fabbri Decl. at ¶¶ 54, 56-57). Indeed, plaintiffs have disclaimed Fendi's association with any of the sources that Ressler named as having provided Ashley Reed with Fendi-branded goods. (See id. at ¶¶ 53-54, 56-57).

---

[13] Mr. Bandinelli's co-worker's name is spelled as both Paolo and Paola at various points in the transcript of Ressler's deposition.

In addition to Ressler's testimony about Ashley Reed's sources of Fendi-branded merchandise, he described the precautions that the company took to ensure that the merchandise it received was genuine. He stated that defendants compared the merchandise that they purchased to that in the Fendi stores "to make sure it is exactly the same." (Genecin Decl., Ex. 18 at 269). He also said that they examined copies of invoices that had been sent from Fendi or other retailers to Ashley Reed's sources. (Id., Ex. 18 at 258-59). Ressler's testimony was corroborated by Ashley Reed's sales manager, Aimee Fink, who stated that defendants have refused to buy Fendi-branded merchandise from dealers who have lacked proper paperwork to support the authenticity of their goods. (Id., Ex. 20 at 81-82).

Ultimately, in order to establish their entitlement to defendants' profits from the sale of Fendi-branded merchandise dating back to 1999, plaintiffs must prove that those profits came from the sale of infringing goods and that defendants acted willfully in making those sales. See Haritatos v. Hasbro, Inc., 2007 WL 3124626, *6 (N.D.N.Y. Oct. 23, 2007) (noting that under section 1117(a) the plaintiff is entitled to "the defendant's profits derived from the infringement") (citing George Basch Co., 968 F.2d at 1537); 15 U.S.C. § 1117(a) (requiring plaintiff to

prove defendant's sales of infringing goods). Defendants have proffered testimony that raises a factual dispute as to whether the merchandise that it sold prior to 2005 infringed on plaintiff's trademarks. Therefore, we recommend that plaintiffs not be awarded summary judgment establishing defendants' liability, including for trademark counterfeiting or dilution, prior to 2005.

2. <u>Plaintiffs' Entitlement to an Accounting of Defendants' Profits from Sales of Fendi-branded Goods in 2005 and 2006</u>

Although we have concluded that triable disputes of fact remain as to whether defendants infringed plaintiffs' trademarks prior to 2005, the infringing nature of defendants' conduct from 2005 until the initiation of this lawsuit and defendants' return of their Fendi-branded merchandise in 2006 was established by the District Court and, at any rate, does not appear to be a matter of dispute between the parties. <u>Ashley Reed Trading Inc.</u>, 2010 WL 571804, at *11-15; (Defs.' Damages Mem. at 2, 14, 15). Since defendants' counterfeiting during that period has been established, plaintiffs are potentially eligible for an award of defendants' profits from such infringement, dependent on our assessment of a number of considerations, starting with whether such infringement was willful as a matter of law.

30

In discussing the plaintiffs' entitlement to an accounting of defendants' profits in its summary-judgment opinion, the District Court highlighted several aspects of the record suggesting defendants' willfulness. These included the fact that defendants' sales of counterfeit goods involved an element of bad faith, not only because the sale of counterfeit goods creates a common-law presumption of bad faith that defendants had not rebutted, but also because plaintiffs' Chief Financial Officer, Mr. Alberto Fabrri, determined that several invoices and packing lists produced by defendants that allegedly had been provided by Fendi or its suppliers were not genuine. Ashley Reed Trading Inc., 2010 WL 571804, at *15 & n.11, 19. The court also found defendants' bad faith to be evidenced by Scott Ressler's insistence that a warranty of Ashley Reed's legal right to sell Fendi-branded merchandise be removed from a contract with one of the company's customers and by the fact that defendants returned their Fendi-branded merchandise to their suppliers following plaintiffs' initiation of the instant lawsuit without examining the genuineness of those goods. Id. at *15 n.11.  The court also cited as evidence of defendants' willfulness the fact that they discarded "crucial financial records after (as little as) one year" and did not always maintain documentation from their suppliers or records of their purported side-by-side comparisons of their merchandise with genuine Fendi

31

goods. Id. at *19. Furthermore, it noted that some of defendants'
suppliers provided them with "sanitize[d]" invoices that did not
include the suppliers' names, thus signaling the questionable
provenance of the items being provided. Id..

In declining to rule on whether the defendants' willfulness
was triable, however, the court stated that "there may still be
issues of fact and/or credibility that bear on [d]efendants'
willfulness in connection with [p]laintiffs' application for an
accounting." Id.. The court described in particular a dispute
between the parties regarding defendants' claimed contact with Mr.
Bandinelli, the Fendi inspector. Id.. Based on a review of the
record and the parties' most recent submissions, we conclude that
no triable factual disputes exist regarding the willfulness of
defendants' infringement during 2005 and 2006.[14]

As we have noted, to establish defendants' willfulness
plaintiffs must prove defendants' knowledge or reckless disregard
that they were engaging in infringing conduct, a standard also
satisfied by showing defendants' willful blindness to the

---

[14] Of course, in accordance with our conclusion that triable
disputes remain regarding the infringing nature of defendants'
sales prior to 2005, we express no view regarding the willfulness
of defendants' possible pre-2005 infringements.

possibility of their infringement. <u>See</u>, <u>e.g.</u>, <u>Tiffany (N.J.) Inc.</u>, 600 F.3d at 109-10; <u>Fendi Adele S.R.L. v. Filene's Basement, Inc.</u>, 696 F. Supp. 2d 368, 393 (S.D.N.Y. 2010); <u>Nike, Inc.</u>, 2005 WL 1654859, at *6. The evidence in the record establishes, at a minimum, defendants' willful blindness to the possibility that they were infringing plaintiffs' trademarks.

Plaintiffs have established that Ashley Reed was on notice of the existence of counterfeit Fendi goods in the marketplace based on the 2001 cease-and-desist letter it received from plaintiffs. (Genecin Supplemental Decl., Ex. 30 at 104). Moreover, Ashley Reed was generally aware of the risk that the products it sold might be counterfeit, based on prior lawsuits that other merchandisers had filed or threatened to file against it, as well as criminal charges that had been brought against defendant James Ressler in connection with alleged counterfeiting activity. (<u>See</u> Ressler Decl. at ¶¶ 12, 16-18; Genecin Decl., Ex. 18 at 53; Decl. of David Shoen, Esq. in Opp'n to Defs.' Mot. for Summ. J., executed Apr. 24, 2009, ¶¶ 2-4; Pls.' Corrected Rule 56.1 Statement at ¶¶ 15-19).

Despite this awareness, defendants apparently failed to determine the source of the bags that they sold in 2005. (<u>See</u> Ressler Decl. at ¶ 13 (stating, in reference to the examined bags

33

that have been determined to be counterfeit, "I suppose these bags were made by the factory I visited with Mr. Bandinelli"); Defs.' Damages Mem. at 7 (acknowledging the likelihood that "Ashley Reed cannot trace the exact source of the [e]xamined [b]ags")). Ashley Reed Trading, Inc., 2010 WL 571804, at *2 n.3 (noting that during oral argument on the summary-judgment motions "[d]efendants' counsel conceded that [d]efendants are not sure exactly where [the examined] bags came from") (internal quotation marks omitted). Plainly, defendants had access to at least some source information for the Fendi-branded merchandise that they sold during this time period, as they returned their stock of Fendi-branded goods to their suppliers after the instant lawsuit was filed in 2006. (See Pls.' Reply Damages Mem. at 2) (noting that defendants' return of their Fendi merchandise renders their asserted ignorance about the source of the goods implausible). Even if the suppliers to whom defendants returned the merchandise acted as intermediaries between defendants and the ultimate source of the merchandise, there is no indication in the record that defendants made any inquiries of these intermediaries as to the original source of the goods. This plainly represents willful blindness on the part of the defendants. See, e.g., North American Karaoke-Works Trade Ass'n, Inc. v. Entral Group Int'l, LLC, 2010 WL 2143661, *14 (S.D.N.Y. Feb. 24, 2010) (considering as evidence of willfulness in analogous copyright

34

context infringers' failure to inquire about the source of
infringing material), aff'd in relevant part, 2010 WL 2158294, *2
(S.D.N.Y. May 27, 2010).

The conclusion that defendants' failure to discern the source
of their merchandise represented willful blindness is reinforced by
the fact that defendants' suppliers frequently refused to provide
defendants with invoices and other documentation bearing the
suppliers' names, and in some cases refused to provide any
paperwork to accompany the goods that defendants were purchasing.
(See Dunne Decl., Ex. 3 at 67 (noting that defendants' suppliers
would sometimes only show them invoices that they were not
permitted to retain and indicating that the suppliers would
"sanitize" the invoices by taking their names off of them). Compare
Fabbri Decl. at ¶ 23 (noting that "for many decades[] Italian law
has required that every seller of goods issue an invoice to each
purchaser on a form regularly used by the seller for this purpose"
and that Fendi has complied with that requirement)). Defendants
also complied with requests from their suppliers to send payments
to locations such as London, Switzerland and the British Virgin
Islands, even though the goods that they were purchasing
purportedly were being sent from Italy, and they did so without
inquiring as to the basis for this routing. (Genecin Decl., Ex. 18

35

at 96, 255, 349, 351-52 (stating that Ressler was "guessing" that his suppliers sought to route payments outside of Italy to avoid paying Italian taxes or to avoid litigation)). The fact that defendants procured merchandise from their suppliers without inquiring about the cause for their desired anonymity and atypical business structures further indicates defendants' willful blindness to the possibility that the Fendi merchandise they were receiving from these suppliers was not genuine.

Other evidence of defendants' willfulness includes the fact that they returned the remaining Fendi merchandise in their possession to their suppliers after the initiation of the instant lawsuit rather than preserving them for inspection, and that they failed to maintain records pertaining to those returns. (See id., Ex. 18 at 124, 133-34). Defendants were plainly under an obligation to keep this evidence under the spoilation doctrine, and their failure to retain either the merchandise or the documentation of their return reflects knowledge of the infringing nature of these goods. See Johnson & Johnson Consumer Companies, Inc. v. Aini, 540 F. Supp. 2d 374, 392 & n.29 (E.D.N.Y. 2008) (noting that defendants' destruction of products after lawsuit was filed against them suggested they had sold infringing goods in bad faith and commenting that defendants were obliged to retain evidence relevant

to lawsuit that had been filed) (citing <u>Allstate Ins. Co. v.</u>
<u>Hamilton Beach/Proctor Silex, Inc.</u>, 473 F.3d 450, 458 (2d Cir.
2007)).

More generally, defendants' failure to maintain records of
their receipt and sale of merchandise evidences the willful nature
of their infringement. <u>See</u> <u>Rodgers v. Anderson</u>, 2005 WL 950021, *2
(S.D.N.Y. Apr. 26, 2005) ("'It is often the case that
counterfeiters' records are nonexistent, inadequate or deceptively
kept in order to willfully deflate the level of counterfeiting
activity actually engaged in . . .'") (quoting <u>Polo Ralph Lauren,</u>
<u>L.P. v. 3M Trading Co., Inc.</u>, 1999 WL 33740332, *4 (S.D.N.Y. Apr.
19, 1999) (additional internal quotation marks omitted)). Scott
Ressler testified at his deposition that defendants frequently did
not maintain records of their payments to their suppliers,
including cancelled checks (Genecin Decl., Ex. 18 at 182, 271), and
that often they did not retain the shipping documents that
accompanied the goods they received, including invoices. (<u>Id.</u>, Ex.
18 at 229, 257, 566). They also did not keep any records to
document their purported purchases of genuine Fendi merchandise for
the purpose of conducting side-by-side comparisons with the
merchandise that they were selling. (<u>Id.</u>, Ex. 18 at 270-71).
Defendants' failure to maintain documentation of their purchases

37

and sales is indicative that defendants were cognizant of their infringing activity.[15]

Given this evidence, defendants have not established a triable dispute about the willfulness of their infringement. Indeed, no reasonable fact-finder could rely on Ressler's testimony regarding his alleged meetings with the Fendi inspector to find that defendants' infringement during the period at issue was not willful. Indeed, even if one were to credit Ressler's testimony that he met with Mr. Bandinelli and relied on his expertise as a Fendi inspector to determine the genuine nature of the merchandise that Ashley Reed intended to acquire, there is no competent evidence in the record to establish that the sources of Fendi-branded merchandise identified by Mr. Bandinelli as genuine were responsible for supplying Ashley Reed the products that it sold in 2005 and 2006.[16] Moreover, in light of the undisputed testimony of

_____

[15] Defendants' production of what Fendi's Chief Financial Officer determined to be forged invoices purporting to reflect shipments of merchandise from Fendi to Ashley Reed in 2004 may also be evidence of defendants' willful infringement in 2005 and 2006. (See Fabbri Decl. at ¶¶ 48-52 & Exs. 4-8).

[16] Indeed, defendants have indicated that they are unable to specify the source of the merchandise that they sold during this period, which prevents them from tracing the goods to the sources allegedly approved by Mr. Bandinelli. (See Ressler Decl. at ¶ 13; Defs.' Damages Mem. at 7; Ashley Reed Trading, Inc., 2010 WL 571804, at *2 n.3). To the extent that defendants have specified the potential source of this merchandise -- including during

Fendi's representative detailing the obvious discrepancies between the merchandise that Ashley Reed sold in 2005 and genuine Fendi products, a rational fact-finder could not credit defendants' claims that they engaged in side-by-side comparisons of their merchandise and genuine Fendi goods and, based on those comparisons, believed their merchandise to be genuine. (See, e.g., Genecin Decl., Ex. 11 at 201-02 (noting it is "very, very obvious" that the quality of the leather of the bag sold by Ashley Reed is lower than that of genuine Fendi bags), 211 (stating that Fendi had never made a bag in the color and fabric combination of the bag sold by Ashley Reed), 265-66 (noting one can "easily see" that the outside fabric of the bag sold by Ashley Reed is a different color from genuine Fendi bags)).[17]

_____

Scott Ressler's 2008 deposition –- they have identified a company named Moda Oggi. (See Pls.' Damages Mem. at 11). However, Moda Oggi was not one of the sources that Ressler identified as supplying Ashley Reed with Fendi-branded merchandise from the factories to which Mr. Bandinelli had taken him. (See Dunne Decl., Ex. 3 at 85-86).

[17] Likewise, defendants' assertion that plaintiffs have admitted that goods that Ashley Reed obtained from a company called Moda Oggi –- a source from which Ashley Reed purchased "extensive amounts of goods" in 2004 –- were genuine is not supported by the record and would not offer a fact-finder a basis for concluding that defendants' infringement was not willful. (Defs.' Damages Mem. at 10. See also Dunne Decl. at ¶ 17 & Ex. 14). Plaintiffs have admitted that items listed on invoices issued by Fendi to a company called Euro Moda Inc. in 2002 were genuine. (Pls.' Response to Defs.' Corrected Rule 56.1 Statement at ¶ 4). However, defendants have neither explained nor proven any link between Euro Moda and the company from which they

In sum, there is no triable dispute regarding the willfulness of defendants' infringement of plaintiffs' trademarks in 2005 and 2006. Moreover, the other factors bearing on plaintiffs' entitlement to an accounting of defendants' profits further demonstrate that such an award is proper. As we noted, we are to evaluate "(1) the degree of certainty that the defendant[s] benefitted from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff[s'] laches; and (5) plaintiff[s'] unclean hands." George Basch Co., 968 F.2d at 1540. Based on the sales records that defendants have produced, there is no doubt that they received substantial revenue from selling Fendi-branded goods in 2005 and 2006. (See Donohue Decl., Ex. 3). Furthermore, although plaintiffs have already obtained injunctive relief barring defendants from selling Fendi-branded goods without plaintiffs' consent, an accounting of defendants' profits is the sole compensatory remedy being sought by plaintiffs. See 15 U.S.C. § 1117(a) (describing purpose of ordering disgorgement of infringers' profits as compensating injured party). Moreover, there is no dispute that Ashley Reed was responsible for the sales at

---

obtained merchandise, Moda Oggi. Thus, the proffered invoices offer no assistance to defendants in disclaiming the willful nature of their infringement in 2005 and 2006.

issue, nor that Scott and James Ressler are the co-owners of the business and that they both buy and sell Fendi-branded merchandise for Ashley Reed. (Genecin Decl., Ex. 18 at 41, 46, 50). Finally, the District Court has already ruled out plaintiffs' laches and unclean hands. Ashley Reed Trading Inc., 2010 WL 571804, at *8-9. In light of defendants' willfulness and our evaluation of the other pertinent factors, we recommend that plaintiffs be afforded an accounting and the disgorgement of defendants' profits from their sales of Fendi-branded goods in 2005 and 2006.


3.   Calculation of Defendants' Profits


We next turn to an evaluation of whether triable disputes exist regarding defendants' profits from the sale of infringing Fendi-branded merchandise in 2005 and 2006. In connection with any accounting proceeding, section 1117(a) directs that "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed" and the court is to assess the final profit figure or "cause the same to be assessed under its direction". 15 U.S.C. § 1117(a). The plaintiff is entitled to receive all of the defendant's profits from its proven sales of infringing goods, "unless the defendant can show 'that the infringement had no relationship' to those earnings." George Basch

41

<u>Co.</u>, 968 F.2d at 1539 (quoting <u>Mishawaka Mfg. Co. v. S.S. Kresge</u>
<u>Co.</u>, 316 U.S. 203, 206 (1942)). "[I]f 'the [defendant's] actual
sales cannot be precisely determined, the court may resolve any
doubts against the defendant in calculating profits, particularly
if the uncertainty is due to the defendant's inadequate
record-keeping or failure to produce documentary evidence.'" <u>U.S.A.</u>
<u>Famous Original Ray's Licensing Corp. v. Tisi's Pizza and Pasta</u>
<u>Inc.</u>, 2009 WL 4351962, *3 (S.D.N.Y. Dec. 1, 2009) (quoting <u>Chloe v.</u>
<u>Zarafshan</u>, 2009 WL 2956827, *5 (S.D.N.Y. Sept. 15, 2009)). <u>Accord</u>
<u>Chesa Int'l, Ltd. v. Fashion Assocs., Inc.</u>, 425 F. Supp. 234, 238
(S.D.N.Y. 1977) (noting the "well-known and ancient doctrine that
when a party frustrates proof of damages, either by withholding
facts or through inaccurate record-keeping, any doubts about the
actual assessment of damages will be resolved against that party,
and the fact-finder may calculate damages at the highest reasonably
ascertainable value") (citing, <u>inter</u> <u>alia</u>, <u>Westinghouse Elec. &</u>
<u>Mfg. Co. v. Wagner Elec. & Mfg. Co.</u>, 225 U.S. 604, 620 (1912)).
Nevertheless, "'some reasonable basis for computation [of
defendant's profits] has to be used.'" <u>U.S.A. Famous Original Ray's</u>
<u>Licensing Corp.</u>, 2009 WL 4351962, at *3 (quoting <u>Chloe</u>, 2009 WL
2956827 at *5).

    In support of their request for an award of defendants'

profits, plaintiffs have submitted the declaration of James J. Donohue, a Certified Public Accountant and Valuation Analyst. (Donohue Decl. at ¶ 5). Mr. Donohue analyzed Ashley Reed's financial and accounting business records that they produced in discovery, and also visited Ashley Reed's offices to examine their records and interview Scott Ressler. (Id. at ¶¶ 9, 14). He also examined the sales and purchase records of several of Ashley Reed's customers that bought Fendi-branded goods from the company. (Id. at ¶ 9). Mr. Donohue determined that the purchase records of Ashley Reed's customers reflected additional sales that were not included in Ashley Reed's records, in part due to a computer failure that Ashley Reed suffered in 2004. (Id. at ¶¶ 14, 17). Therefore, he computed Ashley Reed's sales of Fendi-branded products based on the company's own records, and then included the additional sales contained in their customers' records. (Id. at ¶ 17).

For the year 2005, Mr. Donahue determined that Ashley Reed's records reflected $3,198,934.00 in sales of Fendi-branded goods, and that their customers' records showed an additional $85,100.00 in sales, for a total of $3,284,034.00. (Id., Ex. 3). For 2006, Mr. Donahue concluded that Ashley Reed's records reflected sales of $211,480.00 in Fendi-branded merchandise, which he did not supplement with any sales from the company's customers' records.

(Id.). Therefore, Mr. Donahue concluded that Ashley Reed's sales of Fendi-branded goods in 2005 and 2006 totaled $3,495,514.00. (Id.).

Defendants have raised three objections to Mr. Donahue's calculations of their sales. First, they contend that the documents produced by one of their customers, Neiman Marcus, pertaining to its purchases of Fendi-branded goods from Ashley Reed were purchase orders, which merely reflect orders for goods subject to their availability instead of proof that the listed goods were in fact purchased. (Defs.' Damages Mem. at 16).[18] Second, they note that the report produced by another one of their customers, Saks Fifth Avenue, included both Fendi and non-Fendi-branded merchandise, and they suggest that Mr. Donahue lacked the expertise to separate the Fendi style numbers from the style numbers of the non-Fendi merchandise. (Defs.' Damages Mem. at 16). Finally, they raise a vague objection that plaintiffs' profit calculation is "extremely too high" and "assuredly based on erroneous information." (Ressler Decl. at ¶ 29). They contend that an accurate sales figure could have been obtained from Ashley Reed's factor, Rosenthal and

---

[18] This objection also applies to information produced by Loehmann's, another customer of Ashley Reed. However, Loemann's records pertained to sales in 2001 and 2002, and therefore are not pertinent to the current analysis. (See Defs.' Damages Mem. at 16; Donohue Decl. at ¶ 19).

Rosenthal, LLC, which loaned the company money to make its purchase in exchange for the assignment of its receivables. (<u>Id.</u> at ¶¶ 26, 29).

None of these contentions creates a triable dispute as to the accuracy of plaintiffs' calculations of defendants' revenue from their sales of Fendi-branded goods in 2005 and 2006. Although Mr. Donohue itemized the Neiman Marcus purchase orders in an exhibit to his report, defendants have not specifically identified any of those purchase orders that reflect merchandise that was ordered but not actually shipped by Ashley Reed. (<u>See</u> Donohue Decl., Ex. 11). Likewise, in an exhibit to Mr. Donohue's report, he listed the SKU numbers and style codes for each of the items that he identified as Fendi-branded merchandise in the records provided by Saks Fifth Avenue, and defendants have not specified any items that Mr. Donohue mischaracterized as Fendi-branded goods. (<u>See</u> <u>id.</u>, Ex. 10). Moreover, aside from a generalized objection to plaintiffs' sales figure as "extremely too high", defendants have not demonstrated how the documents purportedly in the possession of Rosenthal and Rosenthal would alter the calculation, nor have they submitted any such documents to the court. As such, their speculative objections do not suffice to create a triable factual dispute about the accuracy of plaintiffs' sales calculations. <u>See</u> <u>Matsushita Elec.</u>

45

Indus. Co., 475 U.S. at 586 (noting that non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" to oppose summary-judgment motion); Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Moreover, we note that defendants must bear the burden of any uncertainty about the validity of their sales figures attributable to their failure to maintain records of their purchases and sales. See U.S.A. Famous Original Ray's Licensing Corp., 2009 WL 4351962, at *3; Chesa Intern., Ltd., 425 F. Supp. at 238.

Once plaintiffs have established the gross revenue that defendants obtained from the sales of infringing merchandise in 2005 and 2006, the burden shifts to the defendants to establish any deductions that may be taken from that gross revenue to arrive at their profits from the sales. 15 U.S.C. § 1117(a). Accord Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Delaware, Inc., 2009 WL 5173920, *7 (S.D.N.Y. Dec. 30, 2009) (citing, inter alia, Am. Honda Motor Co., Inc. v. Two Wheel Corp., 918 F.2d 1060, 1063 (2d Cir. 1990)). Moreover, for the amounts they seek to deduct, defendants must show that "'the costs were related to the production, distribution or sale of the infringing product.'" Id. (quoting

46

<u>Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.</u>, 2006 WL
2128785, *8 (S.D.N.Y. July 28, 2006)).

Defendants have identified documents and deposition testimony
that they claim represent "their costs to be deducted when
calculating their profits, including cost of goods, salaries and
overhead expenses." (Defs.' Damages Mem. at 16). First, a
declaration submitted by Scott Ressler states that during the time
period in which Ashley Reed sold Fendi-branded goods, the company's
"gross profit considering as costs just our cost of goods was
typically 25%" but that considering other costs such as "insurance,
interest, warehouse, employees and the like our profits were very
low." (Ressler Decl. at ¶ 28). Ressler states that in 2005 Ashley
Reed's "net profits were 1.16% of sales." (<u>Id.</u>). Defendants also
note that they produced to plaintiffs during discovery Ashley
Reed's tax returns for the years 2003 through 2005, as well as
underlying documents reflecting the company's profits and costs
which were used to create those returns. (Dunne Decl. at ¶¶ 2-3).
However, defendants do not contest the fact that neither they nor
their damages expert actually calculated the amount of the costs
purportedly reflected in such documents. (Defs.' Rule 56.1
Statement Reply at ¶ 136).

Defendants have not introduced any evidence of their costs that can be attributed to the distribution and sales of the infringing Fendi-branded merchandise. Although defendants have proffered a conclusory assertion by Ashley Reed's president -- unsupported by documentary evidence -- of the company's overall profit margin, they have made no effort to identify those costs that relate specifically to the infringing Fendi-branded merchandise at issue. As such, a reasonable fact-finder could not rely on these assertions to deduct any costs from Ashley Reed's gross revenue from the sales of Fendi-branded merchandise. Hamil Am. Inc. v. GFI, 193 F.3d 92, 107 (2d Cir. 1999) (noting, in the analogous copyright context, that an infringer "shoulders the burden of demonstrating a 'sufficient nexus between each expense claimed and the sales of the unlawful goods,'" and that when an infringement has been found to be willful a fact-finder should "give extra scrutiny to the categories of overhead expenses claimed by the infringer") (quoting Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 8 (2d Cir. 1989)).

In light of the fact that plaintiffs have demonstrated beyond triable dispute defendants' sales of $3,495,514.00 in Fendi-branded goods in 2005 and 2006 and that defendants have failed to establish a triable dispute as to their costs attributable to their sale and

48

distribution of the infringing merchandise, we recommend that the amount of defendants' profits to which plaintiffs are entitled be set at $3,495,514.00.

4.  <u>Plaintiffs' Entitlement to Treble Damages, Prejudgment Interest, Costs and Attorneys' Fees</u>

Plaintiffs seek an award of three times defendants' profits from their sale of infringing goods, prejudgment interest on that amount running from the date of service of their complaint, and reimbursement for their costs and attorneys' fees pursuant to 15 U.S.C. § 1117(b). Under this provision, treble damages are to be awarded as a deterrent to future violations upon a finding of willful trademark counterfeiting, absent "extenuating circumstances". <u>Century 21 Real Estate LLC v. Paramount Home Sales, Inc.</u>, 2007 WL 2403397, *5 (E.D.N.Y. Aug. 20, 2007) (citing <u>Sara Lee Corp. v. Bags of New York, Inc.</u>, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999)). <u>Accord</u> <u>GAKM Res. LLC v. Jaylyn Sales Inc.</u>, 2009 WL 2150891, *6 (S.D.N.Y. July 20, 2009). The term "extenuating circumstances" is not defined in the Act, although the exception has been described as "extremely narrow." <u>Levi Strauss & Co. v. Shilon</u>, 121 F.3d 1309, 1314 (9th Cir. 1997) (citing <u>Louis Vuitton S.A. v. Lee</u>, 875 F.2d 584, 588 (7th Cir. 1989)). <u>Accord</u> <u>Fendi S.a.s. Di Paola</u>

49

<u>Fendi E Sorelle v. Cosmetic World, Ltd.</u>, 642 F. Supp. 1143, 1147 (S.D.N.Y. 1986) (noting congressional intent that defendants who knowingly traffic in counterfeit marks rarely be allowed to avoid the imposition of trebled damages). <u>See also</u> H.R. Rep. No. 98-997, at 26 (1984) (offering as an example of an "extenuating circumstance" an unsophisticated individual, operating on a small scale, whose conduct posed no risk to public health or safety and for whom treble damages would mean that that person would lose "any ability to support his or her family.").

In this case, we have recommended that the court deem defendants' counterfeiting of plaintiffs' trademarks during 2005 and 2006 to be willful as a matter of law. Defendants have not identified any "extenuating circumstances" that would make an award of treble damages inappropriate, nor do we view the case as presenting any such unique considerations. As such, we recommend that plaintiffs be awarded $10,486,542.00 in trebeled profits for defendants' infringement in 2005 and 2006, reflecting three times defendants' profits made from the sale of Fendi-branded goods during that period.[19]

---

[19] We note that the statute also authorizes an award of up to three times defendants' actual profits pursuant under 15 U.S.C. § 1117(a), but in light of plaintiffs' entitlement to treble damages under 15 U.S.C. § 1117(b) we need not address this

Plaintiffs also seek an award of prejudgment interest, as is contemplated in 15 U.S.C. § 1117(b). Such interest can be awarded at a specified rate for the period between service of a plaintiff's complaint and the entry of final judgment in the case, or a "shorter time [that] the court considers appropriate." 17 U.S.C. § 1117(b). An award of pre-judgment interest is intended in part to further the punitive aims of section 1117(b). See <u>Aris Isotoner Inc. v. Dong Jin Trading Co.</u>, 1989 WL 236526, *10 (S.D.N.Y. Sept. 22, 1989). As plaintiffs note, it is also designed to "discourage dilatory tactics in litigation under [the] Act". (Pls.' Damages Mem. at 19 (quoting S. Rep. No. 98-526, 14 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 3627, 3632)).

In light of defendants' willful counterfeiting, we recommend that plaintiffs be awarded prejudgment interest on defendants' profits, calculated from the date on which the complaint was served, that is, January 25, 2006. (<u>See</u> Affidavit of Service dated Feb. 10, 2006). However, we recommend that the interest be awarded only on the defendants' profits from their sales of infringing merchandise in 2005 and 2006, which we have recommended be calculated as $3,495,514.00, instead of on the full trebled profit

alternative source of relief.

51

award that we have recommended. Both the Supreme Court and the Second Circuit have counseled that "prejudgment interest should not be awarded if the statutory obligation on which interest is sought is punitive in nature." Wickham Contracting Co. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO, 955 F.2d 831, 834 (2d Cir. 1992) (citing Rodgers v. United States, 332 U.S. 371, 374-76 (1947); United States v. Childs, 266 U.S. 304, 308-10 (1924)). Given the punitive nature of the trebled damages available under section 1117(b), we do not view an award of prejudgment interest on those treble damages to be appropriate. See Sara Lee Corp., 36 F. Supp. 2d at 165 (noting that 15 U.S.C. § 1117(a) affords compensatory relief while § 1117(b) imposes punitive sanctions) (citing Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 970 (2d Cir. 1985)).[20]

In terms of the interest rate, section 1117(b) states that prejudgment interest is to be calculated based on "an annual interest rate established under section 6621(a)(2) of title 26," a

---

[20] To the extent that section 1117(b) could be read to authorize an award of prejudgment interest on the full amount of treble damages, we note that the statute leaves the determination of whether to award prejudgment interest and, if so, in what amount largely to the discretion of the court, and therefore an award of prejudgment interest only on defendants' profits is consistent with an exercise of that discretion.

provision which in turn specifies as an interest rate the federal short-term rate as announced by the Secretary of the Treasury each quarter plus three percentage points. 15 U.S.C. § 1117(b); 26 U.S.C. § 6621(a)(2). Plaintiffs urge us to apply the interest rate applicable to a "large corporate underpayment," defined as the underpayment of a tax obligation by a C corporation of more than $100,000.00, which is calculated as the federal short-term rate plus five percentage points. (Pls.' Damages Mem. at 19). 26 U.S.C. § 6621(c). However, we decline to do so for several reasons. First, the plain text of section 1117(b) states that prejudgment interest should be calculated at the rate stated in section 6621(a)(2) specifically, not under section 6621 of title 26 generally. Moreover, the large corporate underpayment rate only applies to C corporations. We have been provided no evidence that this designation applies to Ashley Reed, and it plainly does not apply to the individual defendants in the case. Furthermore, given the discretionary nature of an award of prejudgment interest under the Lanham Act, we do not view the application of the large corporate underpayment rate -- a "unique creature of the Internal Revenue Code" designed to deter corporations from delaying tax payments in order to invest the sums owed elsewhere -- to be appropriate in this instance. See Sherwood Brands of Rhode Island, Inc. v. Smith Enters., Inc., 2003 WL 22061871, *2 (D.R.I. Mar. 31, 2003).

53

Similarly, we reject plaintiffs' request that we compound the interest daily, in accordance with the practice under the Internal Revenue Code. (Pls.' Damages Mem. at 19). 26 U.S.C. § 6622(a). "Both prejudgment interest and postjudgment interest have traditionally been calculated as simple interest and there is no discernible reason for treating interest on Lanham Act claims any differently." Sherwood Brands of Rhode Island, Inc., 2003 WL 22061871, at *3. Other courts in this Circuit, applying the rates specified in 26 U.S.C. § 6621 in non-tax cases, have reached the same conclusion. See, e.g., Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d at 607, 625-26; Sabatini v. Briggs, 1999 WL 566854, *1 (S.D.N.Y. Aug. 3, 1999) (addressing award of prejudgment interest on ERISA damages under 26 U.S.C. § 6621); Scalamandre v. Oxford Health Plans (N.Y.), Inc., 823 F. Supp. 1050, 1064 (E.D.N.Y. 1993) (same); McLaughlin v. Cohen, 686 F. Supp. 454, 458 (S.D.N.Y. 1988) (same).

Therefore, we recommend that plaintiffs be awarded prejudgment interest in the amount of $970,795.20. This reflects simple interest on $3,495,514.00, calculated from January 26, 2006 through August 15, 2010, at the applicable federal short-term interest rate plus three percentage points for each quarter during the period.

As for plaintiffs' request for an award of costs and attorneys' fees, we acknowledge that costs and reasonable fees are also properly awarded under 15 U.S.C. § 1117(b) in cases of willful counterfeiting absent "extenuating circumstances". 15 U.S.C. § 1117(b); see, e.g., Century 21 Real Estate LLC, 2007 WL 2403397, at *5. However, as we cannot resolve all aspects of plaintiffs' claims at issue in the case on summary judgment and plaintiffs are likely to incur additional fees and costs in the matter, we view an award of costs and attorneys' fees to be premature at this time. See Music Sales Corp. v. Morris, 73 F. Supp. 2d 364, 382 (S.D.N.Y. 1999). Therefore, we recommend denying plaintiffs' request for costs and attorneys' fees, without prejudice to a renewal of the application upon resolution of all of plaintiffs' claims.

D. Resolution of Plaintiffs' Remaining Claims

Finally, in light of defendants' demand for a jury trial in both their original and amended answers, we recommend that a jury trial be held to resolve all of plaintiffs' remaining claims against defendants. The jury should determine defendants' liability on plaintiffs' federal and state-law claims of counterfeiting, false designation of origin, trademark dilution and unfair competition for the period prior to 2005, as well as the

55

willfulness of any trademark infringement in which the jury determines that the defendants engaged. Should the jury determine that plaintiffs are entitled to the remedy of an accounting of defendants' profits for the period prior to 2005, the jury should also determine the amount of those profits. See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477-79 (1962) (holding that plaintiff's request for an accounting to determine defendant's profits as remedy for trademark infringement is a legal claim, which should be tried to a jury except in the "rare" case in which the accounts are too complicated for a jury to unravel); Daisy Group, Ltd. v. Newport News, Inc., 999 F. Supp. 548, 552 (S.D.N.Y. 1998) (holding that plaintiff is entitled to jury trial on its request for an accounting under 15 U.S.C. § 1117(a) where it seeks defendant's profits as a proxy for plaintiff's own damages); Ideal World Mktg., Inc. v. Duracell, Inc., 997 F. Supp. 334, 338-39 (E.D.N.Y. 1998) (holding that plaintiff is entitled to a jury trial on its demand for an accounting and disgorgement of defendants' profits under 15 U.S.C. § 1117(a) and that "like damages, the actual calculation of profits should be made by the jury").


## CONCLUSION


For the reasons stated, we recommend granting plaintiffs'

request for an accounting of defendants' profits from the sale of infringing goods from 2005 to 2006, and awarding plaintiffs $10,486,542.00 in treble damages for that period. We also recommend awarding plaintiffs $970,795.20 in prejudgment interest on the defendants' profits for that period of time. However, we recommend that plaintiffs' claims pre-dating 2005 and their request for an accounting of defendants' profits from that period be tried before a jury. We further recommend that an award of plaintiffs' costs and reasonable attorneys' fees be postponed until the final resolution of plaintiffs' claims.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. See also Fed. R. Civ. P. 6(a), 6(d). Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard M. Berman, Room 650, and to the chambers of the undersigned, Room 1670, U.S. Courthouse, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989);

Thomas v. Arn, 474 U.S. 140, 150-55 (1985), reh'g denied, 474 U.S.
1111 (1986).


Dated: New York, New York
       July 30, 2010


                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been mailed
today to:

Richard L. Mattiaccio, Esq.
Steven Skulnik, Esq.
Victor Genecin, Esq.
Squire, Sanders & Dempsey, L.L.P.
30 Rockefeller Plaza
New York, NY 10112

Gerard Francis Dunne, Esq.
Law Office of Gerard F. Dunne, P.C.
156 Fifth Avenue, Suite 1223
New York, NY 10010


                              58